UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEN GAMBOA, et al.,

             Plaintiffs,           Case No. 2:18-cv-10106

v.                          HONORABLE DENISE PAGE HOOD

FORD MOTOR COMPANY, et al.,   MAGISTRATE ELIZABETH A. STAFFORD

         Defendants.     **ORAL ARGUMENT REQUESTED**

_____/

## DEFENDANT FORD MOTOR COMPANY'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

Defendant Ford Motor Company, by its attorneys, moves the Court pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Class Action Complaint ("CAC") filed by Plaintiffs Len Gamboa, Jeff Retmier, Nikiah Nudell, David Bates, Pete Petersen, and William Sparks. The undersigned counsel certifies that he communicated with opposing counsel, explained the basis for this motion, and sought concurrence in the relief requested. Plaintiffs' counsel expressly declined concurrence.

The CAC should be dismissed with prejudice. Plaintiffs' numerous state law claims are expressly and implicitly preempted by the Clean Air Act. *See* 42 U.S.C. § 7543(a). Even if not preempted, they are not pleaded with the specificity demanded by Federal Rule of Civil Procedure 9(b). Nor do Plaintiffs have standing

1

to pursue an overwhelming number of the state law claims found in the CAC. Plaintiffs also lack standing to sustain a cause of action under the Racketeer Influenced and Corrupt Organizations Act and otherwise fail to state a plausible claim under that Act.  In further support of this motion, Ford relies upon the accompanying brief.

Respectfully submitted,                  Respectfully submitted,

By:   /s/ Joel A. Dewey                  By:   /s/ Stephanie A. Douglas
     Joel A. Dewey                            Patrick G. Seyferth (P47575)
     Jeffrey M. Yeatman                       Stephanie A. Douglas (P70272)
     DLA PIPER LLP (US)                       BUSH SEYFERTH & PAIGE
     The Marbury Building                     PLLC
     6225 Smith Avenue                        3001 W. Big Beaver Rd., Ste. 600
     Baltimore, Maryland 21209                Troy, MI 48084
     (410) 580-4135                           (248) 822-7800
     joel.dewey@dlapiper.com                  seyferth@bsplaw.com
     jeffrey.yeatman@dlapiper.com             douglas@bsplaw.com
     *Attorneys for Defendant Ford*           *Attorneys for Defendant Ford*
     *Motor Company*                          *Motor Company*

Dated:  April 9, 2018

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEN GAMBOA, et al.,

              Plaintiffs,           Case No. 2:18-cv-10106

v.                            HONORABLE DENISE PAGE HOOD

FORD MOTOR COMPANY, et al.,  MAGISTRATE ELIZABETH A. STAFFORD

              Defendants.

_____/

**BRIEF IN SUPPORT OF DEFENDANT FORD MOTOR COMPANY'S
MOTION TO DISMISS THE CLASS ACTION COMPLAINT
PURSUANT TO FEDERAL RULE OF CIVIL
<u>PROCEDURE 12(B)(6)</u>**

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES PRESENTED.................................................................x

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................ xii

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ...............................................................................4

    I.    The Comprehensive Federal Regulatory Scheme ................................4

    II.    The CAC.................................................................................................9

          A.    Plaintiffs' Alleged Injuries......................................................11

LEGAL STANDARD ........................................................................................12

ARGUMENT .....................................................................................................12

    I.    Plaintiffs' State Law Claims Are Preempted By The Clean Air Act. .....................................................................................................13

          A.    Section 209 of the CAA Expressly Preempts Plaintiffs' Claims. .................................................................................13

          B.    Implied or Conflict Preemption Also Bar Plaintiffs' Claims. .................................................................................25

    II.    Plaintiffs' State Law Claims Do Not Satisfy Rule 9(b) And Do Not Plead An Actionable Misrepresentation or Omission.................27

          A.    Plaintiffs Do Not Comply With Rule 9(b).............................27

          B.    Plaintiffs Otherwise Fail To State An Actionable Misrepresentation or Omission. ................................................33

    III.    The Court Should Dismiss Plaintiffs' RICO Claim...........................37

          A.    Plaintiffs Lack RICO Standing. ..............................................38

          B.    Plaintiffs Do Not Plead the Prima Facie Elements of a RICO Violation. ......................................................................42

          C.    Plaintiffs Fail to Allege That Their Injuries Were Proximately Caused By Ford's Alleged Conduct...................46

    IV.    The Court Should Dismiss Claims For Alleged Violations Of The Laws Of States Where No Named Plaintiff Lives Or Was Allegedly Injured................................................................................48

CONCLUSION ..................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aetna Health Inc. v. Davila*,
   542 U.S. 200 (2004)............................................................................15

*Am. Auto. Mfrs. Ass'n v. Cahill*,
   152 F.3d 196 (2d Cir. 1998) .............................................................18

*Am. Biocare Inc., et al. v. Howard & Howard Attorneys PLLC, et al.*,
   720 F. App'x 416 (6th Cir. 2017) ......................................................46

*Baker v. Great N. Energy, Inc.*,
   64 F. Supp. 3d 965 (N.D. Tex. 2014) ...............................................30

*Barnett Bank, N.A. v. Nelson*,
   517 U.S. 25 (1996).............................................................................27

*Beck v. FCA US LLC*,
   273 F. Supp. 3d 735 (E.D. Mich. 2017) ...........................................29

*Bender v. Southland Corp.*,
   749 F.2d 1205 (6th Cir. 1984) ..........................................................44

*Beshear v. Volkswagen Grp. of Am., Inc.*,
   No. 16-CV-27-GFVT, 2016 WL 3040492 (E.D. Ky. May 25,
   2016) ...................................................................................................16

*Bledsoe v. FCA US LLC*,
   No. 4:16-cv-14024, slip op. (E.D. Mich. March 29, 2018) .................1

*Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*,
   13-13804, 2015 WL 3541905 (E.D. Mich. Apr. 30, 2015)................28

*Boyle v. U.S.*,
   556 U.S. 938 (2009)...........................................................................43

*Bridgeport Music, Inc. v. Diamond Time, Ltd.*,
   371 F.3d 883 (6th Cir. 2004) ............................................................30

*Briggs v. Countrywide Funding Corp.*,
   949 F. Supp. 812 (M.D. Ala. 1996) .................................................................14

*Buckman Co. v. Plaintiffs' Leg. Comm.*,
   531 U.S. 341 (2001)................................................................................24, 35, 36

*C&L Ward Bros., Co. v. Outsource Sols., Inc.*,
   2012 WL 3157005 (E.D. Mich. Aug. 3, 2012)............................................43, 46

*Canale v. Colgate-Palmolive Co.*,
   258 F. Supp. 3d 312 (S.D.N.Y. 2017) ..............................................................17

*Cipollone v. Liggett Grp., Inc.*,
   505 U.S. 504 (1992)...........................................................................................16

*Coffey v. Foamex L.P.*,
   2 F.3d 157 (6th Cir. 1993) ...........................................................................28, 29

*Contreras v. Toyota Motor Sales USA, Inc.*,
   2010 WL 2528844 (N.D. Cal. June 18, 2010)...................................................41

*Counts v. General Motors, LLC*,
   237 F. Supp. 3d 572 (E.D. Mich. 2017) .....................................................passim

*Durant v. Servicemaster Co.*,
   159 F. Supp. 2d 977 (E.D. Mich. 2001) ............................................................37

*Ehrlich v. BMW of N. Am., LLC*,
   801 F. Supp. 2d 908 (C.D. Cal. 2010) ...............................................................33

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
   541 U.S. 246 (2004)...........................................................................................18

*Geier v. Am. Honda Motor Co.*,
   529 U.S. 861 (2000)...........................................................................................27

*Goldsby v. Ford Motor Co.*,
   183 F. Supp. 2d 943 (E.D. Mich. 2001) (Hood, J.) ...........................................48

*Hall v. Sea World Entm't, Inc.*,
   2015 WL 9659911 (S.D. Cal. Dec. 23, 2015) ...................................................33

*Heinrich v. Waiting Angels Adoption Services, Inc.*,
    668 F.3d 393 (6th Cir. 2012) .............................................................................46

*Hemi Grp., LLC v. City of N.Y.*,
    559 U.S. 1 (2010)...................................................................................46, 47

*Hennigan v. Gen. Elec. Co.*,
    2010 WL 3905770 (E.D. Mich. Sept. 29, 2010) ................................................29

*Holmes v. Sec. Inv'r Protec. Corp.*,
    503 U.S. 258, 267 (1992)..........................................................................46, 47

*In re Apple iPhone 3G Prods. Liab. Litig.*,
    728 F. Supp. 2d 1065 (N.D. Cal. 2010) ..............................................................15

*In re Carrier IQ, Inc., Consumer Privacy Litigation*,
    78 F. Supp. 3d 1051 (N.D. Cal. 2015) ................................................................49

*In re Caterpillar, Inc., C13 and C15 Engine Products Liab. Litig.*,
    1:14-CV-3722 JBS-JS, 2015 WL 4591236 (D.N.J. July 29, 2015) ...................16

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, &
    Products Liab. Litig.*,
    17-MD-02777-EMC, 2018 WL 1335901 (N.D. Cal. Mar. 15, 2018) ...............49

*In re Duramax Diesel Litig.*,
    17-CV-11661, 2018 WL 949856 (E.D. Mich. Feb. 20, 2018) ...................passim

*In re Ford Motor Co. Speed Deactivation Switch Prod. Liab. Litig.*,
    2007 WL 2421480 (E.D. Mich. Aug. 24, 2007).................................................29

*In re Gen. Motors LLC Ignition Switch Litig.*,
    2016 WL 3920353 (S.D.N.Y. July 15, 2016)..............................................38, 39

*In Re Packaged Ice Antitrust Litig*,
    779 F. Supp. 2d 642 (E.D. Mich. 2011) ............................................................49

*In re Syngenta Ag Mir 162 Corn Litig.*,
    2016 WL 4382772 (D. Kan. Aug. 17, 2016)......................................................17

*In re Toyota Motor Corp.*,
    790 F. Supp. 2d 1152 (C.D. Cal. 2011) ............................................................41

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab. Litig.*,
826 F. Supp. 2d 1180 (C.D. Cal. 2011) ............................................................43

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*,
264 F. Supp. 3d 1040 (N.D. Cal. 2017) .....................................................21, 24

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*,
MDL 2672 CRB, 2017 WL 2258757 (N.D. Cal. May 23, 2017) ..................21

*Ind. State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) ............................................................................28

*Ingersoll-Rand Co. v. McClendon*,
498 U.S. 133 (1990) ..........................................................................................15

*Jackson v. Gen. Motors Corp.*,
770 F. Supp. 2d 570 (S.D.N.Y. 2011) .........................................................14, 16

*Kidwell v. Wagoner*,
209CV108FTM36DNF, 2010 WL 11507301 (M.D. Fla. Sept. 10, 2010) ................................................................................................................45

*Kramer v. Bachan Aerospace Corp.*,
912 F.2d 151 (6th Cir. 1990) ............................................................................38

*Lanier v. Syncreon Holdings, Ltd.*,
No. 11-14780, 2012 WL 3475680 (E.D. Mich. Aug. 14, 2012) ......................29

*Lewis v. Casey*,
518 U.S. 343 (1996) ..........................................................................................48

*Maio v. Aetna*,
221 F.3d 472 (3d Cir. 2000) ..............................................................................41

*Malloy v. Watchtower Bible and Tract Socy.*,
CV 17-10635, 2017 WL 6539056 (E.D. Mich. Dec. 21, 2017) (Hood, J.) ........................................................................................................13

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) ..............................................................................40

*Medtronic v. Lohr*,
    518 U.S. 470 (1996)..........................................................................................16

*Merrick v. Diageo Americas Supply, Inc.*,
    805 F.3d 685 (6th Cir. 2015) ...........................................................................16

*Metro. Taxicab Bd. of Trade v. City of N.Y.*,
    615 F.3d 152 (2d. Cir. 2010) ...........................................................................13

*Metro. Taxicab Bd. of Trade v. City of N.Y.*,
    633 F. Supp. 2d 83 (S.D.N.Y. 2009) ...............................................................14

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
    453 U.S. 1 (1981)................................................................................................5

*Minger v. Green*,
    239 F.3d 793 (6th Cir. 2001) ...........................................................................28

*Moon v. Harrison Piping Supply*,
    465 F.3d 719 (6th Cir. 2006) ....................................................................37, 42

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)....................................................................................13, 14

*Motor & Equip. Mfrs. Ass'n v. EPA*,
    627 F.2d 1095 (D.C. Cir. 1979).......................................................................14

*Nelson v. Publishers Circulation Fulfillment, Inc.*,
    2012 WL 760335 (S.D.N.Y. Mar. 7, 2012).....................................................45

*Perry v. Am. Tobacco Co.*,
    324 F.3d 845 (6th Cir. 2003) ...........................................................................38

*Phillips v. DePaul U.*,
    19 N.E.3d 1019 (Ill. App. 1st Dist. 2014) .......................................................29

*Puerto Rico v. Franklin-California Tax-Free Trust*,
    136 S. Ct. 1938 (2016).....................................................................................17

*San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v.*
   *Garmon*,
   359 U.S. 236 (1959)........................................................................26

*Sanders v. Apple Inc.*,
   672 F. Supp. 2d 978 (N.D. Cal. 2009)..............................................35

*Scott v. Trott L., P.C.*,
   16-13734, 2017 WL 2691364 (E.D. Mich. June 22, 2017),
   *reconsideration denied*, 16-13734, 2017 WL 6450888 (E.D. Mich.
   Dec. 18, 2017) (Hood, J.)..............................................................28

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985)..........................................................37, 38, 42

*Shaw v. Nissan N. Am., Inc.*,
   220 F. Supp. 3d 1046 (C.D. Cal. 2016).............................................43

*Silkwood v. Kerr-McGee Corp.*,
   464 U.S. 238 (1984)........................................................................25

*Spector v. Mondelez Intl., Inc.*,
   178 F. Supp. 3d 657 (N.D. Ill. 2016).................................................29

*State v. Volkswagen AG*,
   2017 WL 6551054 (Ala. Cir. Ct. Dec. 19, 2017) .............................21

*Travelers Indem. Co. v. Bailey*,
   557 U.S. 137 (2009)........................................................................14

*Tri-State Express, Inc. v. Cummins Engine Co.*,
   2000 U.S. Dist. LEXIS 20837 (D.D.C. Sept. 11, 2000)....................41

*United States v. Van Dyke*,
   605 F.2d 220 (6th Cir. 1979), *cert. denied*, 444 U.S. 994 (1979) .....44

*Wall v. Michigan Rental*,
   852 F.3d 492 (6th Cir. 2017) ..........................................................39

*Werwinski v. Ford Motor Co.*,
   286 F.3d 661 (3d Cir. 2002) ......................................................36, 37

*Williams v. Scottrade, Inc.*,
    06-10677, 2006 WL 2077588 (E.D. Mich. July 24, 2006) ...............................29

*Wilson v. Hewlett–Packard Co.*,
    668 F.3d 1136 (9th Cir. 2012) ................................................................29

*Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*,
    475 U.S. 282 (1986).................................................................................26

**STATUTES**

18 U.S.C. § 1961(4) ....................................................................................42

18 U.S.C. § 1962(c) ...............................................................................37, 42

18 U.S.C. § 1964(c) ...............................................................................38, 46

42 U.S.C. § 7521(a)(l) ..................................................................................5

42 U.S.C. § 7522(a)(1) ..................................................................................5

42 U.S.C. § 7523(a) ......................................................................................5

42 U.S.C. § 7523(b) ......................................................................................5

42 U.S.C. § 7524(a) ......................................................................................8

42 U.S.C. § 7541(c)(1) ..................................................................................5

42 U.S.C. § 7543(a) .......................................................................2, 5, 13, 15

42 U.S.C. § 7543(b) ......................................................................................5

CAA § 209(a).....................................................................................passim

EPA, *CAA Mobile Source Civil Penalty Policy, Title II of the CAA,
    Vehicle and Engine Emissions Certification Requirements* (Jan.
    2009), *available at*
    https://www.epa.gov/sites/production/files/documents/vehicleengin
    e-penalty-policy_0.pdf ...........................................................................5, 8, 27

**OTHER AUTHORITIES**

40 C.F.R. Part 86 App. I .................................................................................6

40 C.F.R. § 2.207 .................................................................8

40 C.F.R. § 86 et. seq. .........................................................42

40 C.F.R. §§ 86.101-86.165-12 ...........................................6

40 C.F.R. §§ 86.101-165.12 .................................................6

40 C.F.R. § 86.1803-01
....................................................................................6, 7, 21, 22

40 C.F.R. § 86.1805-12 ........................................................6

40 C.F.R. § 86.1809-12(a) ....................................................8

40 C.F.R. § 86.1844-01(d)(11) .............................................7

41 Fed. Reg. 36,902 (Sept. 1, 1976) .....................................8

75 Fed. Reg. 74,152, 74,267 (Nov. 30, 2010) ........................6

*Diesel Vehicles*, https://www.fueleconomy.gov/feg/di_diesels.shtml
   (last visited April 5, 2018) ..............................................41

EPA, *Gasoline and Diesel Advanced Technology subject vehicles*,
   https://www.epa.gov/greenvehicles/gasoline-and-diesel-advanced-
   technology-vehicles (last updated Feb. 13, 2017) ..............42

Fed. R. Civ. P. 9(b) ......................................................passim

Fed. R. Civ. P. 12(b)(1)......................................................38

Fed. R. Civ. P. 12(b)(6).................................................4, 12

H.R. Rep. No. 90-728 (Oct. 3, 1967)...................................27

## STATEMENT OF ISSUES PRESENTED

1.      Whether the Clean Air Act (42 U.S.C. § 7543(a)) expressly preempts the Class Action Complaint wherein private Plaintiffs attempt to enforce a standard relating to the control of emissions from new motor vehicles by hinging all of their claims on a showing that certain trucks manufactured by Ford violate federal emissions requirements through the use of "defeat devices" (a phrase defined exclusively by federal law)?

2.      Whether Plaintiffs' claims are impliedly preempted because they seek to impose state law remedies for violations of their own subjective motor vehicle emissions standards in an area where a federal agency (the Environmental Protection Agency) has exclusive power to administer and enforce a detailed and complex regulatory scheme?

3.      Whether Plaintiffs' claims, all of which are supposedly premised on alleged fraudulent misrepresentations or omissions related to the "environmentally friendly" nature of the subject vehicles, lack the specificity required by Federal Rule of Civil Procedure 9(b) where the subject vehicles were not marketed using a pervasive advertising scheme touting environmental benefits, and where none of the individual Plaintiffs specifically identify a representation attributable to Ford that purportedly misrepresented or omitted material information regarding such environmental benefits and induced them to purchase their vehicles?

4.     Whether Plaintiffs' federal Racketeer Influenced and Corrupt Organizations Act ("RICO") claims should be dismissed where they lack standing due to the speculative and conclusory nature of their alleged injuries, fail to plead the existence of an "enterprise," fail to plead plausible and specific acts by Ford constituting predicate acts of mail or wire fraud, and where they plead no facts to suggest their alleged injuries were caused by a RICO violation attributable to Ford?

5.     If this case is not dismissed in its entirety, whether the claims of the six individual named Plaintiffs should be limited to the causes of action asserted under the laws of their home states (Arizona, California, Illinois, Pennsylvania, and Texas) because they lack standing to pursue claims under the laws of the 43 additional states identified in the Class Action Complaint?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

**Argument I(A)**     **Plaintiffs' Claims Are Expressly Preempted By The Clean Air Act.**

Clean Air Act, 42 U.S.C. § 7543(a)

*Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979) (holding Section 209's broad preemptive sweep serves Congress's purpose of avoiding an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers).

*Puerto Rico v. Franklin-California Tax-Free Trust*, 136 S. Ct. 1938 (2016) (rejecting presumption against preemption in express preemption cases).

*In re Duramax Diesel Litig.*, 17-CV-11661, 2018 WL 949856 (E.D. Mich. Feb. 20, 2018) (finding if a plaintiff's state law claims represent veiled attempts to establish a standard relating to the control of emissions, they are expressly preempted).

*Counts v. General Motors, LLC*, 237 F. Supp. 3d 572 (E.D. Mich. 2017) (finding to the extent the plaintiffs suing a defendant for manufacturing a vehicle that emits more than a certain amount of NOx or particulate emissions in violation of EPA regulations or that is not equipped with properly functioning and federally required emission-control technology, their claims are pre-empted by the CAA).

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, 264 F. Supp. 3d 1040 (N.D. Cal. 2017) (explaining Section 209(a) keeps States from interfering with EPA investigations and enforcement actions based on fraud or deceit against the EPA).

**Argument I(A)**     **Implied or Conflict Preemption Also Bar Plaintiffs' Claims.**

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) (holding conflict preemption exists to the extent that state law actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress).

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) (holding claims amounting to fraud-on-the-FDA are impliedly preempted by the Food, Drug, and

Cosmetic Act because such claims conflict with the federal statutory scheme that empowers the FDA to punish and deter fraud against the Agency).

**Argument II(A)          Plaintiffs Do Not Comply With Rule 9(b).**

*Coffey v. Foamex L.P.,* 2 F.3d 157 (6th Cir. 1993) (holding a party must allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the other party; and the injury resulting from the fraud).

*Beck v. FCA US LLC*, 273 F. Supp. 3d 735 (E.D. Mich. 2017) (holding to state a fraud-by-omission claim under the CLRA or UCL, a plaintiff must plead an omission that was contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose').

*Spector v. Mondelez Intl., Inc.*, 178 F. Supp. 3d 657 (N.D. Ill. 2016) (same)

*Baker v. Great N. Energy, Inc.*, 64 F. Supp. 3d 965 (N.D. Tex. 2014) (same)

*Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883 (6th Cir. 2004) (same).

**Argument II(B)(1)          Plaintiffs' Affirmative Misrepresentation Claims Are Non-Actionable Puffery.**

*Counts v. General Motors, LLC*, 237 F. Supp. 3d 572 (E.D. Mich. 2017) (holding statements regarding cleanliness, "low emissions," "great power," and the like are precisely the kinds of inherently subjective, nonquantifiable opinions that this Court has recognized cannot form the basis of a fraud action).

**Argument II(B)(2)          Plaintiffs Fail To Plead That Ford's Alleged Misstatements and Omissions Were Material.**

*In re Duramax Diesel Litig.*, 17-CV-11661, 2018 WL 949856 (E.D. Mich. Feb. 20, 2018) (discussing materiality of statements regarding emissions in advertising).

**Argument III(A)          Plaintiffs Lack RICO Standing.**

*Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151 (6th Cir. 1990) (holding a RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation).

**Argument III(A)(1)**    **Plaintiffs' Speculative Injuries Are Insufficient To Plead A RICO Injury.**

*In re Duramax Diesel Litig.*, 17-CV-11661, 2018 WL 949856 (E.D. Mich. Feb. 20, 2018) (finding plaintiffs' alleged damages for, *inter alia*, out-of-pocket losses, diminished future performance and value, and overpayment are too speculative and not cognizable under RICO).

**Argument III(A)(2)**    **Plaintiffs' Alleged "Benefit-of-the-Bargain" Theory Of Injury Is Not Cognizable Under RICO.**

*In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353 (S.D.N.Y. July 15, 2016) (holding benefit of the bargain damages are plainly unavailable where a RICO claim sounds in fraud because a party's expectation that the product they are purchasing is worth the price they are paying is not an injury to business or property).

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) (holding the unavailability of intangible, expectancy-type benefit of the bargain damages follows from the text of RICO, which compensates only for injury to business or property).

**Argument III(B)(1)**    **Plaintiffs Fail To Allege A RICO "Enterprise."**

*Boyle v. U.S.*, 556 U.S. 938 (2009) (holding an "enterprise" consists of an ongoing organization, evidence that the various associates function as a continuing unit, and a common purpose).

*Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046 (C.D. Cal. 2016) (holding purchasers failed to sufficiently allege that manufacturer and its supplier were members of an enterprise where entities associated in a manner directly related to their primary business activities, rather than a separate criminal enterprise).

**Argument III(B)(1)**    **Plaintiffs Fail To Plead Predicate Acts Of Mail Or Wire Fraud.**

*Bender v. Southland Corp.*, 749 F.2d 1205 (6th Cir. 1984) (holding the crime of mail fraud has two elements: a scheme or artifice to defraud and a mailing for the purpose of executing the scheme).

*Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393 (6th Cir. 2012) (holding a RICO action premised upon mail or wire fraud must allege specific details about the statements allegedly constituting such fraud, including how the statements were fraudulent).

**Argument III(C)**      **Plaintiffs Fail to Allege That Their Injuries Were Proximately Caused By Ford's Alleged Conduct.**

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992) (holding a plaintiff alleging a RICO injury must show that a predicate offense was not only a "but for" cause, but also a proximate cause, of an alleged injury).

*Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1 (2010) (holding in determining whether a plaintiff has established proximate cause in the RICO context, the focus is on the directness of the relationship between the conduct and the harm, not on foreseeability).

**Argument IV**      **Plaintiffs Lack Standing To Bring Claims For Alleged Violations Of The Laws Of States Where No Named Plaintiff Lives Or Was Allegedly Injured.**

*Goldsby v. Ford Motor Co.*, 183 F. Supp. 2d 943 (E.D. Mich. 2001) (Hood, J.) (requiring named plaintiffs who represent a class to allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent).

*In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642 (E.D. Mich. 2011) (holding named plaintiffs lack standing to assert claims under the laws of the states in which they suffered no injury).

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Products Liab. Litig.*, 17-MD-02777-EMC, 2018 WL 1335901 (N.D. Cal. Mar. 15, 2018) (deferring the standing inquiry until class certification because the complaint included claims from named plaintiffs in 43 states, and only seven states and the District of Columbia lacked named plaintiffs).

*In re Carrier IQ, Inc., Consumer Privacy Litigation,* 78 F. Supp. 3d 1051 (N.D. Cal. 2015) (declining to defer standing inquiry and expressing reservations about subjecting the defendants to the expense and burden of nationwide discovery absent named plaintiffs who clearly have standing and are willing and able to maintain state law claims asserted).

## INTRODUCTION

Riding on the coattails of emissions litigation involving Volkswagen, Plaintiffs bring this action hoping the Court will simply adopt its recent holdings in emissions-related cases against General Motors in *Counts v. General Motors, LLC*, 237 F. Supp. 3d 572 (E.D. Mich. 2017) and *In re Duramax Diesel Litig.*, 17-CV-11661, 2018 WL 949856 (E.D. Mich. Feb. 20, 2018) ("*Duramax*"). However, Ford ***is not*** Volkswagen and Ford ***is not*** GM. This case is not a simple repeat of *Counts* or *Duramax*, and Ford urges the Court to recognize case determinative legal and factual pleading deficiencies that are specific to this action.[1] Moreover, and while not necessarily germane to the instant Motion (where Ford recognizes that Plaintiffs' well-pleaded allegations must be accepted as true), it must be understood from the outset: ***the subject vehicles are not equipped with defeat devices or undisclosed Auxiliary Emission Control Devices ("AECDs").*** Thus, the core of Plaintiffs' lawsuit is an utter fallacy, and their attempt to hold Ford hostage through protracted, expensive, and burdensome litigation should be rejected. Ford respectfully requests its Motion be granted and that this case be dismissed at the earliest possible stage.

---

[1] This case is more like *Bledsoe v. FCA US LLC*, No. 4:16-cv-14024, slip op. (E.D. Mich. March 29, 2018), ECF No. 60, wherein this court dismissed claims against an automobile manufacturer for plaintiffs' failure to plausibly plead, *inter alia*, the existence of a "defeat device" in certain diesel vehicles. Ford incorporates by reference Robert Bosch LLC's ("Bosch LLC") discussion of *Bledsoe* found in §§ I(A) and II(D)(2) of its Motion to Dismiss.

1

When evaluating the viability of the Class Action Complaint ("CAC"), Plaintiffs must not be permitted to downplay (or mischaracterize) their own express allegations in order to stave off preemption and other grounds for dismissal. When opposing this motion, Plaintiffs will likely seek to transform alleged violations of highly technical and complex federal environmental regulations—for which there is no private right of action for damages—into a consumer fraud class action based supposedly on false advertisements related to emissions and other performance aspects of the subject vehicles, together with a legally groundless RICO claim.

But far from offering a well-pleaded CAC focused on the supposed false advertising underlying their claims, Plaintiffs premise their pleading firmly upon alleged violations of federal law related to vehicle emissions. Such claims are expressly preempted by the Clean Air Act ("CAA"). 42 U.S.C. § 7543(a). Their pleading is also rife with allegations of emissions violations by *other* manufacturers (in an effort to unfairly prejudice this Court against Ford), and a lengthy description of testing by unidentified lawyer-retained experts in an attempt to show that Ford's 2011-2017 F-250 and F-350 Super Duty diesel vehicles (the "subject vehicles") can have higher emissions in certain "on-road" driving than they exhibit under the Environmental Protection Agency's specific, mandatory, laboratory testing procedures. Plaintiffs also hinge their claims on the faulty premise that the subject vehicles contain an "illegal" "defeat device"—a phrase defined exclusively by

federal law. Allowing Plaintiffs to proceed on their claims—which are inextricably intertwined with the alleged regulatory violations—would undermine the EPA's authority under the CAA by handing an unelected, un-appointed, and unaccountable group of Plaintiffs a central role in establishing and administering diesel emissions standards. The Court must not allow such interference.

Independent of the preemption issues inherent in Plaintiffs' allegations, the express content of the CAC itself does not support a viable consumer fraud theory. Despite attaching over 700 pages of exhibits to a 770 paragraph, 265 page complaint, *none* of the individual Plaintiffs identify *any* specific actionable statement made to them by Ford in advertising or elsewhere. This omission is fatal to their claims. While many of the legal theories presented in the *Duramax* and *Counts* cases also appear here, the fact remains that Ford is not GM, and Ford's advertising campaign is fundamentally different from GM's advertising campaign.

As the product brochures attached to the CAC show, there was no pervasive advertising campaign surrounding the representation "Cleanest Super Duty diesel ever," which spanned the years during which the subject vehicles were made. For this reason, it is essential to know exactly *what* specific Ford representations Plaintiffs were allegedly exposed to, *when* that exposure occurred, whether Plaintiffs relied on the alleged representations, and the reason why those representations are supposedly false. As even Plaintiffs concede, the subject vehicles are "working

trucks," (CAC, ¶ 63), and not vehicles targeted to a "green" market.  Even then, the limited emissions-based statements made by Ford (unlike GM's) in the product brochures are inextricably intertwined with federal regulations. And, in any event, no Plaintiff specifically claims to have seen or heard any specific misrepresentation from Ford before buying their vehicles. Plaintiffs' claims simply cannot go forward on this basis.

Regardless of how the caption is styled, this case is not a certified class action, and it should not be treated as one for purposes of this motion. The Court must focus, instead, on the specifics of the claims brought by the six individual Plaintiffs. None of these Plaintiffs have stated a non-preempted or otherwise viable claim against Ford, whether based on RICO, consumer fraud, breach of contract or otherwise. For the reasons stated below, and for those stated in the Motion to Dismiss filed by Bosch LLC, which Ford joins, this case should not be permitted to proceed to discovery and the entire CAC should be dismissed with prejudice pursuant to Rule 12(b)(6).

## **FACTUAL BACKGROUND**

## **I.    The Comprehensive Federal Regulatory Scheme**

Title II of the CAA establishes a comprehensive federal regulatory scheme governing all motor vehicle emissions, and vests the EPA with the exclusive authority to set emissions standards for new motor vehicles, 42 U.S.C. § 7521(a)(l), issue Certificates of Compliance ("COCs") to indicate compliance with these

emissions standards, *id.* § 7522(a)(1), determine non-conformity with emissions standards and require manufacturers to remedy such non-conformity, *id.* § 7541(c)(1), and bring enforcement actions against manufacturers for violations of emissions regulations, *id.* § 7523(a)-(b).

Subject to a narrow exception not material here, the CAA's expansive preemption provision, Section 209(a), vests exclusive enforcement authority over new-vehicle emissions controls in the EPA: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles…." 42 U.S.C. § 7543(a).[2] The CAA does not allow a private right of action for compensatory damages. *See, e.g., Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 17 n.27 (1981) ("[P]rivate enforcement suits were intended to be limited to the injunctive relief expressly provided for.").

EPA regulations detail—in highly technical terms and over hundreds of pages in the Code of Federal Regulations—the required tests that must be performed, as well as the disclosures that must be made in order to obtain COCs. *See, e.g.*, 40

---

[2] In recognition of California's unique environmental problems and efforts in regulating motor vehicle emissions before Congress enacted Title II, the CAA allows California to adopt and enforce its own emissions standards as long as those standards are approved by the EPA. 42 U.S.C. § 7543(b).

C.F.R. §§ 86.101-86.165-12.[3]   Every vehicle sold in the United States must be covered by a COC issued by the EPA (and, for those sold in California, an Executive Order ("EO") from the California Air Resources Board). (CAC, ¶ 56.)   EPA regulations contemplate, however, that "on-road" or "real world" emissions control performance may differ from the controlled laboratory setting.   *See* 75 Fed. Reg. 74,152, 74,267 (Nov. 30, 2010); *see also* 40 C.F.R. § 86.1803-01.[4]   AECDs that reduce the effectiveness of the emissions control system are permitted under certain circumstances, such as when those parameters pose a risk of damage to the vehicle emissions system, or pose a safety risk to operators of vehicles. *See* 40 CFR 86.1803-01. EPA regulations thus require manufacturers to include in the certification application a list of "all [AECDs] installed in the vehicle" and the parameters they sense and control (CAC, ¶ 197), as well as "a detailed justification" for any AECD "that results in a reduction in effectiveness of the emission control system" and "a rationale for why it is not a defeat device." 40 C.F.R. § 86.1844-01(d)(11).

---

[3] The regulations require the Federal Test Procedure ("FTP") and the Supplemental Federal Test Procedure ("SFTP"), which test exhaust emissions on a treadmill-like device in a laboratory under specified conditions. *See, e.g.*, 40 C.F.R. §§ 86.101-165.12 & *id.* Part 86 App. I. Under the FTP and SFTP testing protocols, manufacturers must ensure their vehicles comply with EPA standards set for each of these regulated emissions at various mileage intervals, over the useful life of the vehicles. *Id.* § 86.1805-12.

[4] Contrary to Plaintiffs' repeated claims of "on the road" emissions in excess of "standards," (CAC, ¶¶ 128-29), EPA and CARB have not promulgated *any* broadly-applicable "real-world" driving (*i.e.*, on the road) emissions testing criteria or emissions standards.

6

The regulatory definition of AECD is broad: it encompasses "any element of design which senses temperature, vehicle speed, engine [revolutions per minute], transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of *any* part of the emission control system." *Id.* § 86.1803-01 (emphasis added).

It should be noted that manufacturers are required to provide their AECD descriptions to EPA and CARB, but not to the general public. AECD descriptions necessarily entail the disclosure of detailed technical information with respect to the manufacturer's vehicle control strategies, software, and calibrations.  Information of this nature is proprietary to each manufacturer and could result in competitive harm if disclosed publicly. Therefore, EPA and CARB permit AECD descriptions (among other things) to be submitted in a portion of the certification application designated as confidential. This arrangement enables EPA to evaluate the appropriateness of each manufacturer's AECDs without compromising the proprietary strategies and information developed by each manufacturer at considerable expense. EPA has determined—after a careful balancing designed to "protect the interest of the businesses which furnish information to EPA, the interests of the public who request that EPA disclose such information, and the interests of EPA in carrying out its statutory mission"—that "the public interest would not be served by disclosure." 41

Fed. Reg. 36,902 (Sept. 1, 1976); *see* 40 C.F.R. § 2.207 (providing for EPA class confidentiality determinations).

A "defeat device," a regulatory term of art, is an AECD that "reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use" unless one of four conditions is met, including "the need for the AECD is justified in terms of protecting the vehicle against damage or accident[.]" *Id.* Although AECDs are permissible (and in many cases, necessary, such as for protection of an engine from overheating), "[n]o new [vehicle] shall be equipped with a defeat device." *Id.* § 86.1809-12(a). The CAA empowers the EPA—and the EPA alone—with the exclusive authority to determine whether a "defeat device" is present, and to bring administrative or civil enforcement actions for circumventing the nationwide emissions requirements, 42 U.S.C. § 7524(a). The EPA in turn has published a "Civil Penalty Policy" for enforcing vehicle emissions standards.[5] The CAC's reliance on EPA actions with respect to other manufacturers does not support plausible claims against Ford, but does underscore the EPA's and the federal government's authority and diligence in policing emissions standards.

---

[5] *See generally* EPA, *CAA Mobile Source Civil Penalty Policy, Title II of the CAA, Vehicle and Engine Emissions Certification Requirements* (Jan. 2009), *available at* https://www.epa.gov/sites/production/files/documents/vehicleengine-penalty-policy_0.pdf.

## II.    The CAC

Six individual Plaintiffs attempt to assert causes of action under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and various consumer protection statutes in 47 states. (CAC, ¶¶ 112-317.) They also assert claims for Fraudulent Concealment and Breach of Contract. (CAC, ¶¶ 318-365.)

Plaintiffs' claims all sound in fraud, either as alleged affirmative misrepresentations or fraudulent concealment or omissions. The bulk of Ford's purported "misrepresentations" and "omissions" are not statements made to consumers, but rather statements made to the EPA and CARB in connection with regulatory submissions. Plaintiffs allege that Ford:[6]

- "fraudulently obtained" COC applications (CAC, ¶ 199);

- "misrepresent[ed] and omitt[ed] . . . vehicle specifications on COC and EO applications" (*id.* ¶ 295);

- "conceal[ed] the existence of the emission controls and the unlawfully high emissions from regulators and the public" (*id.* ¶ 295);

- "misle[d] government regulators as to the nature of the emission control technology and the defects in the [subject vehicles]" (*id.* ¶ 295); and

- "misle[d] the driving public as to the nature of the emission control technology and the defects in the [subject vehicles]" (*id.* ¶ 295).

---

[6] Putting all other legal deficiencies aside, such allegations are pure conjecture and fabrication. Because Ford's AECD disclosures are made confidentially (for the reasons discussed above), Plaintiffs have no plausible basis to cast aspersions on Ford's dealings with regulators with respect to the subject vehicles.

With regard to consumers, the CAC identifies certain supposedly misleading Ford marketing material regarding the emissions system in the subject vehicles. In supposed support thereof, Plaintiffs attach 42 exhibits to the CAC, which consist of approximately 800 pages. Only 7 exhibits, consisting of approximately 191 pages, relate directly to Ford. (*Id.*, Exs. 6-12.) The remainder are primarily newspaper articles and other print materials concerning the Bosch Defendants and automobile manufacturers other than Ford (*e.g.,* Volkswagen, FCA).

The seven Ford-related exhibits are Super Duty brochures for model years 2011 to 2017, which *none* of the named Plaintiffs claim to have seen at any time relevant to their claims. And in those brochures, Ford does not use the slogan "Cleanest Super Duty Diesel Ever" after the 2013 model year, and after model year 2013 altogether stopped expressly referring to the Super Duty in this manner. At the very least, the brochures demonstrate that the messaging Plaintiffs' complain of was not pervasive. In approximately 191 pages of Ford literature, spanning seven years, the vehicles are specifically referred to as the "Cleanest Super Duty Diesel Ever" a total of 4 times. As a point of comparison, the CAC cites or quotes the "cleanest diesel" concept more than 10 times, and uses the phrase "clean diesel" (referring to Ford specifically or otherwise) 54 times.

No named Plaintiff alleges that he relied on a product brochure, or any other particular Ford advertisement when deciding to purchase a subject vehicle. No

named Plaintiff alleges that he bought a subject vehicle because of specific or individual concerns about the environment, or because of representations about emissions. This is unsurprising, given that the marketing materials Plaintiffs' reference in the CAC—unlike the advertisements in the Volkswagen, *Counts*, and *Duramax* complaints—do not focus on emissions.

## A.    Plaintiffs' Alleged Injuries

All six Plaintiffs repeat the same conclusory, formulaic allegations that they "would not have purchased the [subject vehicle], or would have paid less for it," had they known "it did not comply with emissions standards" and "would not have purchased the [subject vehicle], or would have paid less for it," had Ford  "disclosed the manipulation of emissions or the fact that the vehicle actually emitted unlawfully and/or unexpectedly high levels of pollutants." (*See* CAC, ¶¶ 27-42.)

No Plaintiff alleges that he is unable to drive his vehicle, has lost employment or incurred any additional costs at all, let alone *as a result of* the conduct complained of, or that he bought a vehicle for some supposed environmental benefit. No Plaintiff alleged that he relied on *any* specific advertisement or representation by Ford pertaining to the subject vehicles, much less one touting their environmental benefits.

Plaintiffs do not contend that they tried to or actually did sell their vehicles at all—let alone did so at a loss. They instead claim injury by alleged "overpayment at

the time of purchase," and unspecified out-of-pocket losses for "future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles." (*See id.*) They speculate that if their vehicles are found to be non-compliant with EPA regulations and if Ford recalls their vehicles, they might be "required to spend additional sums on fuel" and may "not obtain the performance characteristics of their vehicles when purchased." (*Id.* ¶ 244.) None of these claims have merit.

## LEGAL STANDARD

As explained by this Court:

> A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the plaintiff's complaint. Accepting all factual allegations as true, the court will review the complaint in the light most favorable to the plaintiff. As a general rule, to survive a motion to dismiss, the complaint must state sufficient facts to state a claim to relief that is plausible on its face. The complaint must demonstrate more than a sheer possibility that the defendant's conduct was unlawful. Claims comprised of labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Rather, a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

*Malloy v. Watchtower Bible and Tract Socy.*, CV 17-10635, 2017 WL 6539056, at *3 (E.D. Mich. Dec. 21, 2017) (Hood, J.) (internal quotation marks, citations, and alterations omitted).

## ARGUMENT

## I.     Plaintiffs' State Law Claims Are Preempted By The Clean Air Act.

All of Plaintiffs' state law claims are preempted because the allegations in the CAC are inextricably intertwined with, and founded upon supposed violations of, the CAA. Specifically, every cause of action hinges on a showing that the subject vehicles: (i) are non-compliant with EPA emission requirements; and (ii) employ an unlawful "defeat device" to conceal their non-compliance with EPA emission standards. The CAA preempts these claims, both expressly and through conflict preemption.

### A.     Section 209 of the CAA Expressly Preempts Plaintiffs' Claims.

Section 209(a) of the CAA bars states from "adopt[ing] or attempt[ing] to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). Preemption clauses like this, which use the phrase "relating to," have a "broad scope" and "expansive sweep." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This is because, "in a statute, the phrase 'in relation to' is expansive," *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 157 (2d. Cir. 2010) (quoting *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 149 (2009)). A provision preempting state law relating to a

subject is properly construed to preempt everything that has "any connection with or reference to" that subject. *Morales*, 504 U.S. at 384.[7]

Thus, in the CAA context, "enforcement actions that have any connection with or reference to the control of emissions from motor vehicles are preempted." *Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570, 577 (S.D.N.Y. 2011). That broad preemptive sweep serves Congress's purpose of avoiding an "anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers." *Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979); *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 633 F. Supp. 2d 83, 104 (S.D.N.Y. 2009) (Congress established CAA preemption because it "was concerned about the possibility of 50 different standards applying to one vehicle that so easily moves across state lines.").

Plaintiffs will likely seek to avoid preemption here by citing *Counts* and *Duramax*. These cases, however, improperly limit preemption by ruling that § 209(a) preempts only those claims that "*directly depend* on proof of noncompliance with federal emissions standards." *Counts,* 237 F. Supp. 3d at 591 (emphasis added); *accord Duramax*, 2018 WL 949856, at *15 (citing *Counts* and

---

[7] This can be contrasted with less expansive statutory preemption provisions, such as the Real Estate Settlement Procedures Act, which "expressly provide[] for only limited preemption of state law, requiring that the state law be '***inconsistent***' with it." *Briggs v. Countrywide Funding Corp.*, 949 F. Supp. 812, 813–14 (M.D. Ala. 1996).

upholding consumer protection and fraudulent concealment claims that do not require direct proof of noncompliance). Their holdings also squarely conflict with the expansive "relating to" language actually set forth in the text of the CAA. *See* 42 U.S.C. § 7543(a). Indeed, this unduly heightened standard would defeat the animating purpose of the express preemption provision because a plaintiff could circumvent the CAA's broad preemptive scope simply by relabeling a direct compliance claim as a misrepresentation of compliance claim—a result Congress surely did not intend. *Cf. Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 (2004) (relabeling claims cannot evade preemption).

Instead, the question, according to the Supreme Court of the United States, is whether a violation of the CAA is a "critical factor in establishing liability" or whether the "gravamen of the complaint" relates to emissions standards. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139-140 (1990); *In re Apple iPhone 3G Prods. Liab. Litig.*, 728 F. Supp. 2d 1065, 1070-72 (N.D. Cal. 2010) (state law claims preempted where "core allegation" of claims "tread[ed] on ground reserved by" a federal statute, even where "states' historic police powers include consumer protection laws").

Here, Plaintiffs' claims are predicated on alleged regulatory violations "relat[ing] to the control of emissions" and are therefore expressly preempted. *See, e.g., Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 523 (1992) (preemption of state

enforcement actions "relating to" a federally regulated subject includes state common-law suits); *Jackson*, 770 F. Supp. 2d at 576 (holding CAA preempted state tort claims alleging diesel engines were defectively designed to allow excessive emissions), *aff'd sub. nom. Butnick v. Gen. Motors Corp.*, 472 Fed. App'x 80 (2d Cir. 2012). Plaintiffs' effort to "seek damages…based on alleged violations of the CAA is strictly prohibited." *See Beshear v. Volkswagen Grp. of Am., Inc.*, No. 16-CV-27-GFVT, 2016 WL 3040492, at *4 (E.D. Ky. May 25, 2016).

## 1. No Presumption Against Preemption Applies.

The *Counts* and *Duramax* holdings were grounded in a "presumption against preemption" arising from *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996). *See Counts*, 237 F. Supp. 3d at 589; *Duramax*, 2018 WL 949856, at *11. *Counts* and *Duramax* also cited to a number of other cases that applied a "presumption against preemption" as part of their analysis.[8] The "presumption against preemption," however, ***no longer exists in express preemption cases***.

The Supreme Court squarely addressed and resolved this question in *Puerto Rico v. Franklin-California Tax-Free Trust*, 136 S. Ct. 1938, 1946 (2016). In holding that the federal Bankruptcy Code both expressly and impliedly preempted the Puerto

---

[8] *See, e.g., Cipollone v. Liggett Group, Inc.*, 505 U.S. at 505; *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015); *In re Caterpillar, Inc., C13 and C15 Engine Products Liab. Litig.*, 1:14-CV-3722 JBS-JS, 2015 WL 4591236, at *9, n.12 (D.N.J. July 29, 2015).

Rico Public Corporation Debt Enforcement and Recovery Act, the Supreme Court held that "because the [Bankruptcy Code] 'contains an express pre-emption clause,' *we do not invoke any presumption against pre-emption,* but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Id.* (emphasis added).

Accordingly, the *Counts* and *Duramax* courts erred as a matter of law by applying an outdated presumption and by citing to superseded authority. Because this Court is bound by *Franklin-California,* its preemption analysis should be guided by the plain language of Section 209(a). *See also, e.g., In re Syngenta Ag Mir 162 Corn Litig.*, 2016 WL 4382772, at *3 (D. Kan. Aug. 17, 2016) (declining to invoke presumption against preemption based on *Franklin-California*); *Canale v. Colgate-Palmolive Co.*, 258 F. Supp. 3d 312, 319 (S.D.N.Y. 2017) ("where, as here, Congress has expressly manifested its intent to preempt state law, no presumption against preemption arises.").

### 2. Plaintiffs Are Attempting to Enforce an Impermissible Standard Relating to the Control of Emissions.

The *Duramax* court explained that if a plaintiff's "state law claims represent veiled attempts to establish a 'standard relating to the control of emissions,' they are expressly preempted." 2018 WL 949856, at *12. The court found that because the plaintiffs were not attempting to enforce a *numerical* standard, their state law claims

were not preempted.[9] That holding finds no support in the CAA's text. The CAA preempts "*any* standard relating to the control of emissions," and it contains no limitation to standards based on strict numerical values. But even if a numerical value *were* somehow required to bring claims within the preemptive reach of the CAA, Plaintiffs here *are* attempting to enforce such a standard. In fact, the CAC is filled with conclusions regarding subject vehicles' emission levels that are based purely on numeric comparisons between Plaintiffs' own emissions measurements and federal standards. (*See, e.g.*, CAC, ¶¶ 16, 143, 147, 149.)

It must be further understood that, as explained above, EPA's regulatory scheme for motor vehicle emissions consists of two fundamental, overarching requirements. First, vehicles must meet designated numerical emissions standards when tested in a laboratory on government-specified certification tests. Second, manufacturers must disclose and justify their AECDs to inform the regulatory agencies about how and why the emissions behavior of the vehicles in on-road driving may vary from the emissions behavior seen on the certification tests. The

---

[9] The term "standard" under Section 209(a) is broad, and includes "that which 'is established by authority, custom, or general consent'"—an expansive definition that includes Plaintiffs' state law claims. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252-53 (2004); *see also, e.g., Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 200 (2d Cir. 1998) (defining "standards relating to the control of emissions" as "regulatory measures intended to lower the level of auto emissions").

EPA approves the certification applications when it finds that both of these requirements are met.

Here, Plaintiffs are apparently dissatisfied with this regulatory scheme. The CAC represents an attempt to rewrite the motor vehicle emissions regulations by means of allegations that Ford vehicles need to meet an entirely different set of criteria as determined by Plaintiffs. And perhaps most concerning, is that some of the criteria offered are based purely on Plaintiffs' subjective "expectations," whatever those may be (*see, e.g.*, "***unexpectedly*** *high levels* of pollutants" and "***unexpectedly*** *high emissions***" (CAC, ¶¶ 27-32)).

Plaintiffs would also like to impose specific design requirements upon Ford. For instance, Plaintiffs allege that the configuration of Ford's emission control system is "different from the common configuration" and not to their liking. (CAC, ¶¶ 76-84.) Plaintiffs wish to create a new design-based standard by requiring Ford to put the Selective Catalytic Reduction system downstream of the Diesel Particulate Filter (DPF) in order to avoid putting the DPF in what Plaintiffs view as an "unfavorable location." (*Id.*)

Going even further, Plaintiffs seek to impose new standards based on tests that are not currently included in EPA's battery of certification tests (CAC, ¶¶ 143 *et seq*.), and even want to replace the existing EPA certification tests with *their*

preferred tests, citing with approval a report concluding that testing vehicles in a laboratory produces "meaningless results" (CAC, ¶ 253).

Plaintiffs are attempting to usurp the role of EPA and CARB by creating and imposing new sets of standards upon Ford. And if these Plaintiffs are allowed to do so in this case, it is difficult to see why a different set of plaintiffs in another case would not be allowed to create and impose (perhaps on another manufacturer or another set of vehicles) a different set of standards to *their* liking, and so on until the very concept of emission "standards" becomes meaningless. Indeed, avoiding this result is precisely why the CAA has a preemption provision in the first place.

### 3. Plaintiffs' Claims Are Based on Ford's Alleged Use of a Prohibited Defeat Device.

Plaintiffs' claims also hinge on the premise that the subject vehicles contain an "illegal" "defeat device," as defined by federal law. As *Counts* reasoned, 237 F. Supp. 3d at 590, "to the extent [p]laintiffs are suing [defendant] for manufacturing a vehicle that emits 'more than a certain amount of NOx or particulate emissions in violation of EPA regulations or that is not equipped with properly functioning and federally required emission-control technology, their claims are pre-empted by the [CAA.]" That is *exactly* the case here.

The *Duramax* court found the plaintiffs' complaint did not define "defeat device" using the EPA's definition and, therefore, the plaintiffs did not need to plausibly allege the existence of a defeat device (as defined under federal law) to

state a non-preempted claim. *See* 2018 WL 949856, at *13.[10] This analysis is flawed for several reasons.

"Defeat device" is a term defined ***exclusively*** under federal law. *See* 40 C.F.R. § 86.1803-01. *See also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, MDL 2672 CRB (JSC), 2017 WL 2258757, at *5 (N.D. Cal. May 23, 2017) ("Volkswagen is correct that 'defeat device' is defined only in federal regulations."); *State v. Volkswagen AG*, 2017 WL 6551054, 2 (Ala. Cir. Ct. Dec. 19, 2017).  A "defeat device" can only exist in tandem with something to be "defeated"—such as an emissions certification test—which is exclusively the province of federal law. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, 264 F. Supp. 3d 1040, 1052 (N.D. Cal. 2017) (*Wyoming Volkswagen*") ("States accordingly may not adopt their own rules prohibiting defeat devices[.]").

Allowing a private plaintiff to sustain a state law theory of recovery based on a generalized and subjective concept of a "defeat device" (untethered from any regulatory structure defining what is being "defeated") creates irreducible and unavoidable conflicts with the CAA. AECDs that are disclosed to, and approved by,

---

[10] This court further asserted—with no support—that "the term has entered the common parlance, and so the fact that the EPA has also provided a legal definition for the term 'defeat device' does not mean that every use of the term 'defeat device' necessarily involves a reference to that regulatory definition." *Id.* at n.14.

the EPA are—by definition—*not* "defeat devices" under federal law. And such AECDs may result in heightened emissions under specific operating conditions. (This is, in fact, a natural consequence of their operation.) Using the *Duramax* state law "common parlance" conception of "defeat device," a generalized consumer expectation of vehicle emissions behavior could constitute a "defeat device" for state law purposes—*even* where such vehicle emissions behavior would be deemed acceptable for CAA purposes. This potential for conflict between the CAA and a state law standard is precisely what Congress sought to avoid through the CAA's broad express preemption provision and the EPA's exclusive enforcement rights.

Even if this Court believes *Counts* and *Duramax* are correct statements of law, their holdings should not apply here. Plaintiffs did not create their own defeat device definition. They define "defeat device" in the CAC using the ***exact*** wording of federal law. (*Compare* CAC, ¶¶ 4, 180, 197 *with* 40 C.F.R. § 86.1803-01.) Further, while *Duramax* and *Counts* construed the plaintiffs' "defeat device" allegations as raising claims about "emissions generally, and not necessarily in the context of EPA regulations," ***this Complaint does not state such a generalized claim***. The instant Plaintiffs clearly and repeatedly base the alleged existence of a "defeat device" and describe vehicle performance relative to the EPA Federal Test Procedure standard.[11]

---

[11] *See infra* Argument I(A)(2).

They claim that the existence of emissions in excess of the EPA standard[12] is the affirmative evidence that such a defeat device exists (*see, e.g.*, CAC, ¶ 134), and that statements made by Ford relating to emissions (which they do not specifically claim to have seen) are thus false or misleading. (*See, e.g., id.*, ¶ 295.).

The CAC alleges only one type of defeat device, *i.e.*, one whose purpose is to defeat ***EPA*** certification testing and evade ***federal*** emissions standards. Plaintiffs cannot simultaneously base their claims on these federal predicates, and then disclaim them in favor of some theoretical parallel state standard in an attempt to evade preemption. Plaintiffs' claims are expressly preempted.

> **4.      Plaintiffs' Claims Based on Alleged Misrepresentations to the EPA or That Second-Guess the EPA's Compliance Determination Are Preempted.**

Plaintiffs' allegations that Ford misled the EPA during the certification process reinforce the need for a ruling that Plaintiffs' claims are expressly preempted. (*See, e.g.,* CAC, ¶¶ 295, 304(a)-(g).) Such allegations are just another way of saying that there was an illegal defeat device—because an AECD properly disclosed to and approved by the EPA is not illegal.[13] And just as the EPA alone has the discretion to interpret and enforce its regulations, the EPA alone has the

---

[12] As an aside, it should be noted that the EPA's "emissions standards" are tied to specific certification test procedures set forth in the regulations and are not applicable to whatever alternative test procedures Plaintiffs or others may invent.
[13] *See infra* Argument I(A)(3).

discretion to decide whether its compliance determinations were the product of "fraud on the EPA." *See Buckman Co. v. Plaintiffs' Leg. Comm.,* 531 U.S. 341 (2001).  As Judge Breyer explained in *Wyoming Volkswagen*, the CAA's civil and criminal enforcement powers prevent States from enforcing emissions standards:

> If, after certification, it is discovered that a manufacturer tampered with vehicles during testing, and the manufacturer's vehicles did not comply with EPA's new-vehicle emissions standards, the Clean Air Act vests EPA with authority to bring a civil action, and in some cases even a criminal action, against the manufacturer.  But because ***Section 209(a) prohibits States from enforcing standards relating to control of emissions*** from new motor vehicles, both before and after the vehicles enter into commerce, States cannot do the same.

> Reading Section 209(a) in this way also furthers Congress' purpose in enacting the provision.  By barring State enforcement of new-vehicle emission standards, both before and after the initial sale of the vehicle, ***Section 209(a) keeps States from interfering with EPA investigations and enforcement actions based on fraud or deceit against the Agency*** during the new-vehicle certification process.  If States were also permitted to police such deception, there could be a multiplicity of redundant investigations and enforcement actions ....

264 F. Supp. 3d at 1053 (emphasis added). Section 209(a) thus preempts requests to revisit the EPA's compliance decision.

Here, the EPA reviewed the certification applications for the subject vehicles, including AECD disclosures, and issued COCs that concluded that the "vehicles…had demonstrated compliance with the applicable emissions standards"

and that the subject vehicles "are designed to meet the applicable emissions standards" specified by the CAA and EPA regulations. Any attempt by Plaintiffs to prove that the vehicles contained illegal defeat devices would necessarily amount either to a fraud-on-the-EPA claim or to an effort to second-guess the EPA's own compliance determination. In both situations, the Court would be asked to declare the EPA's existing compliance determination invalid—an affront to the EPA's exclusive jurisdiction.

### B.    Implied or Conflict Preemption Also Bar Plaintiffs' Claims.

In addition to express preemption—where Congressional or administrative regulatory language explicitly states that all contrary state laws are void—Plaintiffs' claims are also preempted by the operation of implied conflict preemption. Conflict preemption exists "to the extent that [state law] actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) (citations omitted). Imposing state-law remedies for federal-law violations creates "a conflict with federal policy in that it involves allowing two law-making sources to govern." *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 247 (1959). This is doubly true where, as here, a federal

agency administers a complex regulatory scheme and has exclusive enforcement powers authorized under that same regime.

"[R]emedies form an ingredient of any integrated scheme of regulation." *Garmon*, 359 U.S. at 247. Thus, a state law imposing a "supplemental sanction for violations" of a federal statute is preempted, because every additional state remedy "incrementally diminishes" the federal agency's control over enforcement of the federal statute and "thus further detracts from the integrated scheme of regulation created by Congress." *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 288-89 (1986) (internal quotation marks omitted).

Plaintiffs' claims can be read in only two ways. Either they are asking this Court to enforce federal law (and their claims are thus expressly preempted, for the reasons stated above) or they are using the statutory and common laws of states to require that Ford comply with their own individualized and incomprehensible emission standards (and their claims are impliedly preempted, for the reasons discussed below). If, under the latter scenario, Plaintiffs' state law claims were allowed to proceed, a conceivable result would be different standards for emissions in every state, rather than the national standard promulgated by the EPA. This invites the possibility of "different juries in different States reach[ing] different decisions on similar facts," *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 871 (2000), creating direct conflicts with the determinations of the EPA and of sister states. This would

lead to confusion for consumers, place manufacturers in impossible positions, and undermine the federal scheme and plan for consistent information and testing relating to emissions for new automobiles. This is exactly what preemption is designed to avoid. *See, e.g.*, H.R. Rep. No. 90-728, at 21 (Oct. 3, 1967) (Title II preemption intended to avoid "uncertainties involved in litigation"). And permitting Plaintiffs to prosecute their state law claims to enforce one-off environmental regulations would result in a patchwork of requirements across the country and stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 31 (1996).

Even if Plaintiffs' claims were not expressly preempted, they should be dismissed as conflict preempted.

## II. Plaintiffs' State Law Claims Do Not Satisfy Rule 9(b) And Do Not Plead An Actionable Misrepresentation or Omission.

### A. Plaintiffs Do Not Comply With Rule 9(b).

All of Plaintiffs' state law claims sound in fraud, and therefore Plaintiffs must meet the heighted pleading requirements of Rule 9(b).[14] "While state law governs

---

[14] This argument applies to Plaintiffs' claims for various consumer protection statutes (CAC, ¶¶ 324-360, 386-404, 430-578, 583-648, 663-769), fraudulent concealment (*id.,* ¶¶ 366-385, 410-429), ***and*** breach of contract (*id.,* ¶¶ 361-365). *See e.g., Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 13-13804, 2015 WL 3541905, at *3 (E.D. Mich. Apr. 30, 2015) (holding Rule 9(b) applies to claims for breach of contract when "fraud is pleaded even though it is not an essential element of the claim") (quotations omitted). Plaintiffs seek to base their breach of contract claims

the burden of proving fraud at trial in a diversity action in federal court, the procedure for pleading fraud in a diversity action in federal court is governed by the special pleading requirements of [Rule] 9(b)." *Minger v. Green*, 239 F.3d 793, 800 (6th Cir. 2001).

"To plead a case of fraud, the plaintiff must be specific." *Scott v. Trott L., P.C.*, 16-13734, 2017 WL 2691364, at *6 (E.D. Mich. June 22, 2017), *reconsideration denied*, 16-13734, 2017 WL 6450888 (E.D. Mich. Dec. 18, 2017) (Hood, J.) (citing Fed. R. Civ. P. 9(b)). A complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Ind. State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942-43 (6th Cir. 2009) (internal quotations and citation omitted).

In addition, a party must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of [the other party]; and the injury resulting from the fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 161-62 (6th Cir. 1993) (internal quotations and citations omitted). *See also Williams v. Scottrade, Inc.*, 06-10677, 2006 WL 2077588, at *7 (E.D. Mich.

on Ford's alleged fraudulent misrepresentations and omissions. (*See, e.g.*, CAC, ¶ 363.)

July 24, 2006) (plaintiff's fraud claims failed to comply with the requirements of Rule 9(b) where plaintiff "refers to [defendant's] website, but does not set forth any specific statements on the site on which he relied").[15] This heightened pleading standard applies to Plaintiffs' state law claims whether they are based on affirmative representations[16] or omissions.[17]

---

[15] *See also Lanier v. Syncreon Holdings, Ltd.*, No. 11-14780, 2012 WL 3475680, at *9 (E.D. Mich. Aug. 14, 2012) ("it is not the Court's job to parse the previous 121 paragraphs of the Amended Complaint to attempt to determine which allegations correspond to which element of a claim of fraud. The particularized information must be set forth clearly and succinctly under the heading of the cause of action for fraud, not spread scattershot throughout 23 pages of generalized allegations").

[16] *See e.g., Coffey*, 2 F.3d at 162; *Hennigan v. Gen. Elec. Co.*, 2010 WL 3905770, at *13-14 (E.D. Mich. Sept. 29, 2010) (applying Rule 9(b) to state consumer fraud claims); *In re Ford Motor Co. Speed Deactivation Switch Prod. Liab. Litig.*, 2007 WL 2421480, at *9 (E.D. Mich. Aug. 24, 2007) (same).

[17] In several states, an omission claim logically requires the plaintiff to identify a communication attributable to the defendant from which material information was allegedly omitted. CA: To state a fraud-by-omission claim under the CLRA or UCL, a plaintiff "must plead an omission that was 'contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose.'" *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 752 (E.D. Mich. 2017) (quoting *Wilson v. Hewlett–Packard Co.*, 668 F.3d 1136, 1141 (9th Cir. 2012)); IL: Illinois courts have held that an omission s not actionable as fraud if it gives rise to "an incomplete" as opposed to an affirmatively "false impression." *Spector v. Mondelez Intl., Inc.*, 178 F. Supp. 3d 657, 672 (N.D. Ill. 2016) (quoting *Phillips v. DePaul U.*, 19 N.E.3d 1019, 1030 (Ill. App. 1st Dist. 2014) ("while the information published by [the defendant] could certainly have been more specific about the types of employment included in the reported percentage of employed graduates, ***plaintiffs have identified no affirmative misrepresentation by [the defendant] of those figures***") (emphasis added)); TX: "To sustain a fraud by omission claim, the plaintiff must prove all the elements of fraud by affirmative misrepresentation, including fraudulent intent, with the exception that the misrepresentation element can be proven by omission of a material fact in light of a duty to disclose." *Baker v. Great N. Energy, Inc.*, 64 F. Supp. 3d 965, 974 (N.D. Tex. 2014) (quotation omitted). *See*

Plaintiffs claim they were deceived by Ford's affirmative misrepresentations, or omissions of material facts, regarding the emissions systems in the subject vehicles through advertisements, product literature, and/or statements by authorized dealers. Yet, not a single Plaintiff states, with any specificity whatsoever, what deceptive statements they were exposed to before purchasing their vehicles. This is not an instance where Plaintiffs should be excused from strict compliance with Rule 9(b) because they allegedly need discovery from Ford to state a claim with the required specificity. Indeed, if anyone knows what supposedly deceived them, it is the Plaintiffs themselves, and Ford is entitled to fair notice of the claims being asserted against it.

Unlike in *Counts* and *Duramax*, this case does ***not*** involve a pervasive advertising campaign focused on the concept of "clean diesel" or "green" "environmentally friendly" trucks. This is illustrated by the product brochures attached to the Complaint for model years 2011-2017. Specifically:

- The 29-page 2011 brochure (CAC, Ex. 6) twice refers to the "cleanest Super Duty diesel ever" – a comparative statement relative to Super Duty engines – but none of the individual Plaintiffs claim to have purchased a 2011 model year vehicle. And when discussing emissions, it measures Ford's compliance ***strictly against government standards***.[18]

---

*also Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 891 (6th Cir. 2004) ("[t]o establish fraudulent concealment, a plaintiff must plead ***specific affirmative conduct*** on the part of defendants") (emphasis added).

[18] "The Ford 6.7L Power Stroke V8 Turbo Diesel engine uses industry proven technology and innovative Ford strategies to meet the ***latest federal emissions***

- The 28-page 2012 brochure (CAC, Ex. 7) refers to the subject vehicles as the "cleanest Super Duty diesel ever" on only *one* occasion, and again measures compliance *strictly against government standards*.[19] The only individual Plaintiff who claims to have purchased a 2012 vehicle bought it used in 2015, and does not allege that he ever saw this brochure (much less this specific statement in this brochure) prior to his purchase.

- The 30-page 2013 brochure (*id.*, Ex. 8) refers to the subject vehicles as the "cleanest Super Duty diesel ever" on *one* occasion and again measures compliance *strictly against government standards*.[20] No individual Plaintiff claims to have purchased a 2013 model year vehicle.

- The 24-page 2014 brochure (*id.*, Ex. 9) does not make any reference to the Super Duty as a "clean diesel" or "low emission" vehicle. One individual Plaintiff claims to have purchased a new 2014 Super Duty vehicle. (*Id.*, ¶ 28.)

- The 25-page 2015 brochure (*id.*, Ex. 9) does not refer to the Super Duty as being a "clean diesel" or "low emission" vehicle. It merely mentions that the vehicle's new "high pressure fuel injectors achieve a more efficient, cleaner burn."

- The 25-page 2016 brochure (*id.*, Ex. 11) does not refer to the Super Duty as a "clean diesel" or "low emission" vehicle. It merely mentions that the vehicle's "best-in class" diesel fuel economy is "maintained

---

*standards* to reduce nitrogen oxide (NOx) levels by more than 80% *compared to previous regulations*." (Emphasis added).

[19] "This engine utilizes industry-proven technology and innovative Ford strategies to meet *the latest federal emissions standards* – reducing nitrogen oxide (NOx) levels by more than 80% compared to the previous generation diesel." (Emphasis added).

[20] "This engine utilizes industry-proven technology and innovative Ford strategies to meet *the latest federal emissions standards* – reducing nitrogen oxide (NOx) levels by more than 80% compared to the previous generation diesel." (Emphasis added).

with the help of high-pressure fuel injectors that achieve a clean, efficient burn."

- The 31-page 2017 brochure (*id.,* Ex. 12) does not make any reference to the Super Duty as being a "clean diesel" or "low emission" vehicle. No individual Plaintiff claims to have purchased a 2017 model year vehicle.

In sum, the phrase "cleanest Super Duty diesel ever" was used only in the years 2011 to 2013, and only sparingly even then. Only one individual named Plaintiff claims to have purchased a truck of that vintage—a 2012 model year F-350 *purchased used in 2015* (CAC, ¶ 35)—and no Plaintiff alleges that they viewed any of these product brochures before buying their vehicles. Because there is no uniform message to which all named Plaintiffs were plausibly exposed, it is of the utmost importance to know what statements Plaintiffs saw, when they saw them, what was false about them, and how they impacted their purchasing decisions. The CAC provides none of this information.

Instead, each individual Plaintiff states, in an identical and wholly generic fashion, only that they "selected and ultimately purchased [their vehicles], in part, because of the diesel system, as represented through advertisements and representations made by Ford. [Plaintiffs recall] that before [they purchased their vehicles, they] reviewed advertisements on Ford's website and representations from Ford's authorized dealer touting the efficiency, fuel economy, and power and

performance of the engine."[21] (CAC, ¶¶ 28-32.) But again, none of the individual Plaintiffs identify what advertisements they viewed or relied upon[22] before purchasing their vehicles, much less attach them to the CAC, or plead what statements in them were false or misleading. Similarly, they do not identify with any specificity what dealer representations they received or state what specific statements therein were false.

Accordingly, Plaintiffs' state law claims fail.

## B. Plaintiffs Otherwise Fail To State An Actionable Misrepresentation or Omission.

### 1. Plaintiffs' Affirmative Misrepresentation Claims Are Non-Actionable Puffery.

---

[21] The plausibility of Plaintiffs' arguments is further undermined by the fact that in a lawsuit supposedly entirely about emissions, the only sentence in the CAC that discusses the "pervasive advertising" and alleged representations by Ford says *nothing* about emissions.

[22] In *Duramax* this Court held that plaintiffs "need not show 'actual reliance,' but…must demonstrate that the misrepresentations or omissions were 'material.'" 2018 WL 949856, at *32. Courts have rejected this view and consistently hold that reliance upon a misrepresentation or omission is not presumed, but must be pleaded. *See, e.g., Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 919-20 (C.D. Cal. 2010) (dismissing claim where plaintiff did not allege that, "before he bought his [vehicle], he reviewed any brochure, website, or promotional material that might have contained a disclosure of the . . . defect"); *see also Hall v. Sea World Entm't, Inc.*, 2015 WL 9659911, at *6 (S.D. Cal. Dec. 23, 2015) (dismissing fraudulent omission claims where plaintiffs "failed to plead with specificity" that they "saw or heard, let alone relied on, any advertisements, offers, or other representations . . . in advance of their [purchases]"). Regardless of whether this Court's holding is accurate, Plaintiffs have failed to plead that the misrepresentations or omissions were material. (*See supra* Argument II(B)(2).)

As indicated above, none of the Plaintiffs identify what specific affirmative misrepresentations Ford supposedly made to them. This pleading deficiency, standing alone, warrants dismissal of their claims. Even then, as this court stated in *Counts*, affirmative fraud claims fail when they are based on non-actionable puffery upon which "no reasonable person would have relied." 237 F. Supp. 3d at 597. Statements regarding cleanliness, "low emissions," "great power," and the like are precisely the kinds of "inherently subjective," "nonquantifiable" opinions that this court has recognized "cannot form the basis of a fraud action." *Id.* at 597-98. Accordingly, Plaintiffs not only need to tell Ford what affirmative misrepresentations state the basis of their claims, but point to statements that constitute more than mere puffery. The CAC fails to do so.

### 2. Plaintiffs Fail To Plead That Ford's Alleged Misstatements and Omissions Were Material.

To the extent Plaintiffs base their fraud claims on Ford's alleged omissions, their claims fail because they have not alleged that Ford had a duty to disclose the allegedly omitted information—*i.e.*, that the NOx emissions system purportedly turns off during certain driving conditions. "[A] duty to disclose arises in at least some states when the defendant actively conceals a ***material fact*** or has exclusive knowledge of that [material] fact." *Counts,* 237 F. Supp. 3d at 600.[23] Information is

---

[23] Even if Ford's alleged misrepresentation and omissions were material—which they are not—Plaintiffs have not and cannot plead that Ford had exclusive

material when a "reasonable consumer" would have behaved differently had the omitted information been disclosed. *See, e.g., Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 986 (N.D. Cal. 2009).

In *Duramax*, this Court found GM's alleged misrepresentations or omissions were material to consumers because of GM's "extended discussion of various advertisements and press releases which GM issued [referencing low emissions] and regarding vehicles equipped with the Duramax engine." 2018 WL 949856, at *15. When making this finding, the *Duramax* court rejected GM's argument that consumers do not have reasonable expectations about emissions separate and apart from EPA standards because the GM advertising at issue was not tied to emissions regulations.[24] Specifically, the advertisements and press releases ***repeatedly emphasized the engine's low emissions, but never expressly referenced EPA***

---

knowledge of these facts. All manufacturers use AECDs that may alter the functioning of emissions control systems under certain driving conditions.   As described above, this fact is public and the subject of extensive regulations and direct review by the EPA. Further, no manufacturer does, or would, publicly disclose every detail of their emissions system and AECDs, and they are specifically authorized by federal regulations to submit proprietary elements of their AECD submissions on a confidential basis.   Thus, all manufacturers would be "misleading" under the standard posited by this Court in *Duramax*. 2018 WL 949856, at *12 ("[p]laintiffs' claims are focused on allegedly inadequate disclosures to the public; confidential disclosures to the EPA are irrelevant").

[24] Ford notes that a "reasonable expectations" standard divorced from EPA emissions requirements is impossible to determine or satisfy. *See Buckman*, 531 U.S. at 342. No vehicle could satisfy the "reasonable expectation" standard invented by this Court in *Duramax*, because every vehicle on the road is capable of producing emissions at higher than "expected" levels if the operating conditions trigger an

*regulations.* Thus, this Court found that GM's own conduct revealed "an understanding that consumers believe emission levels are material to their purchasing decisions separate and apart from the regulatory maximum emission standards." 2018 WL 949856, at *15. Even assuming *arguendo* that this rationale in *Duramax* is correct (which Ford disputes), this case is different. Here, Ford's advertising does *exactly* what the *Duramax* court held GM's did not, *i.e.*, reference regulatory requirements in connection with Ford's statements on emissions. (*See* CAC, Exs. 6-9, 11-12; *infra* Argument II(A).) Therefore, regardless of what this Court ruled with respect to GM, the instant Plaintiffs cannot plausibly argue that they have some expectations about emissions that exist separate from federal law and which can form the basis of their claims.

Accordingly, Plaintiffs have failed to plead that Ford's alleged misrepresentations and omissions were material.[25]

---

AECD—*even gasoline vehicles*. Those emissions are protected under the federal emissions standards so long as those AECDs are disclosed to, and accepted by, the EPA. (*See infra* Argument I(A)(3)). Additionally, any "reasonable consumer expectation" about emissions standards is a state law requirement different than, or in addition to, the federal emissions requirements and subject to express preemption. (*See id.*)

[25] In addition to the grounds for dismissal stated above, the individual Pennsylvania Plaintiff's UTPCPL claim is independently barred by the economic loss doctrine, which "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from contract." *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671, 678-79, 681 (3d Cir. 2002) (affirming district court decision to "apply[ ] the [economic loss] doctrine to appellants' UTPCPL claims," where plaintiffs sought only monetary damages arising out of alleged fraudulent misconduct concerning the

## III.   The Court Should Dismiss Plaintiffs' RICO Claim.

Plaintiffs' attempt to elevate non-actionable and preempted fraudulent misrepresentation and non-disclosure claims into a federal racketeering claim is also without merit. Plaintiffs implausibly posit that, "for many years now" (CAC, ¶ 278), three defendants operating in different countries worked together to perpetrate a vast criminal "scheme" to "deceive" regulators and consumers.  (*Id.*, ¶¶ 309.)

But to plead a fraud-based RICO claim adequately under 18 U.S.C. § 1962(c), Plaintiffs must allege, with the particularity required by Rule 9(b), the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Courts hold civil RICO claims to particular scrutiny: "[b]ecause of the opprobrium that a RICO claim brings to a defendant…courts should eliminate frivolous RICO claims at the earliest stage of litigation." *Durant v. Servicemaster Co.*, 159 F. Supp. 2d 977, 981 (E.D. Mich. 2001).

---

quality of defendant's product). The United States Court of Appeals for the Third Circuit explained that where the only alleged injury "is to the product itself and the product has not met the customer's expectations," "express and implied warranties under contract law are best suited to compensate for a loss in product value," rather than a tort claim such as fraudulent concealment. *Id.* at 671. That is exactly the case here and the UTPCPL claim should be dismissed.

Here, Plaintiffs do not plead: (i) an injury to "business or property," as required by RICO (*see infra* Part A); (ii) a RICO enterprise distinct from ordinary business activity (*see infra* Part B); (iii) the predicate criminal acts of mail and wire fraud (*see infra* Part B); or (iv) that any injury was proximately caused "by reason of" the alleged criminal predicate acts (*see infra* Part C). This is not "the rare complaint that actually states a claim for civil RICO." *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at * 11 (S.D.N.Y. July 15, 2016).

### A.     Plaintiffs Lack RICO Standing.[26]

Plaintiffs must plead they were "injured in [their] business or property by reason of a violation of section 1962 of this chapter."  18 U.S.C. § 1964(c). This requirement is generally referred to as RICO standing or statutory standing, and it is more demanding than an Article III standing inquiry under Rule 12(b)(1).  *See Perry v. Am. Tobacco Co.*, 324 F.3d 845, 849-50 (6th Cir. 2003). Plaintiffs do not satisfy this standard because a RICO plaintiff "only has standing if, and can only recover to the extent that, he ***has been*** injured in his business or property by the conduct constituting the violation." *Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 154 (6th Cir. 1990) (quoting *Sedima*, 473 U.S. at 496 (emphasis added)).

---

[26] In addition to lacking RICO standing, Plaintiffs also lack Article III standing to sue Ford in this case for all of the reasons stated by Bosch LLC in § I of its Motion to Dismiss, which section is incorporated here by reference.

The past-perfect tense of the phrase "has been injured" is significant. Courts within the Sixth Circuit (and elsewhere) consistently require RICO plaintiffs to have already sustained a concrete, non-speculative financial loss as a direct result of the racketeering activity, as opposed to a mere injury to a valuable intangible property interest. *See, e.g., Wall v. Michigan Rental,* 852 F.3d 492, 494 (6th Cir. 2017) (affirming dismissal of RICO claim where plaintiff failed to allege a "concrete injury").

### 1. Plaintiffs' Speculative Injuries Are Insufficient to Plead a RICO Injury.

The instant Plaintiffs seek damages for the same injuries supposedly suffered by the *Duramax* plaintiffs. In that case, this Court found that all of the damages sought, other than the alleged premium price paid for the subject vehicles, were too speculative to survive the pleadings stage. 2018 WL 949856, at *22. To the extent the same damages are sought here, they should likewise be dismissed as speculative.

### 2. Plaintiffs' Alleged "Benefit-of-the-Bargain" Theory of Injury is Not Cognizable Under RICO.

This Court should go one step further than the *Duramax* court and dismiss Plaintiffs' RICO claim its entirety because their "premium price" theory also fails. *See In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *16 (holding that "loss of value" or "benefit of the bargain" damages "are generally unavailable in RICO suits" and "plainly" unavailable where a RICO claim "sound[s] in fraud in

the inducement" because "a party's 'expectation'" that the product they are purchasing is worth the price they are paying is not "business or property."); *see also McLaughlin v. Am. Tobacco Co*., 522 F.3d 215, 228 (2d Cir. 2008).

Plaintiffs allege, in a purely conclusory manner, that all named Plaintiffs paid a "premium" of approximately $8,400 for their vehicles based on false promises of "power, performance, fuel economy, and environmental friendliness" (CAC, ¶¶ 13, 191-95, 243, 274)—*i.e.*, Plaintiffs did not get the benefit of their bargain. But they plead absolutely no facts to even plausibly suggest that the power, performance, and fuel economy they attained with the subject vehicles was, in a quantifiable manner, anything other than represented (indeed, they do not even bother to tell the Court or what specific representations are even at issue).

Similarly, they do not disclose in a plausible manner how, when, or where Ford promised them environmental friendliness or how their vehicles supposedly performed below their expectations. Nor do any of the individual Plaintiffs claim (much less plead facts suggesting) they paid a penny more for any aspect of vehicle performance that was promised and not received. As one district court explained, "[w]hen the economic loss is predicated solely on how a product functions, and the product has not malfunctioned,…something more is required than simply alleging an overpayment for a 'defective' product." *In re Toyota Motor Corp.*, 790 F. Supp.

2d 1152, 1165 n.11 (C.D. Cal. 2011).[27] The required "something more" is completely absent in this case.

Moreover, in *Duramax*, this Court found that because the plaintiffs "paid a premium of nearly $9,000, as GM charged more for its Duramax engine than a comparable gas car," plaintiffs thus identified "a specific payment attributable directly to the vehicle component at issue which they opted to purchase on the basis of fraudulent conduct." 2018 WL 949856, at *23. However, this finding of a "premium" for the subject vehicles rests on an apples-to-oranges comparison to a *gasoline* vehicle. A consumer's choice between diesel and gasoline vehicles involves a host of considerations, including, according to the U.S. Department of Energy, "fuel efficiency," "low-end torque," and per-unit energy (such that "diesel vehicles can often go about 20% to 35% further on a gallon of fuel than their gasoline counterparts").[28] This is evident from the CAC itself, as no named Plaintiff pleads any *facts* showing he specifically selected a diesel engine over a gasoline engine

---

[27] *See also Maio v. Aetna*, 221 F.3d 472, 480, 488 (3d Cir. 2000); *Contreras v. Toyota Motor Sales USA, Inc.*, 2010 WL 2528844, at *2, *6 (N.D. Cal. June 18, 2010); *Tri-State Express, Inc. v. Cummins Engine Co.*, 2000 U.S. Dist. LEXIS 20837, at *16 (D.D.C. Sept. 11, 2000).
[28] *Diesel Vehicles*, https://www.fueleconomy.gov/feg/di_diesels.shtml (last visited April 5, 2018).

because of emissions characteristics.[29] The posited product substitution in *Duramax* should therefore not be extended to this case.

### B. Plaintiffs Do Not Plead the *Prima Facie* Elements of a RICO Violation.

Plaintiffs' RICO claims should also be dismissed because they have failed to adequately plead the essential elements of a violation, *i.e.*: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon*, 465 F.3d at 723 (quoting *Sedima*, 473 U.S. at 496); *see also* 18 U.S.C. § 1962(c). The CAC does not meet at least two essential elements: (1) the existence of an enterprise; and (2) the required predicate acts.

### 1. Plaintiffs Fail to Allege a RICO "Enterprise."

RICO liability under 18 U.S.C. § 1962(c) requires the existence of a racketeering "enterprise," defined as any legal entity or any other group "associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Sedima*, 473 U.S. at 496. An "enterprise" consists of "an ongoing organization," "evidence that the

---

[29] The EPA regulations also recognize this difference in characteristics and require lower emission standards for gasoline engines than diesel engines. *See, e.g.,* 40 C.F.R. § 86 et. seq. *See also* EPA, *Gasoline and Diesel Advanced Technology subject vehicles*, https://www.epa.gov/greenvehicles/gasoline-and-diesel-advanced-technology-vehicles (last updated Feb. 13, 2017) ("In comparison to gasoline, diesel: Is denser and harder to ignite; Contains more energy per gallon of fuel than gasoline (generally resulting in higher fuel economy); Contains more carbon per gallon (generally resulting in more $CO_2$ emissions per gallon)").

various associates function as a continuing unit," and "a common purpose." *Boyle v.*

*U.S.*, 556 U.S. 938, 944-45 (2009) (internal quotations omitted). *See also C&L Ward*

*Bros., Co. v. Outsource Sols., Inc.*, 2012 WL 3157005, at \*6 (E.D. Mich.  Aug. 3,

2012). Plaintiffs offer only conclusory allegations suggesting that Ford and the

Bosch Defendants constituted an enterprise, and even invent a name for the fictional

entity (the "Super Duty Fraud Enterprise") in an effort to bolster their empty claim.

(*See* CAC, ¶ 278.) Such allegations do not satisfy the legal definition of a RICO

"enterprise."

RICO does not apply to acts of separate businesses in pursuit of their ordinary

business activities, even if those activities cross the line into predicate acts under the

statute. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices,*

*and Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1202-03 (C.D. Cal. 2011); *C&L Ward*

*Bros.*, 2012 WL 3157005, at \*6. Here, Plaintiffs allege that the Bosch Defendants

were a parts supplier to Ford in the ordinary and course of their businesses, and

concede that relationship was at least partly legitimate.  (*See* CAC, ¶ 290 (the

enterprise "functioned by selling vehicles and component parts to the consuming

public.  Many of these products are legitimate.").) Plaintiffs also allege that this

manufacturer-supplier relationship constituted the "enterprise" for RICO purposes.

(*Id.*, ¶¶ 289-91.) But because the parties came together for legitimate purposes and

associated in the ordinary course of their business affairs, a RICO enterprise does

not exist as a matter of law. *See Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1056-57 (C.D. Cal. 2016) (dismissing RICO claim for lack of factual allegations to satisfy the necessary element of a "common purpose").

### 2.   Plaintiffs Fail to Plead Predicate Acts of Mail or Wire Fraud.

The Court should also dismiss Plaintiffs' RICO claims for failure to sufficiently plead predicate acts of mail or wire fraud. "The crime of mail fraud has two elements: a scheme or artifice to defraud and a mailing for the purpose of executing the scheme." *Bender v. Southland Corp.*, 749 F.2d 1205, 1215–16 (6th Cir. 1984) (citation omitted). The Sixth Circuit has held that the scheme to defraud must involve "misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979), *cert. denied*, 444 U.S. 994 (1979). *See also Bender*, 749 F.2d at 1215–16. Applying this standard to the CAC shows it is deficient in three respects.

*First*, Plaintiffs' RICO claims are predicated on a preempted fraud-on-the-regulators theory.  (*See* CAC, ¶ 304). *See also Duramax*, 2018 WL 949856, at *3 (stating plaintiffs' RICO claim rests on a vast scheme to defraud environmental regulators). Specifically, they allege that Ford and the Bosch Defendants formed an enterprise for the express purpose of fraudulently obtaining COCs from the EPA and EOs from CARB in order to sell the subject vehicles throughout the United States.

(CAC, ¶¶ 304-310.) As explained above, this attempt to privately enforce the CAA is preempted and within exclusive province of the EPA.[30]

Second, to the extent Plaintiffs' claims are predicated on advertisements to consumers (*see, e.g.*, CAC ¶¶ 304(i), (j); 308), these statements are nonactionable because: (i) Plaintiffs have failed to identify with any specificity which statements are at issue; (ii) the few supposed misrepresentations they do identify are puffery; and (iii) Plaintiffs have failed to allege that the alleged affirmative misrepresentations and or omissions were material.[31] (*See infra* Argument II(B).) Accordingly, their conclusory advertising theory cannot sustain RICO fraud claim.

*Finally*, although Plaintiffs purport to allege multiple instances of mail and wire fraud, (CAC, ¶¶ 302-323), those alleged instances are not pleaded with the factual specificity mandated by Rule 9(b). The courts within the Sixth Circuit have held repeatedly that a RICO action premised upon mail or wire fraud ***must*** allege

---

[30] Relatedly, Plaintiffs' RICO claim should be dismissed because it conflicts with the CAA's regulatory and enforcement structures, as set forth in § II(E) of Bosch LLC's Motion to Dismiss, and incorporated herein by reference.

[31] *See, e.g., Nelson v. Publishers Circulation Fulfillment, Inc.*, 2012 WL 760335, at *4 (S.D.N.Y. Mar. 7, 2012) (dismissing RICO claim because under "the federal mail and wire fraud statutes, 'opinions and puffery or ultimately unfulfilled promises' are not actionable as fraud.") (internal citation omitted); *Kidwell v. Wagoner*, 209CV108FTM36DNF, 2010 WL 11507301, at *4 (M.D. Fla. Sept. 10, 2010) *on reconsideration in part*, 209CV108FTM36DNF, 2010 WL 11507302 (M.D. Fla. Dec. 28, 2010) (holding GM's advertisements involving "general claims of performance and superiority are non-actionable either as RICO predicate acts or as separate causes of action").

specific details about the statements allegedly constituting such fraud, including how the statements were fraudulent. *See Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 404 (6th Cir. 2012). Failure to allege such details warrants dismissal, regardless of the length of the complaint. *Am. Biocare Inc., et al. v. Howard & Howard Attorneys PLLC, et al.*, 720 F. App'x 416, 422 (6th Cir. 2017); *C&L Ward Bros.*, 2012 WL 3157005, at *5-6.[32]

### C.   Plaintiffs Fail to Allege That Their Injuries Were Proximately Caused By Ford's Alleged Conduct.

Even assuming Plaintiffs adequately pleaded a RICO injury and required predicate acts, they have not alleged that the injury was "by reason of" a RICO violation, 18 U.S.C. § 1964(c), under Rule 9(b)'s heightened pleading requirements. The Supreme Court has interpreted the "by reason of" language as requiring plaintiffs to show that a predicate offense was not only a "but for" cause, but also a proximate cause, of an alleged injury. *Holmes v. Sec. Inv'r Protec. Corp.*, 503 U.S. 258, 267-68 (1992). *See also Heinrich*, 668 F.3d at 405.

---

[32] Plaintiffs will likely attempt to excuse their pleading failure by alleging that "[m]any of the precise dates of the fraudulent uses of U.S. Mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records." (CAC, ¶ 311.) This argument is meritless. Plaintiffs do not identify which of the sixteen types of mail and wire fraud supposedly fall into this category, nor explain why they could not determine and allege the dates with sufficient specificity.

To determine whether plaintiffs have established proximate cause "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm," not on foreseeability. *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 12 (2010). In determining whether the relationship between the two is sufficiently direct, the court considers whether: (1) "plaintiff's damages [are] attributable to the violation, as distinct from other, independent factors;" (2) "claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury for the violative acts, to obviate the risk of multiple recoveries;" and (3) "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Holmes*, 503 U.S. at 269. The "general tendency" of the law with respect to "proximate cause inquiries under RICO" is "not to go beyond the first step." *Hemi Grp.*, LLC, 559 U.S. at 10.

Finding proximate cause here would require the Court to "go beyond the first step" to find a supposed connection to Ford.  *Hemi Grp., LLC*, 559 U.S. at 10. The causal link between Ford's alleged "fraud-on-the-regulator" conduct and Plaintiffs' claimed injuries is, at best, indirect and attenuated. In *Duramax*, this Court rejected the argument that plaintiffs failed to plead proximate causation because the alleged intervening acts were carried out by co-conspirator parties, not third-parties.

2018 WL 949856, at *25. But this conclusion overlooks the EPA's acceptance of the allegedly fraudulent COCs, which is an intervening factor—*by a third-party*— that breaks the causal link between Plaintiffs' claimed injuries and Ford.

## IV. The Court Should Dismiss Claims For Alleged Violations Of The Laws Of States Where No Named Plaintiff Lives Or Was Allegedly Injured.

The named Plaintiffs are *six individuals* who reside and allegedly bought Ford trucks in *five states* (Arizona, California, Illinois, Pennsylvania, and Texas). (CAC, ¶¶ 13-23.) Yet, they attempt to bring claims under the laws of *47 different states*, an overwhelming majority of which have no purported connection to their individual claims. Under these circumstances, this Court should rule *now* that the named Plaintiffs lack standing to assert claims in all states where they do not reside or claim to have suffered an injury. "Indeed, the Supreme Court has stated that 'named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Goldsby v. Ford Motor Co.*, 183 F. Supp. 2d 943, 948–49 (E.D. Mich. 2001) (Hood, J.) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal citations omitted)).

Federal courts that have deferred the standing question did so based on factual distinctions not applicable here. For instance, in a recent emissions case against Chrysler, a California district court deferred the standing inquiry until class certification where the complaint included claims from named plaintiffs in 43 states

and claims were asserted in only seven states and the District of Columbia without named plaintiffs. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Products Liab. Litig.*, 17-MD-02777-EMC, 2018 WL 1335901 (N.D. Cal. Mar. 15, 2018). The *Chrysler* court compared the situation before it with another case, *In re Carrier IQ, Inc., Consumer Privacy Litigation,* 78 F. Supp. 3d 1051 (N.D. Cal. 2015), where the court refused to defer the standing inquiry because the named plaintiffs came from 13 states and 35 additional states lacked a named plaintiff. The *In re Carrier IQ* court appropriately expressed "reservations [about] subjecting the [defendants] to the expense and burden of nationwide discovery without Plaintiffs first securing actual plaintiffs who clearly have standing and are willing and able to assert claims" under state law claims asserted. *Id.* at 1074; *see also In Re Packaged Ice Antitrust Litig,*, 779 F. Supp. 2d 642, 655-57 (E.D. Mich. 2011) (finding standing issues should be resolved in the first instance" because deferring them allows "named plaintiffs in a proposed class action… to embark on lengthy class discovery with respect to injuries in potentially every state in the Union."). Therefore, the *Carrier IQ* court dismissed claims under the laws of all states in which the named plaintiffs did not reside or claim to have purchased defendants' products.  The same result should follow here.

Indeed, Plaintiffs indisputably lack standing to bring claims in ***42 of the 47*** states identified in the CAC. It would be fundamentally unfair to subject Ford to

intrusive, burdensome, and expensive discovery across the United States when the six named Plaintiffs lack standing to pursue an overwhelming number of causes of action that appear in the CAC. Ford asks this Court to apply the reasoning of *Carrier IQ* and dismiss for lack of standing all claims other than those brought under Arizona, California, Illinois, Pennsylvania, and Texas law.

## CONCLUSION

For all these reasons, Ford respectfully requests the Court dismiss with prejudice Plaintiffs' Class Action Complaint in its entirety.

Respectfully submitted,

By:   /s/ Joel A. Dewey
    Joel A. Dewey
    Jeffrey M. Yeatman
    DLA PIPER LLP (US)
    The Marbury Building
    6225 Smith Avenue
    Baltimore, Maryland 21209
    (410) 580-4135
    joel.dewey@dlapiper.com
    jeffrey.yeatman@dlapiper.com
    *Attorneys for Defendant Ford*
    *Motor Company*

Respectfully submitted,

By:   /s/ Stephanie A. Douglas
    Patrick G. Seyferth (P47575)
    Stephanie A. Douglas (P70272)
    BUSH SEYFERTH & PAIGE PLLC
    3001 W. Big Beaver Rd., Ste. 600
    Troy, MI 48084
    (248) 822-7800
    seyferth@bsplaw.com
    douglas@bsplaw.com
    *Attorneys for Defendant Ford*
    *Motor Company*

Dated:  April 9, 2018