# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| LEN GAMBOA, JEFF RETMIER, NIKIAH NUDELL, DAVID BATES, PETE PETERSEN, and WILLIAM SPARKS, individually and on behalf of all others similarly situated,<br><br>  Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware corporation; ROBERT BOSCH GMBH, a corporation organized under the laws of Germany; and ROBERT BOSCH LLC, a Delaware Limited Liability Company,<br><br>  Defendants. | Case No. 18-cv-10106<br><br>Hon. Denise P. Hood<br><br>Magistrate Judge Elizabeth A. Stafford |

**PLAINTIFFS' THIRD NOTICE OF SUPPLEMENTAL AUTHORITY**

1.   Plaintiffs, by and through their undersigned attorneys, submit this Notice to inform the Court that on March 27, 2019, Judge Terrence G. Berg of this District issued an Opinion and Order in *Bledsoe et al. v. FCA US LLC et al.*, No. 16-cv-14024 (E.D. Mich. Mar. 27, 2019) ("Opinion") (attached as Exhibit A), which rejected some of the same or similar arguments made by the Defendants in this case in their motions to dismiss. *See* ECF Nos. 28 (Ford), 29 (Bosch).

2.   *Bledsoe* involves claims that FCA and Cummins had developed, manufactured, and sold vehicles that were equipped with emission-cheating

- 1 -

software.  Judge Berg's Opinion denied defendants' motion to dismiss plaintiffs'

RICO claims, as well as state consumer protection, fraud, and contract claims under

all 50 states and the District of Columbia (Judge Berg dismissed the MMWA claim).

*See* Opinion at 47.  In doing so, Judge Berg ruled on many of the same issues raised

by Defendants in this case, including preemption, non-puffery fraudulent statements,

and RICO.  His ruling is also consistent with every other recent decision involving

diesel emissions, which have uniformly denied motions to dismiss RICO and state

law claims.[1]

3.     First, Judge Berg considered the same preemption arguments that

Defendants have raised here. *See* Ford Br. at 13–27. Judge Berg, in holding that the

Clean Air Act does not preempt plaintiffs' claims, explained that plaintiffs' claims

"do not depend on proof of noncompliance with federal emissions standards."

Opinion at 28. "'Rather, Plaintiffs are attempting to hold [defendants] responsible

for what Plaintiffs allege are false representations about certain technology in the

[trucks].'" *Id.* (quoting *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 592 (E.D.

---

[1] *See In re Mercedes-Benz Emissions Litig.*, 2019 WL 413541 (D.N.J. Feb. 1, 2019); *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037 (E.D. Mich. 2018); *In re Ecodiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 295 F. Supp. 3d 927 (N.D. Cal. 2018); *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572 (E.D. Mich. 2017); *In re VW "Clean Diesel" Litig.*, 94 Va. Cir. 189 (Va. Cir. Ct. 2016); *see also In re VW "Clean Diesel" (Nemet)*, 349 F. Supp. 3d 881 (N.D. Cal. 2018) (RICO only; no state claims alleged).

Mich. 2017)) (alterations in original). In particular, defendants misrepresented the

performance of the truck, which deteriorated because of the defeat device:

> Plaintiffs allege that Defendants willfully concealed the presence of a "defeat device" which rendered the trucks more environmentally-harmful and less fuel-efficient than the advertisements they propagated, advertisements which induced reasonable consumers to purchase the trucks based on promises of cleanliness and efficiency. These well-pleaded allegations plausibly allege a scheme by defendants to intentionally misrepresent material aspects of the trucks in violation of state consumer protection laws.

*Id.* at 30.

4.    Second, Judge Berg rejected the notion—advanced by Ford—that

statements about emissions compliance or cleanliness are mere puffery. *Compare*

Opinion at 41–45 *with* Ford Br. at 33–34. In particular, "Defendants' statements that

the trucks meet an ascertainable and quantifiable standard for fuel efficiency and

emissions set in place by a third-party regulator (implying independent

corroboration) rise above nonactionable puffery." *See* Opinion at 44 (citations

omitted). In addition, even statements that are arguably puffery "reflect[]

Defendants' understanding that emissions and fuel efficiency were important

considerations for consumers, they are material to showing that Defendants' [sic]

knowingly defrauded consumers by installing a 'defeat device' in the trucks, as

Plaintiffs allege." *Id.* at 44–45.

5.      Third, Judge Berg allowed state law claims under all 50 states and the District of Columbia to proceed, because "the certification issues in the instant case are logically antecedent to the Article III standing concerns, and the determination of standing will be postponed until a class certification ruling." *Id.* at 26; *compare with* Ford. Br. at 48–50.

6.      Finally, Judge Berg denied the motion to dismiss plaintiffs' RICO claims, holding that (a) plaintiffs adequately alleged predicate acts with particularity (Opinion at 39–40); and (b) plaintiffs adequately pled RICO injury based on overpayments. Opinion at 23–24; *compare with* Bosch Br. at 30–32 (failed to plead with particularity), 17–23 (no RICO injury).

Dated: March 28, 2019                 Respectfully submitted,

By: */s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM PC
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: (206) 623-7292
steve@hbsslaw.com

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY
& AGNELLO, P.C.

5 Becker Farm Road
Roseland, NJ 07068
Tel: (973) 994-1700
JCecchi@carellabyrne.com

David S. Stellings
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 355-9500
dstellings@lchb.com

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, New York 10005
Tel: (212) 584-0700
cseeger@seegerweiss.com

*Attorneys for Plaintiffs and the
Putative Class*

# Exhibit A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| JAMES BLEDSOE, et al., on behalf of themselves and all others similarly situated, Plaintiffs, | |
| v. | Case No. 16-14024 Hon. Terrence G. Berg |
| FCA US LLC, a Delaware corporation, and CUMMINS INC., an Indiana corporation, Defendants. | |

**OPINION AND ORDER DENYING IN PART DEFENDANTS'**
**MOTIONS TO DISMISS PLAINTIFFS' SECOND**
**CONSOLIDATED AND AMENDED CLASS ACTION**
**COMPLAINT AND GRANTING DEFENDANTS' MOTIONS**
**TO DISMISS ALL MAGNUSON-MOSS WARRANTY ACT**
**CLAIMS (ECF No. 67, 68)**

## I.   Introduction

Plaintiffs in this proposed putative class action allege that Defendant FCA's 2007–2012 Dodge Ram 2500 and 3500 diesel trucks (the "Trucks" or "Affected Vehicles"), equipped with 6.7-liter Turbo Diesel engines manufactured by Defendant Cummins Inc., emit nitrogen oxides ("NOx") at levels that exceed federal and state emissions standards and the expectations of reasonable consumers. Plaintiffs allege that they purchased their trucks on the basis of advertising from defendants that touted the trucks as more fuel

1

efficient and environmentally friendly than other diesel trucks. Plaintiffs allege that despite marketing the trucks as containing "clean diesel engines," Defendants knew the trucks discharged emissions at levels greater than what a reasonable customer would expect based on the alleged representations. The instant Complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO Act"), the Magnuson Moss Warranty Act ("MMWA"), and consumer protection, breach of contract, and fraudulent concealment laws of 50 states as well as the District of Columbia.

Pending before the Court are Defendants' motions to dismiss Plaintiffs' second consolidated and amended class action complaint (ECF Nos. 67, 68) pursuant, in part, to Federal Rules of Civil Procedure 9(b), 12(b)(1) and 12(b)(6). For the reasons outlined below, Defendants' motions are **GRANTED** with prejudice as they pertain to the Magnuson Moss Warranty Act, but **DENIED** as they pertain to all other claims.

## II.    Background

Plaintiffs seek to bring claims on behalf of themselves and a nationwide class of all persons or entities in the United States who, as of November 1, 2016, owned or leased a 2007 to 2012 Dodge Ram 2500 or Dodge Ram 3500 pickup truck equipped with a Cummins 6.7-Liter diesel engine.

Plaintiffs also seek to establish sub-classes representing owners and/or lessees of the Trucks in every state and the District of Columbia, alleging deceptive advertising, breach of contract, and fraudulent concealment claims under the laws of those respective states.

The instant complaint—the Second Amended Complaint ("SAC")—is Plaintiffs' third complaint before this Court on these claims. This Court previously granted Defendants' motions to dismiss Plaintiffs' first amended complaint. *See* Amended Complaint, ECF No. 22; Motions to Dismiss, ECF Nos. 26 & 27; Op. and Order, ECF No. 60. In that Opinion, this Court explained the role of the United States Environmental Protection Agency ("EPA") in determining acceptable levels of emissions from diesel-engine vehicles. ECF No. 60, PageID.8281–83. This Court observed that Plaintiffs' claim that Defendants' installed a "defeat device "in the trucks was supported by four purported factual allegations. ECF No. 60, PageID.8288. Despite these allegations, Plaintiffs' complaint failed to state a claim for relief that was plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *and Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 566 (2007).

In brief, Plaintiffs' testing of a single truck, under poorly-defined parameters, was not enough to prove the existence of a "defeat device" where Plaintiffs also did not allege what the "defeat

3

device" did, and purported to rely on factual allegations concerning engines and vehicles different from the Trucks at issue. *See* Op. and Order, ECF No. 60.

Defendant FCA's briefing attempts to characterize the Court's previous Opinion and Order as holding that a Plaintiff may never rely solely on its own PEMS testing and must always have testing results from an independent entity in order to allege a plausible claim. FCA Motion to Dismiss, ECF No. 68, PageID.10250–10251 (quoting *Bledsoe* v. *FCA US LLC*, 2018 WL 1535392, at *10-11 (E.D. Mich. Mar. 29, 2018) (available at ECF No. 60).

This is an incorrect reading of the Court's previous Order. While that Order made it clear that other decisions had found complaints to plausibly allege the presence of specific defeat devices by coupling PEMS testing results with testing from third-parties, the Court did not create any specific two-factor test or requirement. The key inquiry, as the Court explained is whether "the totality of the allegations amounted to plaintiffs having plausibly pled that the products received did not live up to the claims made by Defendants." ECF No. 60, PageID.8305 (quoting *In re Mercedes-Benz Emissions Litig.*, 2016 WL 7106020 (D.N.J. Dec. 6, 2016)) (quotation marks omitted). Plaintiffs need to make specific allegations of fact capable of plausibly showing the presence of a defeat device. Here, Plaintiffs present a detailed accounting of their

4

own extensive PEMS testing, plus chassis dynamometer testing, plus data logging, plus an allegation of a specific defeat device that causes the vehicle to enter active regeneration more frequently in real world driving than when the vehicle senses it is being tested for regulatory compliance. In other words, Plaintiffs have included allegations of considerably expanded testing, extensive details about the nature of the testing, and have alleged the presence of at least one specific defeat device. They also provided factual allegations of an alleged "motive" by defendants for engaging in the alleged fraud. Defendants have each moved for dismissal pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(1) and 12(b)(6). Motions to Dismiss, ECF Nos. 67, 68.

### a. AECDs and Defeat Devices

Every vehicle that is sold in the United States must first be issued a certificate of conformity ("COC") by the EPA that indicates the vehicle meets federal emissions standards, and an Executive Order ("EO") by the California Air Resources Board ("CARB") indicating it meets California's emissions regulations (if it is to be sold in California). ECF No. 62, PageID.8385–8390. When an automobile manufacturer seeks to obtain a COC and an EO they must disclose all Auxiliary Emission Control Devices ("AECDs") present in the vehicle. ECF No. 62, PageID.8340–8341; Cummins Motion to Dismiss, ECF No. 67, PageID.9685–9686; FCA Motion to

5

Dismiss, ECF No. 68, PageID.10258. AECDs are devices that alter the normal operation of the emissions system in a vehicle. ECF No.67, PageID.9685–9686; ECF No. 68, PageID.10258–10259. AECDs are necessary to ensure adequate performance in certain scenarios, and are not illegal on their own. ECF No. 68, PageID.10259. But when an AECD is designed to circumvent emissions standards requirements, and is not disclosed in the application for a certificate of conformity, it is called a "defeat device," and it is illegal. ECF No. 68, PageID.10259. The discovery of "defeat devices" in certain Volkswagen vehicles created an international scandal that led to billions of dollars in fines and awards against that company, as well as tremendous reputational harm. ECF No. 62, PageID.8340.

Vehicle emissions testing commonly occurs on a device called a chassis dynamometer. ECF No. 62, PageID.8430. This device works like a treadmill for cars and trucks: the wheels are on rollers that allow them to spin freely, but the vehicle never moves. ECF No. 62, PageID.8422. This setup allows test operators to run the vehicle through a variety of tests that simulate actual load on the engine as if they are driving on a road, but without moving the vehicle at all. *Id.*

In the Volkswagen vehicle scandal, a "defeat device" was installed on millions of vehicles that was designed to recognize

6

when the vehicle was being tested,[1] and to change the vehicle's emissions to meet the standards, even though actual on-road emissions were much higher. ECF No. 62, PageID.8472–8473. Those "defeat devices" were first discovered by researchers at the Center for Alternative Fuels Engines and Emissions ("CAFEE") at West Virginia University who examined results obtained through a "portable emission measurement system," or "PEMS" test. ECF No. 62, PageID.8436. Those researchers were operating under a contract from the International Council on Clean Transportation, which mandated that they use PEMS testing. ECF No. 62, PageID.8436; ECF No. 62, PageID.8429 at n.60. Furthermore, Plaintiffs allege that "both CARB and EPA make wide use of PEMS to evaluate vehicles for the presence of defeat devices." ECF No. 62, PageID.8429. For instance, Plaintiffs allege that CAFEE worked in collaboration with CARB in discovering the VW defeat devices. ECF No. 62, PageID.8429.

---

[1] Plaintiffs explained different types of algorithms that are used to detect a chassis dynamometer including:

    a) Driven wheels are moving but the front wheels are not turning, a condition only experienced on a chassis dynamometer. All modern vehicles are equipped with steering wheel angle sensors and can detect when the steering wheel is being turned.

    b) On a 2-wheel drive vehicle, the driven wheels are moving but the non-driven wheels are not, a condition only experience on a chassis dynamometer.

    c) On a vehicle equipped with GPS, the vehicle's wheels are moving while the GPS position is not changing.

ECF No. 62, PageID.8435–8436.

Plaintiffs allege here that "the vehicle[s] perform… differently in a test environment (on the dynamometer) than in the real world (PEMS testing), which should not be the case unless the emissions system has been set up with a device to turn the system off or down during real-world testing." ECF No. 62, PageID.8337.

## III.  Standard of Review

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim is plausible on its face if the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atlantic Corp. v. Twombly* 550 U.S. 544, 556 (2007). Plausibility is not the same as probability, but rather "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* While plaintiffs are not required to provide "detailed factual allegations," Rule 8 of the Federal Rules of Civil Procedure demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

The first step in assessing the validity of a 12(b)(6) motion to dismiss is to identify any conclusory allegations contained in the complaint. *Iqbal*, 556 U.S. at 679. Although the Court must accept well-pleaded factual allegations of the complaint as true at the

motion to dismiss stage, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to state a plausible claim for relief]." *Id.* "A plaintiff's obligation to provide the grounds of [his] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

After assuming the truth of all well-pleaded factual allegations, the second step is for the Court to determine whether the complaint pleads "a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678–79 (citing *Twombly*, 550 U.S. at 556). A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. In other words, "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. A "plausibility" determination is a context-specific task that requires the reviewing court to draw on its judicial expertise and common sense. *See Iqbal,* 556 U.S. at 679.

Although the Court must accept all well-pleaded facts as true, conclusory allegations are not entitled to the same assumption of truth. *See Iqbal*, 556 U.S. at 678; *see also Eidson v. Tennessee Dept.*

9

*of Children's Services*, 510 F.3d 631 (6th Cir. 2007) ("Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice [to state a plausible claim for relief].") (internal citations omitted). The Sixth Circuit explained:

> [A] plaintiff cannot overcome a Rule 12(b)(6) motion to dismiss simply by referring to conclusory allegations in the complaint that the defendant violated the law. Instead, the sufficiency of a complaint turns on its "factual content," requiring the plaintiff to plead enough "factual matter" to raise a "plausible" inference of wrongdoing. The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct.

*16630 Southfield Ltd. P'Ship v. Flagstar Bank, F.S.B.,* 727 F.3d 502, 504 (citing *Iqbal,* 556 U.S. at 678, 682–83 and *Twombly,* 550 U.S. at 567).

## IV. Plaintiffs' Factual Allegations

Plaintiffs' claim is that 2007–2012 model year Dodge Ram 2500 and 3500 trucks ("Trucks") were marketed as "clean diesel" vehicles that complied with federal and state emissions standards and offered customers the "strongest, cleanest, quietest, best-in-class engine on the market," but that the Trucks produce emissions in quantities substantially higher than implied by advertising and at amounts greater than those permitted by federal and state regulations. *See* Cummins Press Release, Exh. 5, ECF No. 62-6

(describing engine in above-quoted terms). Plaintiffs also allege Defendants manufactured the Trucks to include "defeat devices" that alter the Trucks' performance so that they perform within the range of compliance when tested under regulatory conditions, but not during normal on-road use.

Plaintiffs rely centrally on twelve main factual allegations in their Second Amended Complaint ("SAC") to support these claims. ECF No. 62. To ensure that their complaint crosses the threshold line of plausibility—and therefore survives the motions to dismiss—plaintiffs need to allege enough factual matter to allow this Court to draw a reasonable inference that there is a "defeat device" in the trucks, and that presence of such a device caused economic harm to plaintiffs, creating a right of action under federal and state laws. Plaintiffs made the following twelve well-pleaded factual allegations in support of their claims:

   A. Diesel engines pose unique environmental challenges, and the U.S. responds with specific regulations;
   B. The trucks in question all share a common engine and aftertreatment design;[2]
   C. The Cummins engine and certification approach were unique;
       1. The Cummins engine employed an arrangement of the Diesel Oxidation Catalyst, NOx Adsorber Catalyst, and Diesel Particulate Filter that resulted in decreased cleanliness and fuel efficiency;

---

[2] Though the aftertreatment system and alleged "defeat devices" are not technically part of the engine, the Court will, for simplicity's sake, refer occasionally to the aftertreatment as being part of the "engine."

D. Sales of these diesel engines gave Cummins a competitive advantage in the heavy-duty engine market;

E. Cummins fraudulently violated EPA standards to obtain additional energy credits;

F. Dodge and Cummins jointly developed and promoted the trucks, focusing on emissions and cleanliness, because those issues were material to a reasonable consumer;

G. FCA has engaged in emissions deceptions before;

H. Plaintiffs tested the trucks using reliable methodology, including by using PEMS testing, dynamometer testing, and data logging;

I. Plaintiff's testing shows that a "defeat device" is present in the trucks;

J. NOx emissions are harmful to the environment, and Plaintiffs do not wish to drive vehicles whose emissions deliberately harm the environment;

K. There is a worldwide emissions scandal;

L. Plaintiffs' PEMS testing methodology has been used by other entities to discover defeat devices.

For the following reasons, the Court holds that Plaintiffs have adequately pleaded enough factual matter to plausibly allege that a "defeat device" is present in the trucks.

## V. Analysis

In their previous motions to dismiss, defendants called on the Court to decide how much factual matter must be pleaded to establish more than conclusory allegation. Defendants make the same request now. They say that Plaintiffs have filed a repackaged version of the dismissed amended complaint, and failed again to plead more than conclusory allegations related to the presence of "defeat devices" in the trucks. As noted above, although the Court

accepts all well-pleaded facts as true, conclusory allegations are not entitled to the same assumption of truth. *See Iqbal*, 556 U.S. at 678; *see also Eidson v. Tennessee Dept. of Children's Services*, 510 F.3d 631 (6th Cir. 2007) ("Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice [to state a plausible claim for relief].") (internal citations omitted). To determine whether the instant complaint states a plausible claim for relief, the Court must identify and weigh the well-pleaded factual matter contained in the complaint, while not accepting as true any conclusory legal inferences that are not sufficiently supported by well-pleaded facts.

### a. Plaintiff's Vehicle Testing Supports a Plausible Allegation That "defeat devices" are Present in the Trucks

In their first amended complaint, Plaintiffs alleged that they conducted portable emission measurement system ("PEMS") testing on a single 2012 Dodge Ram 2500, and that this testing showed high levels of NOx emissions. First Amended Complaint, ECF No. 22, PageID. 1567–69. But plaintiffs did not include relevant and material information about the condition of the truck, or the parameters of the testing, such as the altitude or incline at which testing occurred. Put simply, Plaintiffs failed to plausibly allege the presence of a defeat device—the results from their PEMS

13

testing results could have been explained in other ways.[3] For these reasons and others, this Court granted defendants' motions to dismiss.

Plaintiffs' SAC has far more detailed information[4] about the PEMS testing they conducted in furtherance of this lawsuit, and a better explanation of why this level of testing should be acceptable to the Court. Plaintiffs PEMS-tested three Dodge Ram 2500 trucks equipped with the 6.7 liter Cummins diesel engine: a 2007 with 41,000 miles, a 2009 with 48,000 miles, and a 2012 with 73,000 miles. ECF No. 62, PageID.8427. The vehicles "underwent rigorous inspections" and were examined to ensure the emission control systems "were intact and free from damage." *Id*. Plaintiffs also performed chassis dynamometer testing on the 2012 truck. *Id*.; *and* PageID.8436–8437. The trucks were tested in both stop-and-go conditions (emulating city driving) and in steady speed conditions (highway driving). ECF No. 62, PageID.8437–8441. The trucks were put through both cold and hot start tests, flat road driving, and driving on hills. *Id*. Lastly, in addition to the PEMS testing and dynamometer, the trucks were fitted with data logging software

---

[3] For more on the Court's reasoning, see Opinion and Order, ECF No. 60.

[4] Plaintiffs claimed at the February 15, 2019 hearing that they spent five paragraphs describing the testing in their previous complaint, but now dedicate 101 paragraphs (PageIDs.8421–8467) to describing the tests.

that tracked "all vehicle parameters broadcast by the vehicle's computer[.]" ECF No. 62, PageID.8465.

Plaintiffs based all their testing on the FTP-75 cycle—the test standard they allege is used to certify light and medium duty passenger cars and trucks such as these. ECF No. 62, PageID.8423; PageID.8437–38. The FTP-75 cycle has three phases to recreate the dynamic changes in speed and acceleration experienced during city driving and the steady high speeds of highway driving. *Id*. Though the FTP-75 is normally performed on a dynamometer, Plaintiff's aver that they designed on-the-road testing that recreated the stop-and-go conditions created in the FTP-75 cycle, but with a PEMS device attached to the truck. ECF No. 62, PageID.8438.

The trucks in question are outfitted with a "Diesel Particulate Filter" that traps and removes particulate matter from the trucks' emissions. ECF No. 62, PageID.8342. The trucks also have a "NOx adsorber catalyst" that captures and reduces NOx into less harmful substances before releasing those into emissions. ECF No. 62, PageID.8342. Because it traps particulates, the Diesel Particulate Filter is prone to getting bogged down and clogging. To avoid this, the aftertreatment engages in "regeneration," where the particulate matter in the Diesel Particulate Filter is burned off at very high temperatures. ECF No. 62, PageID.8398–8399. Regeneration can be passive or active. Passive regeneration is when

15

the Diesel Particulate Filter has high enough levels of NOx that the temperature inside gets hot enough on its own to burn the particulate matter. *Id*. at PageID.8398. Active regeneration is when the temperature is not hot enough on its own, so a small amount of fuel is injected directly into the Diesel Particulate Filter, causing a small combustion reaction and burning the particulate matter off. *Id*. at PageID.8398–8399. Active regeneration destroys certain particulate matter, but also creates additional NOx pollution. *Id*. Because it uses fuel and creates a combustion reaction that is downstream of other elements of the exhaust cleaning system, active regeneration creates higher than average emissions, and the EPA limits how frequently a vehicle enters active regeneration in normal use. *Id*. at PageID.8399.

Plaintiffs allege that most diesel aftertreatments are configured in this order:

16

DIESEL OXIDATION CATALYST → DIESEL PARTICULATE FILTER →

NOX REDUCTION CATALYST



ECF No. 62, PageID.8399.[5] This arrangement works well because NOx passes through the Diesel Particulate Filter first, helping to cause passive regeneration to occur. Also, the NOx Reduction catalyst is positioned to capture the additional NOx pollution created by regeneration events before it is expelled from the vehicle. Plaintiffs allege that the 6.7L Engine's aftertreatment is instead configured like this:

---

[5] The diagram is the first result returned for an image search on www.google.com for "NOx Adsorber engine" on March 27, 2019. The Court includes this image for demonstrative purposes only, and does intend to represent that this image is indicative of any Cummins diesel engine aftertreatment.

DIESEL OXIDATION CATALYST → NOX ADSORBER CATALYST →

DIESEL PARTICULATE FILTER



ECF No. 62, PageID.8400. Plaintiffs allege that this arrangement removes NOx before it enters the Diesel Particulate Filter, so the Diesel Particulate Filter is unable to engage in passive regeneration as often as needed to prevent particulate build up. To compensate, the aftertreatment must engage in relatively frequent active regeneration, which should—according to Plaintiff—cause excessively high emissions and poor fuel efficiency.

Using the 2007 truck, Plaintiffs performed stop-and-go testing over 506 miles, conducting 90 individual tests. ECF No. 62, PageID.8438. Plaintiffs allege that the average emissions produced in these tests were 4.4 times the standard, and the vehicle entered active regeneration cycles 10 times more frequently than disclosed in certification documents. *Id.*

18

The 2009 truck was also tested in stop-and-go conditions over 453 miles, over a total of 92 tests. *Id*. This truck averaged 5.3 times the standard for emissions, and also entered active regeneration cycles 10 times more frequently than required by certifications. *Id*.

Finally, the 2012 truck was tested in stop-and-go conditions over 987 miles, for a total of 181 individual tests. *Id*. at PageID.8439. This truck averaged 3.8 times the standard for emissions, and entered active regeneration cycles six times more frequently than required by certification. ECF No. 62, PageID.8439.

Based on the results of their tests, plaintiffs allege that "Cummins introduced a defeat device to dramatically increase the active regeneration frequency to an average of 14.6% in driving closely approximating the FTP-75 certification cycle and 13.3% in steady speed highway driving—7 to 10 times the values permitted by the reported upward adjustment factors." ECF No. 62, PageID.8426. Plaintiffs allege that the defeat device recognizes when the vehicle is being tested or not, allowing the vehicle to meet emissions standards in testing only. Plaintiffs allege that their test results have been controlled for other variables and can only be explained by the presence of a "defeat device." Reviewing all of these detailed allegations, the Court finds that Plaintiffs have corrected the deficiencies in their previous complaint and has plausibly alleged that the trucks have a "defeat device" in them.

19

The Court must also answer the question of whether this well-pleaded allegation—that the trucks contain a "defeat device"—is enough to plausibly support state law claims of deceptive practices (consumer protection), fraudulent concealment, and breach of contract, as well as federal claims under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961, et seq.) and the Magnuson-Moss Warranty Act (15 U.S.C. § 2301, et seq.). But before these specific claims can be addressed, the Court must consider whether Plaintiffs can bring claims under the laws of states in which no named plaintiff lives. Defendants argue that Plaintiffs may not.

### b. Class Certification is Logically Antecedent to Determination of Article III Standing because Plaintiff's Injuries Are Not In Doubt

Article III standing is a threshold question in every federal case and "determin[es] the power of the court to entertain the suit." *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 653 (E.D. Mich. 2011) (quoting *Warth v. Seldin,* 422 U.S. 490, 498 (1975)). Proceeding as a putative class does not alter the "fundamental requirement of standing," and named plaintiffs must show "that they personally have been injured, not that injury has been suffered by other, unidentified members of the class … which they purport to represent." *In re Packaged Ice*, 779 F. Supp 2d at *id*.; *Lewis v.*

20

*Casey,* 518 U.S. 343, 357 (1996). "Class representatives without personal standing cannot predicate standing on injuries suffered by members of the class but which they themselves have not or will not suffer." *In re Packaged Ice,* 779 F. Supp. 2d at 653 (quoting *Rosen v. Tennessee Comm'r of Fin. and Admin.,* 288 F.3d 918, 928 (6th Cir. 2002)).

Courts have been split in the past on the issue of whether to determine issues of standing before or after certifying a class. *See generally,* Linda S. Mullenix, *Standing and Other Dispositive Motions After Amchem and Ortiz: The Problem of "Logically Antecedent" Inquiries,* 2004 MICH. ST. L. REV. 703, 729 (2004); *also compare Hoving v. Transnation Title Ins. Co.,* 545 F. Supp. 2d 662, 668 (E.D. Mich. 2008) (Lawson, J.) (class certification is logically antecedent to, and should be decided before, the determination of standing), *with Smith v. Lawyers Title Ins. Co.,* No. 07–12124, 2009 WL 514210 at *3 (E.D. Mich. March 2, 2009) (Murphy, J.) (construing "logically antecedent" to permit consideration of standing issues prior to class certification). In cases where putative plaintiffs' injury is in doubt, issues of standing should be resolved before the class certification stage, observing that a "court must be sure of its own jurisdiction before getting to the merits." *In re Packaged Ice*, 779 F. Supp. 2d at 655, 657 (quoting *Easter v. American West Financial,* 381 F.3d 948 (9th Cir. 2004)). Bearing

21

this in mind, the Court turns now to assess whether plaintiffs' injury is in doubt.

"Plaintiffs seek damages and equitable relief for Defendants' misconduct related to the design, manufacture, marketing, sale, and lease of Polluting Vehicles with undisclosed, unreasonable, and/or unlawfully high emissions and impaired fuel economy[.]" ECF No. 62, PageID.8350. Plaintiffs do not seek damages related to injury of the environment (PageID.8470), nor for personal injury claims that may arise from the allegedly high emissions of the trucks (PageID.8486).[6] Instead, Plaintiffs allege they have suffered "ascertainable loss ... including, but not limited to, out-of-pocket loss, which can be measured at a minimum in part by the approximately $9,000 premium paid for a diesel vehicle over a comparable gas vehicle, and higher fuel costs due to the higher fuel consumption caused by the excessive active regeneration." ECF No. 62, PageID.8352. "Plaintiffs' allegations that they overpaid for the vehicle based on [a manufacturer's] representations constitute

---

[6] *Cf. Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 589 (E.D. Mich. 2017) ("To the extent Plaintiffs are seeking damages based solely on ... alleged violations of the CAA, those claims are preempted.") (citing *Beshear v. Volkswagen Grp. of Am., Inc.*, No. 16–CV–27–GFVT, 2016 WL 3040492, at *4 (E.D. Ky. May 25, 2016) ("Any such attempt by states or private parties to seek damages or other remedies based on alleged violations of the CAA is strictly prohibited in light of the broad sweep of the CAA, and thus state common law tort claims premised on the failure to meet CAA standards are preempted.")).

economic injury sufficient to establish Article III standing." *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 583 (E.D. Mich. Feb. 14, 2017) (Ludington, J.) ("*Counts I*").

Plaintiffs bring claims under RICO—among other statutes—which holds that plaintiffs suffered a cognizable injury only when "he has been injured in his business or property by the conduct constituting the violation." *Kramer v. Bachan Aerospace Corp.*, 912 F.2d 151, 154 (6th Cir. 1990). RICO plaintiffs must show that they suffered a concrete, out-of-pocket loss of tangible property. *Wall v. Michigan Rental*, 852 F.3d 492, 494 (6th Cir. 2017).

Plaintiffs allege that the emissions controls in the 6.7L diesel engine did not function as advertised in most ordinary driving and, as a result, the trucks routinely emitted NOx at levels far in excess of what a reasonable consumer would expect, and burned more fuel as a result of the design of the aftertreatment. Plaintiffs' Response, ECF No. 70, PageID.11495. Plaintiffs further allege that Defendants overcharge approximately $9,000 per truck (compared to comparable gas-powered trucks) plus additional fuel purchase costs based on misrepresentations made possible by the presence of a "defeat device." *Id.*; *see also Counts I,* 237 F. Supp. 3d at 583. Plaintiffs do not have to plead with specificity how this overcharge is calculated yet. *Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 964 (N.D. Cal.

2018) ("*CDJ EcoDiesel*"). Rather, they must simply plead the fact that damages have been incurred by plaintiffs, and estimate the amount of those damages. Taken together, the allegations in the SAC clearly allege an injury-in-fact. *See In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1052 (E.D. Mich. 2018) (Ludington, J.) ("Plaintiffs' overpayment theory suffices to provide standing to sue GM"); *Ackerman v. U.S. Dep't of Agric.*, 2018 WL 1858165, at *7 (E.D. Mich. Apr. 18, 2018) ("Claims of overpayment, wherein a plaintiff paid a premium but did not receive the anticipated consideration, are cognizable injuries in fact.") (citing *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 794 (6th Cir. 2009)); *CDJ EcoDiesel*, 295 F. Supp. 3d at 945–51 ("Allegations of overpayment based on a defendant's failure to disclose a product's limitations are clearly sufficient to satisfy Article III's injury-in-fact requirement."); *Counts I*, 237 F. Supp. 3d at 582–83 (injury-in-fact where "Plaintiffs allege that GM's misrepresentations resulted in their overpaying for a vehicle because the vehicle did not work in the way GM promised it would.").

Defendants also claim that Plaintiffs have failed to identify the very specific advertisement to which they each were exposed, and that caused them to purchase their vehicles. FCA Motion to Dismiss, ECF No. 68, PageID.10266. But Plaintiffs need only allege "injury that fairly can be traced to the challenged action of the

defendant, and not injury that results from the independent action of some third party not before the court. *Counts I,* 237 F. Supp. 3d at 585–86 (quoting *Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 796 (6th Cir. 2009). "Proximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1394 (2014). Thus, the purpose of causation is to "eliminate those cases in which a third party and not a party before the court causes the injury." *Counts I* at *id.* (quoting *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 542 (6th Cir. 2004)).

For these reasons, Plaintiffs' injuries here are not in doubt, nor is their claim that they relied upon the advertising of both Defendants in deciding to purchase their particular vehicles. Plaintiffs are not seeking relief for themselves under the laws of states where they don't live. They instead are advancing "claims for relief under the statutes of the jurisdictions in which they reside but seek similar relief for absent class members" under the statutes for consumer protection, fraudulent concealment, and breach of contract of those absent members' states. *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2013 WL 2456612, at *11 (E.D. Mich. June 6, 2013) (Battani, J.). Similarly, in *Hoving v. Transnation Title Ins. Co.*, this district found that when the claim of named plaintiffs "is typical of those individuals whose claims arise under

25

the laws of other states," the "question whether he has standing to proceed as a class representative will be subsumed in the class certification decision." 545 F. Supp. 2d 662, 667–68.

Consistent with the approaches in *In re Auto. Parts* and *Hoving*, the certification issues in the instant case are logically antecedent to the Article III standing concerns, and the determination of standing will be postponed until a class certification ruling. *See In re Auto. Parts*, No. 12-MD-02311, 2013 WL 2456612, at *9 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997)).

### c. Clean Air Act Preemption

Defendants contend that all of Plaintiffs' state law claims are pre-empted by the Clean Air Act ("CAA"). Cummins Motion to Dismiss, ECF No. 67, PageID.9655 (citing 42 U.S.C. § 7543(a) ("No state or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engine subject to this part."); and *Counts I*, 237 F. Supp. 3d at 589 (CAA preempts civil action to the extent it is based on alleged violations of the CAA)). Cummins contends that the EPA has "uniform emission standards and testing protocols for motor vehicles in the United States, along with a set of enforcement provisions and penalties for ensuring compliance with these regulations" per 42 U.S.C. § 7521. ECF No.

67, PageID.9707. Cummins also contends that Congress "included a broad preemption provision in the CAA to prevent precisely the type of *ad hoc* emission standards that Plaintiffs seek to impose here." *Id.*

Defendants therefore maintain that Plaintiffs are attempting to "enforce a standard relating to the control of [vehicle] emissions," and that such attempts are preempted because they relate to "the control of emissions from new motor vehicles or new motor vehicle engine[s]." *See* ECF No. 67, PageID.9707–9708; *see also* 42 U.S.C. § 7543(a) ("No state or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engine subject to this part."); *and In re Office of Attorney Gen. of State of N.Y.*, 269 A.D. 2d 1, 3, 709 N.Y.S. 2d 1 (2000) (Court finding that action by a state attorney general focused on punishing vehicle manufacturers for purposely circumventing federal regulation is preempted).

Defendants believe that Plaintiffs seek to "enforce" their PEMS testing "standard" on the RAM Trucks over the EPA testing that resulted in the EPA's approval of the Engines. ECF No. 67, PageID.9708–9709 (citing *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252–53 (2004) (defining "standard" broadly to include "that which is established by authority, custom, or general consent")). Defendants go on,

27

"Plaintiffs... [are attempting] to rewrite the EPA's emissions regulations by replacing the EPA's criteria with Plaintiffs' criteria, and the EPA's certification testing standards with Plaintiffs' preferred tests." ECF No. 67, PageID.9709.

Plaintiffs' claims do not depend on proof of noncompliance with federal emissions standards. *See Counts v. Gen. Motors, Inc.*, 2017 WL 1406938 at *2 (E.D. Mich. Apr. 20, 2017) ("*Counts II*") (citing *Counts I*, 237 F. Supp. 3d at 595) . As in *Counts I*, Plaintiffs here "are not attempting to tighten emissions regulations or introduce separate state emissions regulation.... Rather, Plaintiffs are attempting to hold [defendants] responsible for what Plaintiffs allege are false representations about certain technology in the [trucks]." *Counts I*, 237 F. Supp. 3d at 592 (E.D. Mich. 2017). Accordingly, Plaintiffs claims here are not preempted by the CAA.

## 1. Plaintiffs adequately pleaded the elements of state consumer protection and fraudulent concealment laws and these claims are not preempted by the CAA

Defendants' opposition on this point as they relate to Plaintiffs' allegations of violations of state consumer protection and fraudulent concealment laws is based on a misapprehension of Plaintiffs' claims. Plaintiffs allege that Defendants fraudulently concealed or misrepresented the functionality and effectiveness of the relevant trucks, which was substantially lower than a

reasonable customer would expect. ECF No. 62; *See Counts II.* , 2017 WL 1406938 at *2. Plaintiff's claim is that Defendants installed a "defeat device" in the trucks to create "the appearance of low emissions without the reality of low emissions," and that the very nature of a "defeat device" is such that it is meant to be concealed from regulators and consumers alike. *Counts II,* 2017 WL 1406938 at *2.

Plaintiffs allege violation of the state consumer protections laws of every state and the District of Columbia. As summarized in the SAC, those State consumer protection laws generally prohibit,

> "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," … including: "(c) Representing that goods or services have … characteristics … that they do not have;" … "(e) Representing that goods or services are of a particular standard … if they are of another;" … "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" … "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" … "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" … and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."

ECF No. 62, PageID.8509 (citing MICH. COMP. LAWS § 445.903(1)). Plaintiffs allege that Defendants willfully concealed the presence of a "defeat device" which rendered the trucks more environmentally-harmful and less fuel-efficient than the advertisements they propagated, advertisements which induced reasonable consumers to purchase the trucks based on promises of cleanliness and efficiency. These well-pleaded allegations plausibly allege a scheme by defendants to intentionally misrepresent material aspects of the trucks in violation of state consumer protection laws.

Similarly, plaintiffs have plausibly pleaded claims of fraudulent concealment, because manufacturers have a duty to disclose[7] all AECDs, and because Plaintiffs allege that Defendants had exclusive knowledge of the "defeat devices" but actively concealed them, knowing they would be material to consumers' considerations. *See Counts II,* 2017 WL 1406938 at *2 ("[I]n at least some states, a duty to disclose [the presence of a "defeat device"] arises when the defendant has exclusive knowledge of … or actively conceals [the "defeat device."]"). Plaintiffs have adequately pleaded

---

[7] Under the CAA, it is a violation "for any person to . . . install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass defeat or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being . . . installed for such use or put to such use." 42 U.S.C. § 7522(a)(3)(B).

enough factual matter to make their claims that Defendants violated state consumer protection and fraudulent concealment laws rise to the level of plausibility. Defendant's Motions to Dismiss are **DENIED** as they pertain to Plaintiffs' state law consumer protection and fraudulent concealment claims.

### 2. Plaintiffs Plausibly State a Claim for Breach of Contract

Plaintiffs allege breach of contracts claims again defendant FCA only. Plaintiffs allege that "each and every sale of a Polluting Vehicle constitutes a contract between FCA and the purchaser or lessee." ECF No. 62, PageID.8521–8522. Plaintiffs believe that FCA breached their contract with consumers by "selling or leasing to Plaintiffs and the other Subclass members defective Polluting Vehicles and by misrepresenting or failing to disclose that the NOx reduction system in the Polluting Vehicles turns off or is limited during normal driving conditions, and is thus less valuable than vehicles not equipped with the Adsorber Engine." ECF No. 62, PageID.8521–8522.[8] Plaintiffs allege that FCA's "misrepresentations and omissions…caused Plaintiff and the other Subclass members to make their purchases or leases of their Polluting Vehicles." ECF No. 62, PageID.8521. Absent those

---

[8] Plaintiffs repeat the same claim verbatim under the breach of contract law for each state. The Court cites only to their first usage of this claim.

misrepresentations, Plaintiffs and Subclass members would have chosen to purchase different vehicles entirely, or possibly pay less for these vehicles. ECF No. 62, PageID.8521. Plaintiffs allege that they have contractual privity with FCA through "sufficient direct dealings with either FCA or its agents (e.g., dealerships and technical support) [.]" ECF No. 62, PageID.8506. However, Plaintiffs also assert that "privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between FCA and its dealers[.]" ECF No. 62, PageID.8506.

Defendant FCA does not address Plaintiffs' state law breach of contract claims directly. Rather, in a footnote, they claim "There are several additional grounds on which to dismiss the remainder of Plaintiffs' claims, including that Plaintiffs do not plead … any contract with FCA that could be breached[.]" ECF No. 68, PageID.10256 at n.2.

Defendant seeks to incorporate its argument from their previous Motion to Dismiss, in which they claimed that Plaintiff's failed to allege they purchased their trucks from FCA directly, as opposed to third party dealerships. FCA's First Motion to Dismiss, ECF No. 27, PageID.3587; PageID.3627. Doing so would not be entirely fair, because it would effectively permit Defendant to exceed the 60-page limit the Court established in the previous

32

round of motions to dismiss. *See* May 27, 2017 Text Only Order (granting 60 page limit for Defendants' Motions to Dismiss); *also* ECF No. 33 (stipulated order granting page extensions for opposition and reply briefs). However, the Court will address the arguments made in Defendant's first Motion to Dismiss so as to explain why they fail.

Defendants say that without direct contractual privity, there can be no contractual breach. ECF No. 27, PageID.3626. Defendants also say that Plaintiffs failed to allege "which specific provisions of such contracts that FCA supposedly breached." ECF No. 27, PageID.3627. Defendant refers frequently to the *Counts I* decision, in which that plaintiff's similar breach of contract claim was dismissed. However, in that case, plaintiff conceded that they failed to adequately plead their claim, and the court's decision contained no analysis of privity or breach. For that reason, the *Counts I* decision as it pertains to breach of contract is of limited use here.

Defendants also cite to *Harris*, an unpublished decision which says, "[i]t is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." *Harris v. Am. Postal Workers Union*, 1999 WL 993882, at *4 (6th Cir. Oct. 19, 1999).

Plaintiffs allege in their SAC that, "On or about September 7, 2007, [James Bledsoe] purchased a 2007 Dodge Ram 2500…, in Merced, California." ECF No. 62, PageID.8353. Similar representations follow for each named plaintiff.[9] In the instant case, the "contract" is the sale of the vehicle. *Elecromotive Div. of Gen. Motors Corp. v. Transportation Sys. Div. of Gen. Elec. Co.*, No. CIV. 03-70940, 2004 WL 3550145, at *7 (E.D. Mich. July 28, 2004) (quoting *In re Caveney,* 761 F.2d 671, 675 (Fed. Cir. 1995) ("It is well settled that a sale is a contract between parties to give and to pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.")). Plaintiffs has adequately pleaded that named plaintiffs purchased their vehicles on the basis of multiple advertising from Defendants as to the low-emissions and high fuel economy of the vehicles. What's more, Plaintiff's allegation is that Defendants knowingly installed and caused to operate a device whose only purpose was to circumvent the regulatory safeguards in place for emissions and fuel economy. Taken as true, this well-pleaded allegation

---

[9] Though it is implied by the very nature of Plaintiffs' claims, Plaintiffs do not clearly and straight-forwardly allege that they purchased their trucks either new, or from an FCA-approved dealership, as opposed to pre-owned or through a private sale. This issue is more appropriate to be explored through the process of discovery, however, and the Court will not dismiss these claims on the basis of an imperfect pleading, when the remainder of the claims are well-pleaded and plausible.

establishes that consumers received a product other than the one
for which they bargained consideration, thereby plausibly stating a
claim for breach of contract.

### d. Racketeer Influenced and Corrupt Organizations Act

Plaintiffs allege that the Defendants are "persons" under 18
U.S.C. § 1961(3) because they hold a "legal or beneficial interest in
property." ECF No. 62, PageID.8490. Plaintiffs further allege that
Defendants,

> along with other entities and individuals, were
> employed by or associated with, and conducted or
> participated in the affairs of, one or several RICO
> enterprises (the "Emission Fraud Enterprise"), whose
> purpose was to deceive regulators and the driving public
> into believing that the Class Vehicles were complaint
> with emissions standards, "clean," and
> "environmentally friendly" so as to increase revenues
> and minimize losses from the design, manufacture,
> distribution, and sale of the Class Vehicles and the
> defective catalyst devices installed therein. As a direct
> and proximate result of their fraudulent scheme and
> common course of conduct, Defendants were able to
> extract revenues of billions of dollars from Plaintiffs and
> the Class.

ECF No. 62, PageID.8490–8491. Plaintiffs claim that this behavior
violates 18 U.S.C. § 1962 (c)&(d). Among other things, section 1962
(c)&(d) makes it unlawful for a person or enterprise engaging in
interstate commerce to participate in "racketeering activity," either
directly or indirectly. "Racketeering activity" can be predicated by

involvement with numerous acts, but Plaintiffs allege here that Defendants "committed, conspired to commit, and/or aided and abetted in the commission of two predicate acts": mail fraud (18 U.S.C. §1341) and wire fraud (18 U.S.C. § 1343). ECF No. 62, PageID.8497.

Plaintiffs allege that "each of the RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. §1961(4) … through which [they] conducted their pattern of racketeering activity in the U.S." ECF No. 62, PageID.8491. Plaintiffs also allege that, with the assistance of unknown third parties, the "association-in-fact enterprise engaged in interstate and foreign commerce," for the purpose of obtaining EPA certificates of conformity and CARB Executive Orders so that FCA could sell vehicles it knew to contain a "defeat device." ECF No. 62, PageID.8491.

Plaintiffs allege that Defendants committed the predicate act of mail fraud when they "sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Class Vehicles by means of false pretenses, misrepresentations, promises, and omissions." ECF No. 62, PageID.8498.

Plaintiffs allege that Defendants committed the predicate act of wire fraud "by causing to be transmitted and/or received,

materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions." ECF No. 62, PageID.8498. Plaintiffs then proceed to catalog what they believe are examples of Defendants' use of the mails and wires (including the transmission, delivery and shipment of the following) by the RICO Defendants that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

    a.    Application for certificates submitted to the EPA and CARB and Approved Applications received in the mail on April 9, 2008, June 23, 2008, June 6, 2008, and July 2, 2008.

    b.    Applications submitted to the EPA and CARB for each model year as follows:
- 2007–2010 Dodge Ram 2500 with Cummins diesel (2WD, 4WD);
- 2011–2012 Dodge Ram 2500 with Cummins diesel (non-SCR systems, 2WD, 4WD);
- 2007–2010 Dodge Ram 3500 with Cummins diesel (2WD, 4WD); and
- 2011–2012 Dodge Ram 3500 with Cummins diesel (non-SCR systems, 2WD, 4WD).

    c.    The Polluting Vehicles.

    d.    The Adsorber Engines.

    e.    The essential hardware for the Polluting Vehicles.

    f.    False and misleading emissions tests.

    g.    Additional fraudulent applications for COCs and EOs.

    h.    Fraudulently obtained COCs and EOs.

    i.    Vehicle registrations and plates as a result of the fraudulently obtained EPA COCs and EOs.

j. False or misleading communications to the public and to regulators.

k. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, falsely promoted, and concealed the true nature of the Polluting Vehicles.

l. Documents intended to facilitate the manufacture and sale of the Polluting Vehicles, including bills of lading, invoices, shipping records, reports and correspondence.

m. Documents to process and receive payment for the Class Vehicles by unsuspecting Class members, including invoices and receipts.

n. Payments to Cummins.

o. Deposits of proceeds.

p. Other documents and things, including electronic communications.

ECF No. 62, PageID.8498–8499. Plaintiffs allege that Defendants used U.S. Mail, interstate facsimile, and interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of a scheme to deceive regulators and consumers and lure consumers into purchasing vehicles the Defendants knew emitted illegal amounts of pollution, despite their advertising campaign that the Class Vehicles were "clean" diesel cars. ECF No. 62, PageID.8500.

Plaintiffs further allege that each of the Defendants also constitutes a single, legal entity "enterprise" under 18 U.S.C. §1961(4), "through which the RICO Defendants conducted their pattern of racketeering activity in the U.S." ECF No. 62,

PageID.8491. Plaintiffs say that because "FCA and Cummins jointly designed, manufactured, and sold the Polluting Vehicles, and FCA obtained COCs and the EOs through material misrepresentations and omissions," both FCA and Cummins participated directly or indirectly in the enterprise. ECF No. 62, PageID.8492.

### 1. Plaintiffs' pleading satisfies Rule 9(b) and adequately alleges predicate crimes of mail fraud and wire fraud

Defendants claim that Plaintiffs have failed to allege the underlying predicate acts with particularity, that defendant Cummins acted with the requisite scienter, or that there are facts showing Cummins was the proximate cause of Plaintiffs' alleged harm. ECF No. 67, PageID.9656. Defendants further claim that Plaintiffs did not plead a "cognizable injury" to business or property, nor any predicate acts of mail or wire fraud. ECF No. 68, PageID.10287.

Both Defendants argue that Plaintiffs must meet a heightened pleading standard under Rule 9(b) for their RICO predicate allegations. ECF No. 68, PageID.10267–10268 (citing FED. R. CIV. P. 9(b); *Minger* v. *Green*, 239 F.3d 793, 800 (6th Cir. 2001)); ECF No. 67, PageID.9693–9694 (quoting *Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 322

(6th Cir. 1999) ("[Rule 9(b) requires] plaintiff, at a minimum, to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.")).

Plaintiffs respond, "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." ECF No. 70, PageID.11504 (quoting *Duramax*, 298 F. Supp. 3d at 1055–1056 ). The *Duramax* court went on, that, "[in] a complex case, involving multiple actors and spanning a significant period of time, where there has been no opportunity for discovery, the specificity requirements of Rule 9(b) [should] be applied less stringently." ECF No. 70, PageID.11504 (quoting *Duramax*, 298 F. Supp. 3d at 1055–1056 (punctuation omitted)). Plaintiffs assert that Defendants "have notice of the *who* (Defendants), the *what* (they designed and installed an engine designed to appear one way on lab tests, but act another on the road), and the *when* (Defendants jointly designed, manufactured, and sold the Vehicles, and FCA obtained the necessary certifications to introduce the Vehicles into the stream of commerce)," and that such notice satisfies Rule 9(b)'s pleading requirement. ECF No. 70, PageID.11503–11504 (emphasis in original). At this stage, such pleading is sufficient.

### 2. Some of Defendants' statements about the Trucks are more than mere puffery and are not preempted

Defendants claim that all of their public statements and advertising are either irrelevant, mere "puffery," or are preempted. ECF No. 68, PageID.10278 ("the alleged misstatements are either puffery or preempted (or both)"). Defendants say that statements extolling the Trucks as "so good, so powerful, so clean" or "the cleanest" or "a model of cleanliness" are "precisely the type of [i]nherently subjective statements about cleanliness, or promises of reliability that the Sixth Circuit has held cannot form the basis for a fraud claim[.]" ECF No. 68, PageID.10279 (citing *Seaton* v. *TripAdvisor LLC*, 728 F.3d 592, 598 (6th Cir. 2013) (quotation marks omitted); *Ram Int'l Inc.* v. *ADT Sec. Servs., Inc.*, 2011 WL 5244936, at *6 (E.D. Mich. Nov. 3, 2011) (Edmunds, J.) (statement that a product is "efficient" or "reliable" is inactionable puffery), *aff'd*, 555 F. App'x 493 (6th Cir. 2014)). Defendants point also to the *Counts I* decision, which found that "GM's representations about the 'high quality' and 'safety' of its vehicles," including statements about the Cruze's "more efficient combustion," "improved performance," and "90% less emissions" were "inherently subjective" or "nonquantifiable" and therefore inactionable puffery." ECF No. 68, PageID.10280 (citing *Counts I*, 237 F. Supp. 3d at 598–99).

41

The *Counts I* decision was focused on whether statements made in advertising were "quantifiable." That court pithily captured the essence of puffery when it observed, "[u]nlike claims about candlepower or battery life, assertions that a product has "90% less emissions" raises the question: 90% less than what?" *Counts I* 237 F. Supp. 3d at 598. "[T]he more general the assertions, the more likely they are to be considered puffery." *Id. at* 597 (citing *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990)). Accordingly, when assertions include specific numerical representations, they are more likely to rise above puffery, but numbers alone are not enough. *Compare Smith–Victor Corp. v. Sylvania Elec. Prods., Inc.*, 242 F. Supp. 302, 308–09 (N.D. Ill. 1965) (statements like "far brighter than any lamp ever before offered for home movies" were puffery, but statements promising "35,000 candlepower and 10–hour life" were actionable) *with Tietsworth v. Sears, Roebuck & Co.*, No. 5:09-CV-00288 JFHRL, 2009 WL 3320486, at n. 5 (N.D. Cal. Oct. 13, 2009) (claim that a machine would save "at least 47% less water and 53% less energy" was puffery despite being numerically quantifiable). The focus in determining whether quantification lifts a claim above puffery is whether the claim "impl[ies] independent corroboration." *Counts I*, 237 F. Supp. 3d at 597. There is not a bright line, but a "slippery slope on the continuum between numerical claims that

42

imply independent corroboration and numerical claims involving mere puffery." *Counts I*, 237 F. Supp. 3d at 598 (quoting *Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*, No. 94CIV3958(AGS), 1994 WL 267836, at *7 (S.D.N.Y. June 15, 1994) (claim that a product was "100 times" better than a competitor's was puffery)).

Many of Defendants' claims on their own are simply touting the "cleanliness" of their vehicles, which is well-established puffery. *Counts v. Gen. Motors, LLC*, 237 F. Supp. 3d 572, 598 (E.D. Mich. 2017). But some of their claims rose above this, and made quantifiable promises such as meeting the 2010 emissions standards three years early. ECF No. 62, PageID.8411–8412; Exh. 14, ECF No. 62-15. This number is quantifiable because the 2010 emissions standards were an ascertainable and specific goal. Claiming to have met the standard early is not the same as alleging having met specific amount of emissions—rather, it is saying that these trucks performed at *least* as well as the 2010 standards. Plaintiffs claim is that, in real driving conditions, the trucks *never* meet those 2010 standards. Only when the "defeat device" recognizes that the truck is being tested for compliance does the truck meet the 2010 standards, as advertised by Defendants. Defendants sought to specifically highlight the clean emissions of these trucks, because they knew that this was a selling point for consumers.

43

Defendants' individual statements along the lines that the trucks are the cleanest or best in the world are nonactionable puffery. But Defendants' statements that the trucks meet an ascertainable and quantifiable standard for fuel efficiency and emissions set in place by a third-party regulator (implying independent corroboration) rise above nonactionable puffery. *See Counts I*, 237 F. Supp. 3d at 598; *see also Duramax*, 298 F. Supp. 3d at 1086 ("to the extent Defendants may have had no duty to disclose the operation of the Duramax engine's emissions technology in the abstract, a duty arose when they created the appearance that it was a 'clean diesel' engine."). The *Duramax* court found that defendant's "extensive advertising which emphasized the low emissions and environmentally-friendly nature of its 'clean diesel' engine underscores" that defendant's understanding that the "level of emissions produced by a diesel engine was a material consideration for consumers purchasing a vehicle." *Duramax*, 298 F. Supp. 3d at 1084. As such, "regardless of whether these advertisements would be actionable on their own, they were material to the scheme." *Id*. Likewise here, Plaintiffs allege that Defendants made many statements which, on their own, were nothing more than puffery. But since these statements reflected Defendants' understanding that emissions and fuel efficiency were important considerations for consumers, they are material to

44

showing that Defendants' knowingly defrauded consumers by installing a "defeat device" in the trucks, as Plaintiffs allege.

A civil RICO suit may be brought by "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). A party advancing a civil RICO claim must allege the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Duramax,* 298 F. Supp. 3d at 1066–67 (quoting *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012)). In this case, Plaintiffs have adequately pleaded these elements, alleging that Cummins and FCA formed an enterprise that engaged in fraudulent representations regarding the emissions and fuel economy of the Trucks to both consumers and regulators, for the ultimate purpose of selling more vehicles than either or both Defendants would otherwise be able. Plaintiffs have satisfied the Rule 9(b) requirements, and have identified advertising language that was specific and quantifiable enough to rise above "mere puffery." Defendant's motions to dismiss Plaintiffs' RICO claims are **DENIED**.

### e. Magnuson-Moss Warranty Act

The Magnuson-Moss Warranty Act ("MMWA") provides a private right of action for any consumer who is damaged when a

warrantor fails to comply with a warranty. 15 U.S.C. § 2301, *et seq.*
In their first amended complaint, Plaintiffs alleged that defendants
violated the MMWA, but did not allege any underlying state law
warranty claims. *See* Am. Complaint, ECF No. 22, PageID.1601–
04. Plaintiffs previously conceded that the MMWA section of their
first amended complaint was deficient and requested leave to
amend this portion of their complaint. *See* Resp. to First Motions to
Dismiss, ECF No. 34, PageID.4834–35. This Court agreed, and
expected Plaintiffs to correct this deficiency in the second amended
complaint. *See, generally*, Op. and Order, ECF No. 60.

Defendants' allege in their motions that Plaintiffs again failed
to adequately plead MMWA claims in the SAC, for the same reason
as before. In their response to defendants' motions, Plaintiffs agree,
saying, "Plaintiffs concede that the SAC should be amended to
allege underlying state law warranty claims and respectfully
request leave from the Court to do so." Plaintiff's Resp., ECF No.
70, PageID.11522. Plaintiffs do not provide any explanation for why
they have failed to correct this deficiency, nor why three separate
complaints were not sufficient for them to adequately articulate
facts in support of the MMWA claim. The Court **DENIES** Plaintiff's
request for leave to amend their second amended complaint in order
to fix this long-known deficiency. The Court will therefore **GRANT**
Defendants' motions to dismiss as they pertain to claims that

Defendants violated the Magnuson Moss Warranty Act, and dismiss Plaintiffs' MMWA claims with prejudice.

## VI. Conclusion

For the reasons above, Defendants' Motions to Dismiss (ECF Nos. 67, 68) are

**DENIED** as they pertain to violations of the Racketeer Influenced and Corrupt Organizations Act (Count I of federal statute allegations);

**DENIED** as they pertain to violations of consumer protection (Count I of state statute allegations), fraudulent concealment (Count II of state statute allegations), and breach of contract (Count III of state statute allegations), brought under the laws of all 50 states and the District of Columbia;

**GRANTED** as they pertain to violations of the Magnuson-Moss Warranty Act (Count II of federal statute allegations), with prejudice.

**IT IS SO ORDERED**.


Dated: March 27, 2019          s/Terrence G. Berg
                                                    TERRENCE G. BERG
                                                    UNITED STATES DISTRICT JUDGE

## <u>Certificate of Service</u>

I hereby certify that this Order was electronically submitted on March 27, 2019, using the CM/ECF system, which will send notification to each party.

<u>s/Amanda Chubb</u>
Case Manager