UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEN GAMBOA, *et al.*,

     Plaintiffs,               CASE NO. 18-10106

v.                            HONORABLE DENISE PAGE HOOD

FORD MOTOR COMPANY,
ROBERT BOSCH GMBH,
ROBERT BOSCH LLC,

     Defendants.
_____/

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS [#153]

## I.     BACKGROUND

### A. Procedural Background

On January 10, 2018, Plaintiffs Len Gamboa, Jeff Retmier, Nikiah Nudell, David Bates, Pete Petersen, and William Sparks, individually, and on behalf of all other similarly situated individuals (collectively, "Plaintiffs" or the "Gamboa Plaintiffs"), commenced this action (the "Gamboa Action") against Defendants Ford Motor Company ("Ford"), Robert Bosch GmbH ("Bosch GmbH"), and Robert Bosch LLC ("Bosch LLC") (collectively, "Defendants"). [ECF No. 1] Plaintiffs allege that Defendants unlawfully manufactured and sold defective vehicles that had defective emissions controls in violation of: the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d) (Count 1); and various state consumer protection statutes (Counts 2-57).  [*Id.*]

On April 6, 2018, Plaintiffs James Ruston, Vic Sparano, Andreas Alsdorf, Jeffrey Martin, Ken Ryan, Christopher Dieterick, Johnny Tolly, Kohen Marzolf, and Bruce Szepelak, individually, and on behalf of all other similarly situated individuals filed a Complaint (the "Ruston Action")[1] against all Defendants from the Gamboa Action.  These plaintiffs are represented by the same attorneys who represented the Gamboa Plaintiffs.  The same attorneys who represented Defendants in the Gamboa Action are representing Defendants in the Ruston Action.  In the Ruston Action, Plaintiffs allege that in connection with Ford's vehicles, Defendants were in violation of: RICO (Count 1); and various state consumer protection statutes (Counts 2-63).

On April 20, 2018, Plaintiffs Glenn Goodroad, Jr., Richard Castro, Alan Flanders, Edward Hatten, Michael King, William McKnight, Luther "Ed" Palmer, Don Recker, Ivan Tellez, Brian Urban, Christina Bouyea, Value Additives LLC, and Michael Wilson, individually, and on behalf of all other similarly situated individuals filed a Complaint (the "Goodroad Action")[2] against all Defendants from the Gamboa Action as well as James Hackett ("Hackett"), Mark Fields ("Fields"),

---

[1] *Ruston et al. v. Ford Motor Company et al.*, Case No. 2:18-cv-11108.
[2] *Goodroad, Jr. et al. v. Ford Motor Company et al.*, Case No. 5:18-cv-02403.

and Volkmar Denner in the United States District Court, Northern District of California. Attorneys Elizabeth J. Cabraser, David Stellings, Gretchen Freeman Cappio, Jason Henry Alperstein, Lynn L. Sarko, and Paul Jeffrey Geller represent the plaintiffs. Ford is represented by Attorneys Jeffrey M. Yeatman, Joel A. Dewey ("Dewey"), Stephanie A. Douglas, and Susan M. McKeever. Attorney Dewey represents Hackett and Fields. Attorney Matthew D. Slater represents Bosch GmbH and Bosch LLC in the Goodroad Action. In the Goodroad Action, Plaintiffs allege that in connection with Ford's vehicles, Defendants were in violation of: RICO (Count 1); and fraud by concealment (Count 2).

On June 14, 2018, the plaintiffs and defendants in the Goodroad Action agreed to stipulate to a transfer of the case to the Eastern District of Michigan. When the parties agreed to this stipulation, they both expressed that once their case was transferred, they would work with the plaintiffs from the Gamboa and Ruston Actions to file a consolidated amended complaint in the Eastern District of Michigan. [ECF No. 39-2] On June 14, 2018, the Honorable Beth Labson Freeman signed a Stipulation and Order to Transfer the Class Action Complaint Pursuant to 28 U.S.C. § 1404(a). On June 15, 2018, the Goodroad case was transferred from the Northern District of California to the Eastern District of Michigan.[3]

---

[3] *Goodroad, Jr. et al. v. Ford Motor Company et al.*, Case No. 2:18-cv-11900.

On July 31, 2018, Dina Badagliacco ("Badagliacco") individually, and on behalf of all other similarly situated individuals filed a Complaint (the "Badagliacco Action")[4] against all Defendants from the Gamboa Action.  Attorneys Sharon S. Almonrode, Melvin B. Hollowell, and E. Powell Miller represent Badagliacco.  The same attorneys who represented Defendants in the Gamboa Action are representing Defendants in the Badagliacco Action.  In the Badagliacco Action, Badagliacco alleges that in connection with Ford's vehicles, Defendants were in violation of: RICO (Count 1); New Jersey's Consumer Fraud Act (Count 2); and fraud by concealment under New Jersey common law (Count 3).

On April 9, 2018, Gamboa Plaintiffs filed a Motion for the Appointment of Interim Class Counsel. [ECF No. 27] Defendants filed their Response to that Motion on April 23, 2018. [ECF No. 31] On April 27, 2018, Gamboa Plaintiffs filed their Reply. [ECF No. 33]

On April 9, 2018, both Ford and Bosch LLC filed a Motion to Dismiss Gamboa Plaintiffs' Complaint. [ECF No. 28]; [ECF No. 29] On July 9, 2018, Defendants filed a Motion to Consolidate Cases.  [ECF No. 39]

On March 31, 2019, the Court granted Plaintiffs' Motion for the Appointment of Interim Class Counsel, granted Defendants' Motion to Consolidate, and denied

---

[4] *Badagliacco v. Ford Motor Company et al.*, Case No. 2:18-cv-12379.

Defendants' Motions to Dismiss. [ECF No. 69] On May 1, 2019, Plaintiffs filed their Amended Complaint ("Complaint"). [ECF No. 73]

In August 2019, Plaintiffs moved to authorize service on Bosch GmbH by hand delivery to its U.S. counsel, Cleary Gottlieb, and by email to kontakt@bosch.de. [ECF No. 100] Alternatively, Plaintiffs requested 90 days to attempt service under the Hague Convention. [*Id.*] On October 25, 2019, Magistrate Judge Elizabeth A. Stafford granted Plaintiffs' Motion Authorizing Service on Bosch GmbH via email and hand delivery through Cleary Gottlieb. [ECF No. 127] On November 8, 2019, Bosch GmbH filed a Motion to Reconsider [ECF No 132] Magistrate Judge Stafford's Order authorizing service on Bosch GmbH. On November 15, 2019, Magistrate Judge Stafford's Order [ECF No. 135] granted in part and denied in part Bosch GmbH's Motion for Reconsideration. The November 15, 2019 Order granted Bosch GmbH's request to be served through their U.S. attorney in this matter, Cleary Gottlieb. [ECF No. 135].

On November 27, 2020, Bosch GmbH filed an Objection [ECF No. 146] to Magistrate Judge Stafford's Order issued on November 15, 2019.[5] Plaintiffs filed a Response to Bosch GmbH's Objection on December 18, 2019, [ECF No. 152] and

---

[5] Bosch GmbH also alleges here that the Court does not have personal jurisdiction because of the alleged improper service of process. *King v. Taylor*, 694 F.3d 650, 655 (6th Cir. 2012) ("[W]ithout proper service of process, consent, waiver, or forfeiture, a court may not exercise personal jurisdiction over a named defendant."); *see also Plastic Molded Techs., Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 2009 WL 10680593, at *3 (E.D. Mich. May 19, 2009) (Hood, J.).

Bosch GmbH filed its Reply on January 8, 2020.  [ECF No. 156]  On November 30, 2020, the Court denied Bosch GmbH's Objection to Magistrate Judge Stafford's November 15, 2019 Order.  [ECF No. 214]

Because Bosch GmbH did not join the instant suit until December 2019, it filed the instant Motion to Dismiss on December 18, 2019.  [ECF No. 153]  On January 22, 2020, Plaintiffs filed their Response, [ECF No. 162] and Bosch GmbH filed its Reply on February 5, 2020.  [ECF No. 163]

## B. Factual Background

Plaintiffs are suing Ford, Bosch GmbH, and Bosch LLC for allegedly selling vehicles that were not sold to consumers as advertised. [ECF No. 73] According to Plaintiffs, Ford made several claims to consumers regarding its Ford F-250, F-350, and F-450 "Super Duty" vehicles ("Subject Vehicles") that were untrue, including that its: (1) 6.7-liter Power Stroke Diesel is the "Cleanest Super Diesel Ever"; (2) proven technology and innovative strategies were used to meet the latest federal emissions standards; (3) vehicles reduced nitrogen oxide ("NOx") by 80% over previous models; and (4) vehicles were "best-in-class" with respect to fuel economy and that they were the most tested Power Stroke diesel engines ever.  [*Id.* at 2434] Plaintiffs contend that scientifically valid emissions testing revealed that Ford's Super Duty vehicles emit levels of NOx that are many times higher than: (1) its gasoline counterparts; (2) what a reasonable consumer would expect; (3) what Ford

6

had advertised; (4) the Environmental Protection Agency's ("EPA") maximum standards; and (5) the levels set for the vehicles to obtain a certificate of compliance, which allows them to be sold in the United States. [*Id.* at 2435-35] Plaintiffs state in their Complaint that exposure to the pollutants from NOx has been linked with "serious respiratory illnesses and premature death due to respiratory-related or cardiovascular-related effects." [*Id.* at 2438]

Plaintiffs' claims are based on the fact that they believe that "Ford's top selling Super Duty vehicles often emit far more pollution on the road than in the emissions-certification testing environment." [*Id.* at 2436] Plaintiffs argue that Ford's vehicles employ "defeat devices" to turn down emissions controls when the vehicles sense that they are not in the certification test cycle. [*Id.*] According to Plaintiffs, Ford benefits by using defeat devices because they allow Ford to reverse the traditional order of the exhaust treatment components and put the selective catalytic reduction in front of the diesel particulate filter. [*Id.* at 2436] Plaintiffs state that in modern vehicles with electronic engine controls, defeat devices are almost always activated by illegal software in each vehicle's engine control module. [*Id.*] Plaintiffs contend that these defeat devices give Ford the ability to obtain and market higher power and fuel efficiency from its engines while still passing cold-start emissions certifications tests. [*Id.*]

Plaintiffs argue that Ford's representations are "deceptive and false" and should cause Ford to be held legally responsible for selling their vehicles while omitting information that would be material to a reasonable consumer.  [*Id.* at 2441] It is Plaintiffs' contention that Ford had a duty to disclose that in real-world driving conditions, Ford's vehicles could "only achieve high fuel economy, power, and durability by reducing emission controls in order to spew NOx into the air."  [*Id.* at 2443] Plaintiffs further contend that Ford was responsible for disclosing to consumers that their vehicles may be "clean" diesels in certain circumstances but are "dirty" diesels under common driving conditions.  [*Id.*]

Plaintiffs bring their present lawsuit forward against the named Defendants because they believe that they are all responsible for the harms associated with Ford's alleged misrepresentations.  While these are Ford's vehicles, Plaintiffs name Bosch GmbH[6] and Bosch LLC as defendants because Plaintiffs allege that they were active and knowing participants in Ford's scheme.  [*Id.* at 2444] Plaintiffs claim that Bosch GmbH and Bosch LLC developed, manufactured, and tested the Electronic Diesel Control Unit 17 ("EDC17") that allowed Ford to implement the defeat devices.   [*Id.*] Plaintiffs also allege that Defendants coordinated with various unnamed coconspirators. [*Id.* at 2640]

---

[6] Bosch GmbH is a German company. [ECF No. 73-3, PageID.2973, 2980; ECF No. 73-5, PageID.3162]. Bosch LLC, is a U.S. company and is one of Bosch GmbH's roughly 300 subsidiaries worldwide. [*Id.*] Bosch GmbH and its subsidiaries are called "The Bosch Group," and that group describes itself as "a leading global supplier of technology and services." [ECF No. 73-5, PageID.3162]

Plaintiffs bring this action individually, but also on behalf of all other current and former owners or lessees of the vehicles.  [*Id.* at 2444] Plaintiffs are seeking damages, injunctive relief, and equitable relief for Defendants' alleged misconduct related to the design, manufacture, marketing, sale, and leasing of the vehicles.  [*Id.*]

## II.   LEGAL ANALYSIS

### A. Standard of Review

#### 1.  Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for a motion to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  This type of motion tests the legal sufficiency of the plaintiff's complaint.  *Davey v. Tomlinson*, 627 F. Supp. 1458, 1463 (E.D. Mich. 1986).  When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Directv Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  A court, however, need not accept as true legal conclusions or unwarranted factual inferences."  *Id.* (*quoting Gregory v. Shelby Cnty.*, 220 F.3d 443, 446 (6th Cir. 2000)).  "[L]egal conclusions masquerading as factual allegations will not suffice."  *Edison v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

As the Supreme Court has explained, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level. . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *see LULAC v. Bresdesen*, 500 F.3d 523, 527 (6th Cir. 2007).   To survive dismissal, the plaintiff must offer sufficient factual allegations to make the asserted claim plausible on its face.   *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).   "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  (*Id.*)

Federal Rule of Civil Procedure Rule 9(b) applies to fraudulent concealment claims. *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975).   Although other circuits have relaxed the pleading standard for omission-fraud claims, the Sixth Circuit has not.   *See, e.g.*, *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (finding a complaint that alleges the "precise misconduct with which [the defendant is] charged" provides sufficient notice to satisfy Rule 9(b)) (internal citations omitted).

In the Sixth Circuit, fraudulent omission complaints require a plaintiff to plead "'the who, what, when, where, and how' of the alleged omission." *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012).   This Circuit

specifically requires fraudulent omission complaints to allege "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [the defendant] obtained as a consequence of the alleged fraud." *Id.* Under this standard, a complaint is adequate when it alleges that a manufacturer knew of a defect before sale, and that the plaintiffs would not have bought the product or would have paid less for the product if they knew about the defect. *See Wozniak v. Ford Motor Co.*, No. 2:17-CV-12794, 2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019).

### 2. RICO Claim

A RICO civil suit may be brought by "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Section 1962 provides that: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *Id.* at § 1962(c). In other words, a party advancing a civil RICO claim must establish their right to sue and then further allege the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d

393, 404 (6th Cir. 2012) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

### B. Bosch GmbH's Claims

#### 1. Regulatory Statutes and RICO Claims

Plaintiffs may assert a RICO claim only if they can identify an injury to their "business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). In so limiting the scope of RICO standing, Congress exhibited an intention to exclude "personal injury—that is, an injury 'to a person, such as a broken bone, a cut, or a bruise' or a 'bodily injury.'" *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 564 (6th Cir. 2013) (quoting *Black's Law Dictionary* 857 (9th ed. 2009)). Similarly, a RICO injury must be concrete, not intangible or speculative. *See Saro v. Brown,* 11 Fed.Appx. 387, 389 (6th Cir. 2001); *see also Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989) (explaining that RICO plaintiffs must identify a "reasonable and principled basis of recovery" which is "not based upon mere speculation and surmise"); *see also Short v. Janssen Pharm., Inc.*, No. 1:14-CV-1025, 2015 WL 2201713, at *3 (W.D. Mich. May 11, 2015) ("Short must, at a minimum, show some direct, pecuniary injury to his own pocket that is unrelated to the claimed personal injury.").

In *Reiter v. Sonotone Corp.*, the Supreme Court interpreted § 4 of the Clayton Act, which authorizes "[a]ny person who shall be injured in his business or property"

by reason of an antitrust law violation to bring suit.  442 U.S. 330, 337 (1979).  The Supreme Court held that "where petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct, she has alleged an injury in her 'property' under § 4."  *Id.* at 342.  That holding did not involve the RICO statute, but the Sixth Circuit has held that "*Reiter*'s common-sense observation about § 4 applies with equal logical force to § 1964(c)."  *Jackson*, 731 F.3d at 564.

Bosch GmbH asserts that Plaintiffs may not bring a private RICO claim for treble damages based on actions that allegedly violate a regulatory statute.  *See Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 525 (11th Cir. 2000) (rejecting a state RICO claim based on the defendant's alleged failure to make required safety disclosures under the National Traffic and Motor Vehicle Safety Act).  Bosch GmbH contends that Plaintiffs' RICO claim is actually a claim under the Clean Air Act ("CAA"), which does not include a private right of action.  Bosch GmbH further asserts that simply alleging that the EDC17 gave Ford the ability to alter the behavior of the emissions-control system cannot establish the presence of a defeat device.  Bosch GmbH explains that Plaintiffs cannot explain the concept of a defeat device and connect it to Bosch GmbH's alleged wrongful conduct without referencing the specific operation and disclosure of emissions-control software requirements of the CAA's regulatory framework. [ECF No. 153, Pg.ID 7459]

13

Citing *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1229 (D.C. Cir. 1991), Bosch GmbH argues that the CAA's statutory scheme for administrative relief "leaves no room for a RICO action." *Id.* at 1226. The defendants in *Danielsen* fraudulently entered into contracts with incorrect minimum wage classifications in violation of the McNamara-O'Hara Service Contract Act's ("SCA") regulatory provisions. *Id.* In *Danielsen*, the Court determined that the SCA did not include a private right of action. *Id.*

Bosch GmbH also relies on *Brown v. First Tenn. Bank Nat'l Ass'n*, to support its argument that a regulatory statute's lack of a private right of action precludes a RICO claim. 753 F. Supp. 2d 1249, 1254 (N.D. Ga. 2009); *see also S. Snow Mfg. Co., Inc. v. SnoWizard Holdings, Inc.*, 912 F. Supp. 2d 404, 421 (E.D. La. 2012) (explaining that where "fraud in obtaining" rights from a federal agency does not establish RICO violation," it would be nonsensical to believe "asserting those [rights] in the marketplace" would comprise a RICO violation). In *Brown*, the court rejected a RICO claim brought when the defendant injured the plaintiff by making misrepresentations about loan-related charges in violation of Department of Veterans Affairs regulations. *Id.* at 1263. Despite finding that the defendant, "affirmatively misrepresented the [loan-related] charges and used the mail and wires to further the scheme," the court, held that the absence of a private statutory right of

action and a comprehensive administrative framework, evidenced Congress' intent to preclude a RICO claim. *Id.* at 1258-59.

Plaintiffs respond by claiming that the CAA includes a savings clause,[7] which preserves their RICO claim.  Various courts involved with similar emissions-fraud cases have heard, and rejected, similar iterations of the savings clause argument. *See, e.g.*, *Counts v. Gen. Motors, LLC*, No. 16-CV-12541, 2018 WL 5264194, at *12 (E.D. Mich. Oct. 23, 2018).  This Court also finds the savings clause argument unpersuasive.  *Id.*  ("In other words, the allegations concerning regulatory violations are collateral allegations which are unnecessary to sustain Plaintiffs' RICO claim."); *see also In re Duramax Diesel Litig.* ("*Duramax*"), 298 F. Supp. 3d 1037, 1088 (E.D. Mich. 2018) ("Plaintiffs' RICO claim is not primarily premised on proof of violation of EPA regulations and thus is cognizable.  The alleged common purpose at the heart of the RICO scheme is the deception of consumers. The alleged injury is overpayment by consumers . . . . Plaintiffs' RICO claim is not an attempt to obtain a remedy which is exclusively within the purview of the EPA.").

The Court is more persuaded by Plaintiffs arguments that *Ayers*, *Danielsen*, and *Brown* are distinguishable from the instant case.  Plaintiffs distinguish *Ayers* by citing the *Duramax* opinion, which found that "[p]laintiffs allegations are not

---

[7] The savings clause states: "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief . . . ." 42 U.S.C. § 7604(e).

dependent upon proof of violation of federal emission regulations," but rather, the "common purpose at the heart of the RICO scheme is the deception of consumers." *Duramax*, 298 F. Supp. 3d at 1088.

Plaintiffs distinguish *Danielsen* by indicating that the RICO claims were premised on violations of the SCA. And the SCA explicitly assigns the task of determining and enforcing wage levels and other employee benefits to the Department of Labor. *Id.* at 176. The express designation of an enforcement entity prevented private civil actions—even RICO claims. *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1229 (D.C. Cir. 1991) ("The very fact that Congress enacted the SCA with its complex framework for administrative recovery suggests that Congress did not contemplate that violation of the SCA constituted the criminal felony of mail fraud."). Here, Plaintiffs assert that unlike the SCA, the CAA does not provide a regulatory overview for fraud claims, so it surely cannot provide an exclusive remedy for fraud claims.

As for *Brown*, Plaintiffs explain that the court opined that the plaintiff's suit was "at its core, an attempt to use a fraud-predicated civil RICO claim to enforce regulatory provisions." *Brown*, 753 F. Supp. 2d at 1260. As Plaintiffs indicate, this Court's previous opinion found that Plaintiffs "do not seek to set or enforce any emissions standards or obligations." [ECF No. 69, Pg.ID. 2378]

Bosch GmbH asserts that Plaintiffs' RICO claim should be dismissed because Congress did not intend for Plaintiffs' RICO claim to fall within the "zone of interests" of the CAA. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-32 (2014); *see also Hemi Group, LLC v. City of New York*, 559 U.S. 1, 19 (2010) ("[A]lleged fraud is based on violations of [a comprehensive] Act, the nature and consequences of the fraud are properly determined solely by the scope of that Act.") (internal quotations and citations omitted); *see also Callahan v. A.E.V., Inc.*, 182 F.3d 237, 267 (3d Cir. 1999) (rejecting small beer distributorship's RICO claim against a chain of liquor stores that allegedly fraudulently obtained liquor licenses, observing that "[t]he purpose of the Pennsylvania Liquor Code is to promote temperance, not to protect small-business owners or ensure competition among beer retailers").

In response, Plaintiffs assert that since the CAA does not regulate fraud, they do not look to the CAA for redress. Plaintiffs contend that their RICO claim is permissible because it falls within the "zone of interests" of mail and wire fraud statutes. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 645 (2008) (rejecting the district court's holding that plaintiffs "are not in the class of individuals protected by the mail fraud statute, and therefore are not within the zone of interests that the RICO statute protects, because they were not recipients of the alleged

misrepresentations and, at best were indirect victims of the allege fraud") (internal quotations omitted).

### 2. The Relationship between Bosch GmbH and Plaintiffs

Bosch GmbH asserts that *Illinois Brick Co.'s* indirect purchaser standing rule bars Plaintiffs' RICO claim.  *Illinois Brick Co. v. Illinois*, 431, U.S. 720 (1977).[8]  Although the price effects of an antitrust[9] injury can indirectly affect anyone in the stream of distribution, *Illinois Brick* provides that only direct purchasers harmed by an antitrust violation are permitted to assert an antitrust injury claim.  *Id.* at 729.  The Sixth Circuit has applied *Illinois Brick's* antitrust rule to RICO claims.  *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004) ("[I]ndirect purchasers lack standing under RICO and the antitrust laws to sue for overcharges passed on to them by middlemen."); *see also McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842 855 (3d Cir. 1996) (holding that in the RICO context, "the central and dispositive issue is whether plaintiffs are 'direct purchasers'").

---

[8] The Supreme Court did not foreclose states from permitting indirect purchaser actions. *See, e.g.*, *A & M Supply Co. v. Microsoft Corp.*, 654 N.W.2d 572, 574 (Mich. App. 2002). Michigan's Legislature passed an *Illinois Brick* repealer law in 1984. *See* MCL 445.778(2); *see also GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 823 (E.D. Mich. 2018) (finding that several states have implemented "so-called" '*Illinois Brick* repealer statutes'" that "allow recovery by indirect purchasers under state law"). Here, however, Bosch GmbH indicates—and Plaintiffs do not argue otherwise—that Plaintiffs have not brought any state law claims against the specific defendant, Bosch GmbH. [ECF No. 153, Pg.ID 7457 n. 3]; *see also Miller v. Mercy Anderson Hosp.*, 2007 WL 9729000, at *2 (S.D. Ohio July 17, 2007) ("Plaintiff must state specifically . . . the defendant or defendants she is suing.").

[9] The Supreme Court and the Sixth Circuit have repeatedly confirmed that antitrust principles are equally applicable to RICO cases. *See Cty. of Oakland v. City of Detroit*, 866 F.2d 839, 845 (6th Cir. 1989) ("Although we have focused primarily on the antitrust laws in the foregoing discussion, most of what we have said is applicable also to the treble damage provision of RICO, 18 U.S.C. § 1964(c), a provision patterned directly on § 4 of the Clayton Act.").

Plaintiffs counter that *Holmes v. Sec. Inv'r Prot. Corp*, —the case that establishes *Trollinger's* reasoning—establishes that here, Plaintiffs do qualify as direct purchasers.  503 U.S. 258, 268 (1992).  Plaintiffs claim that because their injuries stem directly from Bosch GmbH's actions, and not indirectly from "the misfortunes visited upon a third person," there is a "direct connection between the fraudulent scheme and their injuries."  *Id.* at 268.

Although the Court previously determined that "Plaintiffs have sufficiently demonstrated that there was a direct link between the injuries that they allege they suffered and Bosch LLC's conduct," Bosch GmbH correctly indicates that "a RICO case with a[n] [indirect purchaser] problem is better suited to dismissal on the pleadings than a RICO case with a traditional proximate-cause problem." *Trollinger*, 370 F.3d at 615.

Bosch GmbH cites *In re Insulin Pricing Litig.*, 2019 WL 643709, at *1 (D.N.J. Feb. 15, 2019), to further support its indirect purchaser argument.  In that case, the plaintiff consumers were "multiple purchasers down the distribution chain" in a dispute involving a scheme to "artificially inflat[e] the benchmark prices" for insulin products.  *Id.*

Plaintiffs argue that *In re Insulin* is inapplicable because the plaintiffs in that case did not allege fraud or show that they were directly defrauded.  Plaintiffs indicate that the plaintiffs "merely alleged a pass-through of the inflated price from

19

one of the various intermediaries to the consumers." *Id.* at *12.  Plaintiffs note that *In re Insulin*, distinguished itself from *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*("*Avandia*"), which ultimately allowed the plaintiff consumers' claim to proceed. 804 F.3d 633 (3d Cir. 2015).

The court in *In re Insulin* opined that *Avandia* differed because the *Avandia* plaintiffs' claim stemmed from the defendants' "alleged failure to disclose known health risks of various drugs ultimately included in their formularies."  *In re Insulin*, 2019 WL 643709, at *9.  Similar to *Avandia*, Plaintiffs argue that their claim is not based on passed-on injuries but that their claim is "couched in the defendants' alleged failure to disclose known" defects in the Subject Vehicles.  *Id.*

Next, Plaintiffs contend that the Supreme Court's indirect purchaser jurisprudence does "not mean to preclude all possibility of recovery for injury that was transmitted indirectly . . . ."  *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours*, 61 F.3d 1250, 1257 (7th Cir. 1995) (citing *Holmes v. Sec. Inv'r Prot. Corp*, 503 U.S. 258, 272 (1992)).  Instead, Plaintiffs argue that there are an "infinite variety" of RICO cases.  *Id.*  And that reality "makes it virtually impossible to announce a black-letter rule that will dictate the result in every case" for ascertaining whether an alleged RICO violation was the proximate cause of a plaintiff's injuries. *Id.* at 272 n. 20.

20

Plaintiffs also argue that *Trollinger* is inapplicable because they are the "most direct" and "intended victims" of the alleged RICO scheme.  *See Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*, 2015 WL 5719801, at *8–9 (D.P.R. Sept. 29, 2015) *adopted by*, 2016 WL 9459821 (D.P.R. Mar. 31, 2016) (rejecting *Trollinger* because the Plaintiffs had sufficiently established their direct connection with the defendant who was a coconspirator).

In response, Bosch GmbH contends that their relationship with Plaintiffs fits the indirect purchaser framework established in *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) ("[I]f manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A.").  Bosch GmbH further explains that it is a component part supplier "A," which allegedly sold to manufacturer "B" (Ford), which sold to retailers "C" (dealers), which then sold or leased products to "D" (consumers).  Claiming to have no relationship with consumers (or Plaintiffs), Bosch GmbH asserts that it is at least three levels removed from Plaintiffs. [ECF No. 153, Pg.ID 7466]

The Court finds that Bosch GmbH's analysis of the distribution chain and Plaintiffs' relationship to it is overly simplified and the Court notes that Plaintiffs are direct purchasers for purposes of their RICO claim.

First, the Court must determine if Bosch GmbH is a coconspirator with other members of the distribution chain.  *See Tamburo v. Dworkin*, 601 F.3d 693, 699

(7th Cir. 2010) (providing that the "crucial question" for courts considering whether the coconspirator exception applies is whether the alleged anticompetitive conduct stems from an agreement between the alleged coconspirators).  If so, *Illinois Brick's* coconspirator exception may apply.  *See Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 633 (7th Cir. 2002).

The Sixth Circuit has not yet addressed the "coconspirator exception," but the Seventh Circuit has provided persuasive guidance in *Nippon Paper*.  In *Nippon Paper*, the Seventh Circuit explained that *Illinois Brick* "allocate[s] to the first non-conspirator in the distribution chain the right to collect 100% of the damages."  *Id.* at 631-32; *see also In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 604 (7th Cir.1997) ("[A]ny indirect-purchaser defense would go by the board since the [plaintiffs] would then be direct purchasers from the conspirators.").  And where intermediate purchasers in the chain of distribution are alleged to be involved in the conspiracy, the first purchasers outside of the conspiracy "are entitled to collect damages from . . . the manufacturers . . . if conspiracy and overcharges can be established."  *Paper Sys. Inc.,* 281 F.3d at 632 (citing *Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630 (1981)).

Here, Plaintiffs' Complaint adequately alleges, with specificity, the necessary facts to establish Bosch GmbH's complicity in an alleged conspiracy.

The Complaint provides:

> All Bosch ECUs, including the EDC 17, run on complex, highly proprietary engine management software over which Bosch exerts near-total control. In fact, the software is typically locked to prevent customers, like Ford, from making significant changes on their own. Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end.

[ECF No. 73, Pg.ID 2598-99 ¶ 242]  The Complaint, when viewed in the light most favorable to Plaintiffs, satisfies the legal standard. Plaintiffs have "causally link[ed]" their RICO injury to "an illegal [scheme] in the market." *Brunswick v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977).

The Court is mindful of the Supreme Court's warning against granting exceptions to the indirect purchaser rule—even the most deserving cases.  *Illinois Brick*, 431 U.S. at 744.  But the intent of *Illinois Brick* was not to restrict the sole non-conspirators in a multi-level distribution chain—usually consumers—from bringing a private antitrust claim.  *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 107 (1984) ("Congress designed the Sherman Act as a consumer welfare prescription.") (citation omitted); *see also Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir.1992) ("[A]ntitrust laws, [ ] protect consumers from suppliers rather than suppliers from each other."). Finding that the next purchaser who is not involved in an unlawful conspiracy has standing to sue is not an exception to *Illinois Brick*, but rather an acknowledgment

that *Illinois Brick* "bans Clayton Act lawsuits by persons who are not direct purchasers from the defendant antitrust violator[s]." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159 (3d Cir. 2002).

In response to such a theory, Bosch GmbH claims that the automobile dealerships could also sue Defendants, and that the dealerships are the proper party. *See Ford Motor Co. v. Lane*, 86 F. Supp. 2d 711, 717 (E.D. Mich. 2000) (dismissing antitrust claims by Ford-owning plaintiff because "[t]here are more direct potential plaintiffs . . . such as the dealerships which purchase directly from Ford").

Although the dealerships are unnamed, the Court views Plaintiffs' statement that "there are no more directly affected plaintiffs" [ECF No. 162, Pg.ID 7765] as an allegation that Ford dealerships may have been involved in the conspiracy. *See* [ECF No. 73, Pg.ID 2640, ¶ 338] ("[Defendants] exerted control . . . by ensuring that the other RICO Defendants and *unnamed coconspirators* complied with the fraudulent scheme.") (emphasis added). The dealerships' roles as potential unnamed coconspirators is currently undetermined. But discovery may illuminate more facts about the unnamed coconspirators, which precludes dismissing Plaintiffs claims. *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014 (9th Cir.1981).

The logic in *Williams Inglis* also applies here.  *Williams Inglis* involved the question of whether the plaintiffs could rely on their originally filed pleadings when the entire nature of the vertical conspiracy claim was not evident from the original complaint.  *Id.* at 1053.  The Ninth Circuit held that the plaintiff had sufficiently placed the defendant on notice about its vertical conspiracy claim by identifying the unnamed coconspirators in answers to interrogatories a year before trial.  *Id.* at 1053-54.  The Ninth Circuit further explained that "the factual relationship" between the defendant and the vertical conspiracy coconspirators had also been explored in discovery.  And plaintiff also sought to "develop evidence of [Defendant's] specific intent to monopolize the wholesale bread market."  *Id.* at 1054.

Here, the Court finds that the relevant question is not whether Plaintiffs named all of the coconspirators, but whether Plaintiffs have granted sufficient notice to the named coconspirators—either in their Complaint or through discovery—so that Defendants are not prejudiced.

The Complaint alleges that Bosch GmbH joined with other members of its distribution network to defraud Plaintiffs.  The scope of the distribution network "is a finite group whose members can be determined through discovery."  *Hewlett-Packard Co. v. Arch Assocs. Corp.*, 908 F. Supp. 265, 269 (E.D. Pa. 1995).  Plaintiffs' claim is also bolstered because the subject matter of the scheme is

adequately identified by the pleading.  *See American Health Sys. v. Crozer–*

*Keystone Health Sys.*, 93–0543, 1993 WL 533102 at *2 (E.D.Pa. Dec. 21, 1993)

(allowing suit with unnamed coconspirators to proceed because the pleading was

specific enough to permit a responsive pleading); *but see Garshman v. Universal*

*Resources Holding Inc.*, 824 F.2d 223, 230 (3d Cir.1987) (dismissing complaint

that did not specify coconspirators, contracts, nor unlawful acts).

### 3.  Pattern of Racketing Behavior

Bosch GmbH argues that Plaintiffs have failed to allege a substantive RICO

violation as it pertains to Bosch GmbH. Bosch GmbH indicates that a party can

only be held liable for RICO treble damages if it participated in the RICO

enterprise's affairs by committing two or more predicate racketeering acts.  *See* 18

U.S.C. § 1962(c); *see also Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 604-05

(E.D. Mich. 2015) ("[I]n a multi-defendant § 1962(c) action, . . . a plaintiff must

allege that each defendant individually committed at least two predicate acts.").

Bosch GmbH contends that Plaintiffs have only alleged that it sold Ford an

EDC17, which violated the CAA.  Bosch GmbH asserts that Plaintiffs failed to

argue that it participated with Ford in any subsequent marketing campaign or any

other actions that may support a fraud claim.  [ECF No. 153, Pg.ID 7468]

Bosch GmbH further argues that even if Plaintiffs could provide facts

supporting the contention that Bosch GmbH participated in a scheme to

fraudulently obtain regulatory certificates, RICO does not cover such actions.  *See Cleveland v. United States*, 531 U.S. 12 (2000) (finding that a scheme to obtain regulatory approvals does not amount to a scheme to obtain "money or property" to support a mail fraud claim); *see also United States v. Murphy*, 836 F.2d 248, 253-54 (6th Cir. 1988) (reversing a mail fraud conviction premised on a misrepresentation to obtain state certificates to operate bingo games because the state certificates were not the state's "property"); *Williams v. Dow Chem. Co.*, 255 F. Supp. 2d 219, 225-26 (S.D.N.Y. 2003) ("The fraudulent statements and concealments allegedly directed at the EPA by Defendants do not constitute racketeering activity. . . . because the alleged [mail and wire fraud] scheme was designed to obtain EPA regulatory approval . . . , not to deprive the EPA of money or property.").

Bosch GmbH specifically claims that Plaintiffs' claim is indistinguishable from the rejected argument in *Cleveland*.  Bosch GmbH contends that the EPA decides whether to grant a certificate of conformity ("COC") based on "whether [a] vehicle or engine conforms with the regulations prescribed" by the CAA.  42 U.S.C. § 7525(a)(1).  Bosch argues that since the CAA "establishes a typical regulatory program," the EPA and California Air Resources Board's ("CARB") "core concern" when granting certificates is regulatory.  *Cleveland*, 531 U.S. at 13. Bosch also asserts that there is no allegation that it "defrauded the State of any

money to which the State was entitled by law" and that an alleged scheme to defraud the EPA and CARB is insufficient to establish a predicate RICO act.  *Id.* at 22.

Plaintiffs counter by asserting that *Cleveland* is "fully consistent with [their] RICO claims."  [ECF No. 162, Pg.ID 7770]  Plaintiffs contend that Bosch GmbH's citation of *Cleveland* is a red herring because the Supreme Court held that the defendant did not commit mail fraud because the defendant did not obtain money or property from *anyone*.  [*Id.*]  Plaintiffs assert that the Court rejected the government's argument that the State had "a property interest in its video poker licenses" and found that "a Louisiana video poker license in the State's hands is not 'property'" under § 1341.  *Cleveland*, 531 U.S. at 25.  Plaintiffs claim that the fact that regulatory licenses do not constitute property in mail or wire fraud underscores their argument that consumers, and not the EPA or CARB, were the direct victims of Bosch GmbH's scheme.

In response, Bosch GmbH argues that Plaintiffs incorrectly state that the defendant in *Cleveland* did not get money from *anyone*.  Bosch GmbH indicates that Plaintiffs omitted the fact that the defendant in *Cleveland* later used his illicitly obtained gambling licenses to obtain money from Louisiana gamblers.  *Id.* at 22.

Here, Plaintiffs argue that the COCs in the instant case were later used to obtain money from the sale of vehicles.  Bosch GmbH argues that a similar

28

argument was rejected in *Cleveland*.  Bosch GmbH explains that "[b]ecause the 'licenses pre-issuance' were not money or property in the hands of the regulators— just as the COCs are not—the expectation of revenue to be gained from the licenses was not sufficient to establish mail or wire fraud."  [ECF No. 163, Pg.ID 7788] (citing *Cleveland v. United States*, 531 U.S. 12, 22 (2000)) (footnote omitted).  Bosch GmbH also cites *Williams v. Dow Chem. Co.*, to further establish that "allegations of fraud on the EPA cannot be considered racketeering activity because the alleged scheme was designed to obtain EPA regulatory approval."  255 F. Supp. 2d 219, 226 (S.D.N.Y. 2003).

The Court finds that *Cleveland* and *Williams* have limited application to the instant case.  While Bosch GmbH's explanation of *Cleveland* is technically right, the Court notes that in both *Cleveland* and *Williams*, misrepresentations to a government agency provided the sole basis for the plaintiff's mail fraud theory.  Here, Plaintiffs do not base their wire and mail fraud claims on an assertion that Bosch GmbH fraudulently obtained COCs from the EPA; rather, Plaintiffs allege substantive RICO claims that Bosch GmbH participated in and had knowledge of.  Although Plaintiffs allege that Bosch GmbH fraudulently obtained COCs from the EPA, which were later used to induce Plaintiffs' purchases, the allegations go further than that.  Plaintiffs' theory of their case is that Defendants made material

misrepresentations that encouraged Plaintiffs to buy the Subject Vehicles based on what Plaintiffs thought they were buying—absent any EPA regulations.

The Complaint sufficiently outlines Bosch GmbH's alleged involvement in the design and implementation of the scheme to use defeat devices in the Subject Vehicles and explains how Bosch GmbH, Bosch LLC, and Ford collaborated to market and conceal the alleged deception. The Complaint provides that:

> [Defeat devices] were manufactured by Bosch GmbH and sold to Ford. Bosch built the ECU hardware and developed the software running in the ECU. Bosch developed a "function sheet" that documents the functional behavior of a particular release of the ECU firmware. All function sheets used in the Ford EDC, on information and belief, bear a 'Robert Bosch GmbH' copyright.

[ECF No. 73, Pg.ID 2641]  While it is true that the alleged scheme to defraud consumers included misrepresentations to the EPA, the EPA is not alleged to be the wire or mail fraud victim.  Additional facts may illuminate the breadth of Bosch GmbH's involvement.  But for the purposes of the Motion to Dismiss, Plaintiffs have sufficiently established facts alleging a pattern of racketeering.

Plaintiffs assert that Bosch GmbH misunderstands RICO and that each defendant need only "participate, directly or indirectly" in the enterprise.  18 U.S.C. § 1962(c).  Citing *Reves v. Ernst & Young*, Plaintiffs indicate that the Supreme Court has held that "the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, . . . but *some* part in directing the enterprise's affairs is required."  *Reves v.*

*Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis in original).  Plaintiffs further

explain that RICO conspiracy liability may be established "even if a conspirator

does not agree to commit or facilitate each and every part of the substantive

offense."  *Salinas v. United States*, 522 U.S. 52, 63–64 (1997).  The partners in the

criminal plan must agree to pursue the same criminal objective and may divide up

the work, yet each is responsible for the acts of each other.  *Id.*

Plaintiffs assert that they allege in detail that Bosch GmbH played more than

"some part" in the enterprise, and that Bosch GmbH played a crucial role in the

pattern of racketeering.  Bosch GmbH counters by asserting that Plaintiffs

incorrectly cite *Reves v. Ernest & Young*, and that *Reves* only dealt with the narrow

issue of "the meaning of the phrase 'to conduct or participate, directly or indirectly,

in the conduct of such enterprise's affairs.'"  507 U.S. at 177.  Bosch GmbH

contends that *Reves* did not address the separate requirement that a defendant's

participation be "through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

"A pattern of racketeering activity requires at least two predicate acts of

racketeering related to the enterprise that amount to continued criminal activity."

*United States v. Nicholson*, 716 F. App'x 400, 407 (6th Cir. 2017) (citing 18

U.S.C. § 1961(5)); *see also H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239

(1989); *United States v. Corrado*, 227 F.3d 543, 554 (6th Cir. 2000) (explaining

the "relationship plus continuity" test).  The required predicate acts need not be

directly interrelated to establish the required relationship, as long as the acts are connected to the enterprise's affairs and operations. *United States v. Lawson*, 535 F.3d 434, 444 (6th Cir. 2008); *see also H.J. Inc.*, 492 U.S. at 240.

Here, the Court cites to its previous Order to explain that Plaintiffs have adequately alleged a pattern of racketeering behavior.  The Court's previous Order found that "[b]ut for Bosch LLC working with Ford to make the defeat devices, Plaintiffs would not have overpaid for the vehicles."  [ECF No. 69, Pg.ID 2410] The Court agrees with Plaintiffs' contention that they need not allege that Bosch GmbH participated in every activity carried out by the members of the RICO scheme.  Only that Bosch GmbH's creation of the defeat device for every vehicle demonstrates Bosch GmbH's active participation in the pattern of racketing activity.  *See Salinas*, 522 U.S. at 65 (finding that predicate acts can be committed if the defendant "adopt[ed] the goal of furthering or facilitating the criminal behavior" as long as the defendant "share[d] a common purpose" with its coconspirators).

The Court is persuaded by Plaintiffs' citation to *Duramax*, which opines that "Bosch has provided no authority for the proposition that a RICO defendant may avoid liability simply by identifying a separate action by its codefendant which partially contributed to the plaintiff's injury (especially when, as here, the Plaintiffs allege that the RICO Defendants worked together to cause the injury").  298 F.

Supp. 3d 1074-75.  Plaintiffs claim that "[s]uch an assertion is facially absurd."  *Id.*
at 1075.

Bosch GmbH also claims that Plaintiffs' citation to *Salinas* is misplaced.
Because Plaintiffs allegedly failed to state a claim under § 1962(c), Bosch GmbH
asserts Plaintiffs' § 1962(d) claim must also fail.  *See United States v. Driver*, 535
F.3d 424, 433 (6th Cir. 2008) (overturning § 1962(d) conviction where "the
evidence was insufficient to establish that [defendant] intended to further an
endeavor which, if completed, would satisfy all of the elements of [the] substantive
[RICO] criminal offense") (internal citations and marks omitted).  This argument
fails because the Court has found that Plaintiffs sufficiently established their claim
under § 1962(c).

Bosch GmbH also claims that any alleged promotions that Bosch GmbH was
involved with are too attenuated from Plaintiffs' alleged injury to support predicate
acts of mail and wire fraud.  *Heinrich v. Waiting Angels Adoption Services, Inc.*,
668 F.3d 393, 404-06 (6th Cir. 2012).  *Heinrich* involved a RICO claim premised
on an adoption agency's fake references that they circulated via emails to potential
clients.  *Id.*  The Sixth Circuit rejected the RICO claim because the emails just put
the plaintiffs "in a position to be defrauded by other, unrelated representations
concerning the availability of specific children or how adoption fees will be spent."
*Id.* at 405.  Plaintiffs assert that the instant case differs from *Heinrich* because here,

Plaintiffs' injuries were the direct result of Defendants' alleged fraudulent conduct—not other, unrelated representations.  The Court agrees.

Bosch GmbH argues that Plaintiffs have provided no evidence to establish that Bosch GmbH had a relationship or produced a statement that would create a duty on Bosch GmbH to disclose information to Ford's customers.  [ECF No. 153, Pg.ID 7472]  Bosch GmbH concedes that this Court previously determined that Plaintiffs did not need to show that Bosch LLC had a duty to disclose.  [*Id.*] However, Bosch GmbH contends that the Court should have considered *United States v. Jamieson*, 427 F.3d 394, 415 (6th Cir. 2005).

In *Jamieson*, the Sixth Circuit found that courts must "guard[] against the jury finding that a simple omission, independent of any other statements encouraging trust and confidence in the defendant, can constitute [mail or wire] fraud."  *Id.*; *but see United States v. Autuori*, 212 F.3d 105, 119 (2nd Cir.2000) ("A duty to disclose can also arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading.").  While *Jamieson* holds true, the Court finds the Sixth Circuit has additional authority more applicable here.  *See Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 153 (6th Cir. 1987).

In *Blount*, the Sixth Circuit explained that "in order to establish a scheme to defraud, which is an essential element of mail fraud, there must be proof of

misrepresentations or *omissions* which were reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* (internal quotations and citations omitted) (emphasis added).  Finding that the plaintiff was just as qualified to discover the "true" prime rate, the court of appeals opined that "[a]n ordinary and prudent business person in the financial field would not have merely accepted [the defendant's] quotation of the prime rate," but would have independently verified it. *Id.*

Here, the Court finds that Plaintiffs have sufficiently alleged that Bosch GmbH's omissions satisfy the RICO pleading criteria explained in *Blount*.  An "ordinary and prudent" consumer would not know and could not discover Defendants' alleged scheme or know that they omitted material information.

Arguing that the case is inapposite, Plaintiffs contest Defendants' citation to *United States v. Shields*, 844 F.3d 819, 823 (9th Cir. 2016) ("[I]t was error to not instruct the jury that it must find a relationship creating a duty to disclose before it could conclude that a material non-disclosure supports a wire fraud charge.").  Plaintiffs argue that *United States v. Stewart* is more applicable here.  728 F. App'x 651 (9th Cir. 2018) (holding that "in a case involving half-truths, the duty to disclose arises from the truth half-spoken, not from a separate duty," which means the jury did not need to find a separate duty to disclose); *see also Kriss v. Bayrock Grp. LLC*, 2017 WL 1901966, at *2 (S.D.N.Y. May 8, 2017) (finding that the

defendant had a RICO duty to disclose information that "could not have been discovered through the exercise of ordinary intelligence because Defendants allegedly sought to conceal it from not only Plaintiffs and other investors but also government regulators"). Because the instant matter involves active concealment or half-truths and not pure omissions, the Court agrees with Plaintiffs that *Stewart* is more persuasive than *Shields*.

### 4. Cognizable Rico Injury

Bosch GmbH argues that Plaintiffs have failed to "identify a 'reasonable and principled basis of recovery.'" *Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989). Bosch GmbH also asserts that Plaintiffs' injuries are too speculative for the Court to accept. *See Tri-State Express, Inc. v. Cummins Engine Co.*, 2000 U.S. Dist. LEXIS 23564, at *17 (D.D.C. Sept. 11, 2000) ("Plaintiffs' claim of having paid more than fair-market value for their trucks [with alleged defeat devices] because of defendants' misrepresentations . . . falls short of demonstrating RICO injury."); *see also In re General Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *16 (S.D.N.Y. July 15, 2016) ("[C]ourts . . . have found speculative, expectation-based . . . damages to be incompatible with RICO.").

Bosch GmbH argues that Plaintiffs cannot bring a RICO claim premised on an alleged design defect that had not yet manifested. *Compare In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1089-

90 (S.D. Ind. 2001) (finding that tires "may" be defective) *with Bailey v. Atl. Auto. Corp.*, 992 F. Supp. 2d 560, 579 (D. Md. 2014) (discussing the purchase of a used car that the defendant represented as new); *see also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 220 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

Bosch GmbH also argues that Plaintiffs seek to overcome a foreclosed RICO claim with creative pleading. [ECF No. 153, Pg.ID 7475] Bosch GmbH claims that Plaintiffs are trying to recast a non-RICO expectation injury into an injury to "business or property." *See Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 566 (6th Cir. 2013) ("[R]acketeering activity leading to a loss or diminution of benefits the plaintiff expects to receive under a workers' compensation scheme does not constitute an injury to 'business or property under RICO.'").

In response, Plaintiffs assert that several courts nationwide have previously rejected Bosch GmbH's argument. *See Bledsoe v. FCA US LLC*, 2019 WL 1379588, at *9 (E.D. Mich. Mar. 27, 2019); *see also In re Mercedes-Benz*, 2019 WL 413541, at *9–12; *Counts*, 2018 WL 5264194, at *3-5; *In re Volkswagen*, 349 F. Supp. 3d at 904–05; *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 959-61 (N.D. Cal. 2018); *Duramax*, 298 F. Supp. 3d at 1067-73.

The Court finds that Plaintiffs' overpayment theory of their RICO injury is valid. The Court is persuaded by *In re Mercedes-Benz*, 2019 WL 413541, at \*12. *In re Mercedes-Benz* provides:

> Here, as in *Volkswagen, FCA*, and *Duramax*, Plaintiffs allege that Defendants participated in a scheme to place a defeat device in the Polluting Vehicles, rendering them defective from the moment they were manufactured. Because Defendants allegedly knew of—and orchestrated the creation of that defect, they had no intention of delivering vehicles with heightened fuel efficiency and environmental friendliness. *See Duramax*. 298 F. Supp. 3d at 1072 ("But, here, GM allegedly sold Duramax vehicles, for a premium. which did not perform as a reasonable consumer would expect. In other words, Defendants had no intention of delivering the emissions performance which consumers expected.").

*Id.* The Supreme Court has determined that "when a consumer . . . acquir[es] goods or services for personal use, [she] is injured in 'property' when the price of those goods or services is artificially inflated by reason of" Defendants' racketeering conduct. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). Guided by *Reiter*, the Court finds that Plaintiffs have alleged a cognizable RICO injury.

## III.   CONCLUSION

Based on the allegations in Plaintiffs' Complaint noted above, the Court's review of the parties' arguments, and the relevant caselaw, the Court determines that Plaintiffs have sufficiently met the pleading standards to warrant proceeding with the case. Through its analysis of the instant matter,

the Court finds that Plaintiffs have sufficiently satisfied the elements of a civil RICO claim to survive the instant Motion to Dismiss. The Court **DENIES** Defendant Bosch GmbH's Motion to Dismiss.

For the reasons stated above,

IT IS HEREBY ORDERED that Defendant Bosch GmbH's Motion to Dismiss [ECF No. 153] is **DENIED**.

IT IS ORDERED.

s/Denise Page Hood
DENISE PAGE HOOD
DATED: November 30, 2020          United States District Judge

39